UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ACUITY, A MUTUAL INSURANCE COMPANY,<br><br>      Plaintiff,<br><br>v.<br><br>RIVERDALE PACKAGING CORPORATION,<br><br>and<br><br>LORA PROPERTY INVESTMENTS, LLC<br><br>and<br><br>WOMBAT ACQUISITIONS LLC,<br><br>      Defendants. | Case No.: 4:24-cv-01277 |

### ACUITY'S MOTION FOR SUMMARY JUDGMENT

COMES NOW plaintiff Acuity, by and through its undersigned counsel of record, and pursuant to Rule 56, moves this Court for its order entering judgment in its favor as a matter of law on its Complaint for Declaratory Judgment and defendant Wombat's counterclaims.

Acuity is entitled to judgment as a matter of law because the assignment of insurance benefits between Riverdale and Wombat, is unenforceable against Acuity. Acuity did not consent to the assignment and the insurance policy includes an

unambiguous anti-assignment provision. Because the assignment is not enforceable against Acuity, Acuity has no contractual obligations to Wombat. Moreover, because Wombat does not enjoy the status of an insured under the policy, it lacks standing to assert any claim for breach of contract or vexatious refusal to pay.

Pursuant to Local Rule 4.01 (A) and (E), Acuity's separate memorandum in support of said motion and statement of uncontroverted facts are being filed contemporaneously with this motion.

## Introduction

Riverdale Packaging Corporation ("Riverdale") is a manufacturer of cardboard packaging products. (Acuity Statement of Uncontroverted Facts ("SOF") ¶1) Bill Nottke was President and C.E.O. of Riverdale Packaging until he passed away on November 6, 2025. (SOF ¶2.) Mr. Nottke formed Lora Property Investments, LLC for the purpose of owning company real estate, including a large warehouse ("the building") at 4501 Gustine Avenue, in St. Louis, Missouri. (SOF ¶3) The total footprint of the building was approximately 100,000 square feet. (SOF ¶3)

On or about January 20, 2024, while a portion of the building was being used by a subsidiary company of Riverdale, an exterior water pipe broke, which caused water to spray onto the roof of the building where it accumulated in the form of ice and/or snow. (SOF ¶¶4 and 5) As a result of this accumulation, a portion of the roof comprising approximately 10 percent of the total surface area collapsed from the excess weight. (SOF ¶¶6 and 7)



Aerial View of Building with Area of Collapse Indicated in Blue

At the time of the above-referenced incident, the building was insured under a commercial property insurance policy issued by Acuity. (SOF ¶9) Riverdale is identified as the named insured on the policy and Lora Investments is designated as an additional named insured. (SOF ¶¶9 and 10) Wombat is not a named in the policy, nor does it meet the definition of insured as that term is defined by the policy. (SOF ¶12)

> The policy contains the following language:
>
> Your [the insured's] rights and duties under this policy may not be transferred without our [Acuity's] written consent except in the case of death of an individual named insured.

(SOF ¶13)

3

Under the policy, the insured had a continuing duty of cooperation with the insured. (SOF ¶14) According to the policy, the insurer can require the insured to complete a statement of loss with supporting documentation for the purpose of determining if there is a disagreement between the insurer and insured. (SOF ¶15) After the statement of loss is presented, the insurer and insured can either negotiate a resolution of the claim, or in the alternative, they can invoke the arbitration provision. (SOF ¶16) The arbitration clause invokes a new series of reciprocal obligations under the policy, including the identification of a mutually agreeable appraiser, and if that cannot be accomplished, the appointment of an umpire. (SOF ¶17)

On January 23, Acuity claim specialist Dave Jostes was assigned as the primary claim handler on this loss. (SOF ¶19) Mr. Jostes immediately engaged Servpro to provide emergency remediation services. (SOF ¶20) He also engaged Newman Construction Company ("NCC") to estimate the scope and cost of repair work. (SOF ¶21) Mr. Jostes also engaged the services of Joseph Krause, a structural engineer with EFI Global, Inc., to inspect the building and determine the scope of structural damage. (SOF ¶22) Mr. Jostes engaged Servpro, NCC and EFI Global for the ultimate purpose of working for the insured, Riverdale, to perform remediation work and repair the property damage caused by the incident. (SOF ¶23)

On or about February 1, Mr. Jostes conducted an inspection with representatives of the owner and above-referenced contractors. (SOF ¶24) During that inspection the participants discussed and agreed to the general scope of

4

necessary repairs. (SOF ¶25) On March 1, EFI structural engineer Joseph Krause issued his report on the nature and scope of structural damage to the building. (SOF ¶26) Generally speaking, the report called for the replacement of the collapsed portion of the roof, in addition to the replacement of other affected areas immediately adjacent to the location of the collapse. (SOF ¶27) On the same day, Mr. Jostes sent a copy of the EFI report to Bill Nottke. (SOF ¶28)

On April 3, in his preliminary written estimate for building repairs, NCC building consultant Tom Celosky estimated the total cost of repair to be $1,179,293. (SOF ¶29)

On April 30, Mr. Jostes learned that another party had expressed interest in purchasing the Building. (SOF ¶30)

During all of his interactions with Mr. Jostes regarding this claim, Mr. Nottke was cooperative. (SOF ¶31) Mr. Nottke never expressed to Mr. Jostes any concern or disagreement about the scope or cost of repair. (SOF ¶32)

