UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ACUITY, A MUTUAL INSURANCE COMPANY, | |
| Plaintiff, | |
| v. | |
| RIVERDALE PACKAGING CORPORATION, | Case No.: 4:24-cv-01277 |
| and | |
| LORA PROPERTY INVESTMENTS, LLC | |
| and | |
| WOMBAT ACQUISITIONS LLC, | |
| Defendants. | |

**ACUITY'S STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

COMES NOW plaintiff Acuity, by and through their undersigned counsel of record, and pursuant to Rule 56 and Local Rule 4.01(E), submits the following statement of uncontroverted material facts in support of its motion for summary judgment.

1. Riverdale Packaging Corporation ("Riverdale") is a manufacturer of cardboard packaging products. (Riverdale Responses to Acuity's Second Request for Admissions, ¶1 attached as Exhibit 1.)

2.  Bill Nottke was Riverdale's President and C.E.O. until he passed away on November 6, 2025. (Riverdale Responses to Acuity's Second Request for Admissions, ¶2 attached as Exhibit 1.)

3.  Mr. Nottke formed Lora Property Investments, LLC ("Lora Property") to own company real estate, including a large (approximately 100,000 square feet) warehouse building located at 4501 Gustine Avenue (the "Building"). (Riverdale responses to Acuity's Second Request for Admissions, ¶¶3 and 4, attached as Exhibit 1.)

4.  In January of 2024, a portion of the building was being used by a subsidiary company of Riverdale. (Riverdale responses to Acuity's Second Request for Admissions, ¶5 , attached as Exhibit 1.)

5.  On or about January 20, 2024, an exterior water pipe broke, which caused water to spray onto the roof of the building. (Riverdale Responses to Acuity's Second Request for Admissions, ¶6, attached as Exhibit 1.)

6.  On or about that date, a portion of the roof of the building collapsed due to the accumulation of ice and snow. (Riverdale Responses to Acuity's Second Request for Admissions, ¶7, attached as Exhibit 1.)

7.  The area of the roof collapse was approximately 10 percent of the total surface area of the roof. (Riverdale Responses to Acuity's Second Request for Admissions, ¶8, attached as Exhibit 1.)

8.  The photograph marked Photo No. 1 on Exhibit A of Riverdale's Responses to Acuity's Second Request for Admissions depicts an aerial photograph of the roof

with the collapsed area depicted in blue. (Riverdale Responses to Acuity's Second Request for Admissions, ¶9 attached as Exhibit 1.)

9. The photograph marked Photo No. 15 on Exhibit B of Riverdale's Responses to Acuity's Second Request for Admissions depicts the portion of the roof that collapsed. (Riverdale Responses to Acuity's Second Request for Admissions, ¶10 attached as Exhibit 1.)

10. Riverdale is the named insured on an Acuity insurance policy, which covered the company's commercial property, including the Building. (Affidavit of Dave Jostes, ¶2, attached as Exhibit 2)

11. Lora Property is an additional named insured on that policy. (Affidavit of Dave Jostes, ¶3, attached as Exhibit 2)

12. Wombat is not identified as a named insured on the policy, nor does Wombat fall within the definition of an insured under the policy. (Exhibit A to Affidavit of Dave Jostes (Exhibit 2).)

13. The policy provides, "[the insured's] rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured." (Exhibit A to Affidavit of Dave Jostes (Exhibit 2), Section K(2), Bates No. Acuity 0182.)

14. According to the policy, the insured had a continuing duty of cooperation with the insured. (Exhibit A to Affidavit of Dave Jostes (Exhibit 2), Section E(3)(a)(8), Bates No. Acuity 0120.)

15. According to the policy, the insurer can require the insured to complete a statement of loss with supporting documentation for the purpose of determining if there is a disagreement between the insurer and insured. Exhibit A to Affidavit of Dave Jostes (Exhibit 2), Section E(3)(a)(7), Bates No. Acuity 0120.)

16. After the statement of loss is presented, the insurer and insured can either negotiate a resolution of the claim, or in the alternative, they can invoke the arbitration provision. (Exhibit A to Affidavit of Dave Jostes (Exhibit 2), Section E(4)(g), Bates No. Acuity 0121.)

17. The arbitration clause invokes a new series of reciprocal obligations under the policy, including the identification of a mutually agreeable appraiser, and if that cannot be accomplished, the appointment of an umpire. (Exhibit A to Affidavit of Dave Jostes (Exhibit 2), Section E(2)(g), Bates No. Acuity 0120.)

18. Shortly after the incident was reported, a representative of Acuity arrived on-site site to meet with a representative of the insured. (Affidavit of Dave Jostes, ¶11, attached as Exhibit 2.)