On May 24, Mr. Jostes received a call from Michael Paul Michio, who identified himself as a representative of the buyer. (SOF ¶33) Mr. Michio was part of the ownership group purchasing the building. (SOF ¶34) At that time, Mr. Michio advised Mr. Jostes that the insurance claim benefits would be assigned to the buyer. Mr. Michio further advised that the buyer had its own general contractor who would need to assess the loss. (SOF ¶35) Mr. Jostes advised Mr. Michio was not consenting to the assignment of benefits. (SOF ¶36)

On or about June 11, Riverdale/Lora sold the Building to Wombat. (SOF ¶37)

On June 15, Mr. Jostes received an email from Mr. Michio instructing him that all future payments should be sent to Wombat Acquisitions and to refrain from making any further payments to other parties or contractors. (SOF ¶38) In that same email, Mr. Michio said the buyer's general contractor would "assess a permanent repair" and perform all future repairs. (SOF ¶39)

On July 22, Mr. Jostes informed Mr. Nottke by email that Acuity was not consenting to an assignment of claim benefits to Wombat and he asked Mr. Nottke to complete an attached Sworn Proof of Loss form. (SOF ¶40)

On August 3, Mr. Michio sent another email to Mr. Jostes complaining about the alleged failure of Acuity to pay Wombat funds owed under the policy and asking Mr. Jostes for an explanation. (SOF ¶41) In that same email, Mr. Michio attached an estimate of the repair cost in the amount of $9,519,891.86. (SOF ¶41) Mr. Michio, who was part of the investment group purchasing the building, personally prepared the estimate, though he did not identify himself as the estimator on the document itself. (SOF ¶¶42-43) Instead, in the computer form section for the name of the estimator, Mr. Michio inserted the address. (SOF ¶43)

Mr. Michio's estimate was based on his belief that the entire 100,000 square foot roof needed to be replaced. (SOF ¶44.) Aside from his experience as a public adjuster, Mr. Michio has no experience in engineering, architecture, construction, roofing or plumbing. (SOF ¶45.) Nor did he consult an engineer until after the lawsuit was filed. (SOF ¶45.) Despite his claim that he had prepared cost of repair estimates for several incidents involving roof collapses, he could not recall specific

6

information about any of them sufficient to allow counsel for Acuity to confirm the the claim. (SOF ¶46)

On August 3, Mr. Michio sent an email to Mr. Nottke (with a copy to Mr. Jostes) in which he stated: "If the insurer does not analyze this matter properly and violates and [sic] term or condition of the policy or governing law we will consider all remedies available to seek resolution." (SOF ¶47)

On August 13, Mr. Michio again wrote to Mr. Jostes alleging that Acuity had "failed to treat us properly," that it had engaged in conduct amounting to "vexatious refusal to pay a valid insurance claim," and threatening legal action. (SOF ¶48)

On the same day, Mr. Jostes issued payment to Riverdale in the amount of $836,124.37 for the unpaid balance of the NCC estimate for the cost of building repair. (SOF ¶49) This payment was in addition to $462,983.08 already paid by Acuity for mitigation, replacement of building contents and consultants. (SOF ¶49)

On August 29, Acuity (through counsel) offered to settle the building repair claim with Riverdale for a total of $1.3 million, which allowed for $263,874.63 in additional unforeseen expenses. (SOF ¶50.) Mr. Nottke, who is now deceased, did not respond to that offer, nor did he provide a sworn statement proof of loss. (SOF ¶51)

In 2024, Mr. Michio and his public adjusting company was investigated by the Iowa Insurance Commissioner for endorsing checks on behalf of insureds and banks without proper authorization, failing to release client funds, failing to communicate or respond to inquiries from insureds, and taking higher fee amounts

7

than they were entitled to. (SOF ¶52.) As a result of this investigation, Mr. Michio and his company were ordered to pay a total of more than $1.3 million in restitution, penalties and fees. (SOF ¶53.) His public adjusters license was revoked in the state of Iowa and he was permanently banned from applying for a public adjuster license in that state. (SOF ¶53.)

The issue raised by Acuity's Complaint for Declaratory Judgment is whether Michael Paul and Wombat can be supplanted in place of Riverdale as the insured in this case without Acuity's consent. Because such a result is prevented under Missouri law, not to mention basic rules of fairness, Wombat is not an insured under the Acuity policy and judgment should be entered in favor of Acuity on its Complaint for Declaratory Judgment and on all counts asserted in Wombat's counterclaim.

WHEREFORE, for reasons set forth in its memorandum in support of this motion, plaintiff Acuity respectfully requests an order of this Court entering judgment in its favor on the Complaint for Declaratory Judgment and all counts in Wombat's counterclaim, and for such additional relief as the Court deems appropriate under the circumstances.

Respectfully submitted,

BAKER STERCHI COWDEN & RICE LLC

/s/ Michael Shunk
James R. Jarrow MO # 38686
Michael W. Shunk MO # 43841
2400 Pershing Road, Suite 500
Kansas City, Missouri 64108
Tel: (816) 471-2121
jarrow@bakersterchi.com
mshunk@bakersterchi.com
ATTORNEYS FOR PLAINTIFF ACUITY, A MUTUAL INSURANCE COMPANY

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was served on all parties of record by operation of the Court's electronic case filing and case management system on February 11, 2026.

/s/ Michael Shunk