19. On January 23, Acuity claim specialist Dave Jostes was assigned as the primary claim handler on this loss. (Affidavit of Dave Jostes, ¶12, attached as Exhibit 2.)

20. Mr. Jostes immediately engaged Servpro to provide emergency remediation services. (Affidavit of Dave Jostes, ¶13, attached as Exhibit 2)

21.  He also engaged Newman Construction Company ("NCC") to estimate the scope and cost of repair work. (Affidavit of Dave Jostes, ¶14, attached as Exhibit 2.)

22.  Mr. Jostes also engaged the services of Joseph Krause, a structural engineer with EFI Global, Inc., to inspect the building and determine the scope of structural damage. (Affidavit of Dave Jostes, ¶15, attached as Exhibit 2.)

23.  Mr. Jostes engaged Servpro, NCC and EFI Global for the ultimate purpose of working for the insured, Riverdale, to perform remediation work and repair the property damage caused by the incident. (Affidavit of Dave Jostes, ¶16, attached as Exhibit 2.)

24.  On February 1, Mr. Jostes conducted an inspection with a representatives of the owner and above-referenced contractors. (Affidavit of Dave Jostes, ¶17, attached as Exhibit 2.)

25.  During that inspection the participants discussed and agreed to the general scope of necessary repairs. (Affidavit of Dave Jostes, ¶18, attached as Exhibit 2.)

26.  On March 1, EFI structural engineer Joseph Krause issued his report on the nature and scope of structural damage to the building. (Affidavit of Dave Jostes, ¶19, attached as Exhibit 2.)

27.  Generally speaking, the report called for the replacement of the collapsed portion of the roof, in addition to the replacement of other affected areas

immediately adjacent to the location of the collapse. (Affidavit of Dave Jostes, ¶20, attached as Exhibit 2.)

28. On the same day, Mr. Jostes sent a copy of the EFI report to Bill Nottke. (Affidavit of Dave Jostes, ¶20, attached as Exhibit 2.)

29. On April 3, in his preliminary written estimate for building repairs, NCC building consultant Tom Celosky estimated the total cost of repair to be $1,179,293. (Affidavit of Dave Jostes, ¶22, attached as Exhibit 2.)

30. On April 30, Mr. Jostes learned that another party had expressed interest in purchasing the Building. (Affidavit of Dave Jostes, ¶23, attached as Exhibit 2.)

31. During all of his interactions with Mr. Jostes regarding this claim, Mr. Nottke was cooperative. (Affidavit of Dave Jostes, ¶24, attached as Exhibit 2.)

32. Mr. Nottke never expressed to Mr. Jostes any concern or disagreement about the scope or cost of repair. (Affidavit of Dave Jostes, ¶25, attached as Exhibit 2.)

33. On May 24, Mr. Jostes received a call from Michael Paul Michio, who identified himself as a representative of the buyer. (Affidavit of Dave Jostes, ¶26, attached as Exhibit 2.)

34. Mr. Michio was also part of the ownership group purchasing the building. (Dep. Michael Michio, 45:5-16; 47:5-16, attached as Exhibit 3.)

35. At that time, Mr. Michio advised Mr. Jostes that the insurance claim benefits would be assigned to the buyer. Mr. Michio further advised that the buyer

had its own general contractor who would need to assess the loss. (Affidavit of Dave Jostes, ¶27, attached as Exhibit 2.)

36.  Mr. Jostes advised Mr. Michio was not consenting to the assignment of benefits. (Affidavit of Dave Jostes, ¶28, attached as Exhibit 2.)

37.  On or about June 11, Riverdale/Lora sold the Building to Wombat. (Affidavit of Dave Jostes, ¶29, attached as Exhibit 2.)

38.  On June 15, Mr. Jostes received an email from Mr. Michio instructing him that all future payments should be sent to Wombat Acquisitions and to refrain from making any further payments to other parties or contractors. (Affidavit of Dave Jostes, ¶30, attached as Exhibit 2.)

39.  In that same email, Mr. Michio said the buyer's general contractor would "assess a permanent repair" and perform all future repairs. (Affidavit of Dave Jostes, ¶31, attached as Exhibit 2.)

40.  On July 22, Mr. Jostes informed Mr. Nottke by email that Acuity was not consenting to an assignment of claim benefits to Wombat and he asked Mr. Nottke to complete an attached Sworn Proof of Loss form. (Affidavit of Dave Jostes, ¶¶32-33, attached as Exhibit 2.)

41.  On August 3, Mr. Michio sent another email to Mr. Jostes complaining about the alleged failure of Acuity to pay Wombat funds owed under the policy and asking Mr. Jostes for an explanation. In that same email, Mr. Michio attached an estimate of the repair cost in the amount of $9,519,891.86. (Affidavit of Dave Jostes, ¶34, attached as Exhibit 2.)

42. Mr. Michio personally prepared the estimate he submitted to Mr. Jostes including a repair cost of $9,519,891.86. (Dep. Michael Michio, 77:12-18, attached as Exhibit 3.)

43. Mr. Michio did not identify himself as the person who prepared the estimate. Instead, in the computer form section for the name of the estimator, Mr. Michio inserted the address. (Dep. Michael Michio, 76:19-77:18, attached as Exhibit 3.)

44. Mr. Michio's estimate was based on his belief that the entire 100,000 square foot roof needed to be replaced. (Dep. Michael Michio, 83:6-13, attached as Exhibit 3.)

45. Aside from his experience as a public adjuster, Mr. Michio has no experience in engineering, architecture, construction, roofing or plumbing. Nor did he consult an engineer until after the lawsuit had been filed. (Dep. Michael Michio, 6:6-8:1; 8:23-9:20; 11:13-12:7; 56:19-57:17, attached as Exhibit 3.)

46. Despite his claim that he had prepared cost of repair estimates for several incidents involving roof collapses, he could not recall specific information about any of them sufficient to allow counsel for Acuity to confirm the the claim. (Dep. Michael Michio, 15:25-17:21; 78:25-79:23, attached as Exhibit 3.)

47. On August 3, Mr. Michio sent an email to Mr. Nottke (with a copy to Mr. Jostes) in which he stated: "If the insurer does not analyze this matter properly and violates and [sic] term or condition of the policy or governing law we will consider

all remedies available to seek resolution." (Affidavit of Dave Jostes, ¶35, attached as Exhibit 2)

48.  On August 13, Mr. Michio again wrote to Mr. Jostes alleging that Acuity had "failed to treat us properly," that it had engaged in conduct amounting to "vexatious refusal to pay a valid insurance claim," and threatening legal action. (Affidavit of Dave Jostes, ¶36, attached as Exhibit 2)

49.  On the same day, Mr. Jostes issued payment to Riverdale in the amount of $836,124.37 for the unpaid balance of the NCC estimate for the cost of building repair. This payment was in addition to $462,983.08 already paid by Acuity for mitigation, replacement of building contents and consultants. (Affidavit of Dave Jostes, ¶¶37-38, attached as Exhibit 2)

50.  On August 29, Acuity (through counsel) offered to settle the building repair claim with Riverdale for a total of $1.3 million, which allowed for $263,874.63 in additional unforeseen expenses. (Affidavit of Dave Jostes, ¶39, attached as Exhibit 2.)

51.  Mr. Nottke, who is now deceased, did not respond to that offer, nor did he provide a sworn statement proof of loss. (Affidavit of Dave Jostes, ¶¶40-41, attached as Exhibit 2.)

52.  In 2024, Mr. Michio and his public adjusting company was investigated by the Iowa Insurance Commissioner for endorsing checks on behalf of insureds and banks without proper authorization, failing to release client funds, failing to communicate or respond to inquiries from insureds, and taking higher fee amounts

than they were entitled to. (Dep. Michael Michio, 21:14-29:2 attached as Exhibit 3; and Michio deposition Exhibit 11, attached hereto as Exhibit 4.)

53. As a result of this investigation, Mr. Michio and his company were ordered to pay a total of more than $1.3 million in restitution, penalties and fees. His public adjusters license was revoked in the state of Iowa and he was permanently banned from applying for a public adjuster license in that state. (Dep. Michael Michio, 21:14-29:2, attached as Exhibit 3; and Michio deposition Exhibit 11, attached hereto as Exhibit 4.)

WHEREFORE, for reasons set forth in its memorandum in support of this motion, plaintiff Acuity respectfully requests an order of this Court entering judgment in its favor on the Complaint for Declaratory Judgment and all counts in Wombat's counterclaim, and for such additional relief as the Court deems appropriate under the circumstances.

Respectfully submitted,

BAKER STERCHI COWDEN & RICE LLC

/s/ Michael Shunk
James R. Jarrow MO # 38686
Michael W. Shunk MO # 43841
2400 Pershing Road, Suite 500
Kansas City, Missouri 64108
Tel: (816) 471-2121
jarrow@bakersterchi.com
mshunk@bakersterchi.com
ATTORNEYS FOR PLAINTIFF ACUITY,
A MUTUAL INSURANCE COMPANY

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was served on all parties of record by operation of the Court's electronic case filing and case management system on February 11, 2026.

/s/ Michael Shunk