1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF MISSOURI
2                      EASTERN DIVISION

3    ACUITY, A MUTUAL          )
     INSURANCE COMPANY,        )
4                              )
              Plaintiffs,      )
5                              )
              -vs-             )   No. 4:24-cv-01277-MTS
6                              )
     RIVERDALE PACKAGING       )
7    CORPORATION, et al.,      )
                               )
8             Defendants.      )

9    DEPOSITION OF MICHAEL PAUL MICHIO, via Zoom

10   videoconference, produced, sworn and examined on

11   Monday, January 26, 2026, between the hours of

12   9:00 a.m. and 6:00 p.m. of said day, before:

13

14                   MARY KERKVLIET IVEY

15                   Missouri C.C.R. 529

16                    Kansas CSR 863

17

18   in a certain cause now pending in the United

19   States District Court, Eastern District of

20   Missouri, Eastern Division, wherein ACUITY, A

21   MUTUAL INSURANCE COMPANY is Plaintiff and

22   RIVERDALE PACKAGING CORPORATION, et al., are

23   Defendants.

24

25           Taken on behalf of Plaintiff



Michael Paul Michio
January 26, 2026                                                    Page 2

```
 1                      INDEX

 2                                          Page

 3   Examination by Mr. Shunk                 5

 4   Examination by Mr. Ott                 187

 5   Re-Examination by Mr. Shunk            201

 6                    EXHIBITS

 7   Exhibit 1    Defendant/Counterclaim    150

 8                Plaintiff Wombat Acquisitions

 9                First Supplemental Rule 26(e)

10                Disclosures

11   Exhibit 2    Michio E-Mail to Jostes   158

12   Exhibit 3    (not identified)

13   Exhibit 4    Michio Estimate            76

14   Exhibit 5    Michio E-Mail to Nottke   175

15   Exhibit 6    Michio E-Mail to Nottke   176

16   Exhibit 7    Michio E-Mail to West     177

17   Exhibit 8    Michio E-Mail to Nottke and 179

18                West Dated 6/20/2024

19   Exhibit 9    Paul E-Mail to Jostes Dated 179

20                6/15/2024

21   Exhibit 10   West E-Mail to Michio Dated 181

22                6/12/2024

23   Exhibit 11   Iowa Insurance Commissioner 21

24                Ban

25   Exhibit 12   SERVPRO Estimate          100
```

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179


Michael Paul Michio
January 26, 2026                                                        Page 3

```
 1                    EXHIBITS (continued)

 2                                                   Page

 3   Exhibit 13    Witness's Internal Notes        166

 4

 5        (Exhibits provided electronically and

 6        e-mailed to counsel.)

 7

 8

 9

10

11

12

13

14

15

16

17                    STIPULATIONS

18        It is hereby stipulated and agreed by and

19   between counsel for the respective parties and

20   the witness that presentment of this deposition

21   to this witness is hereby waived, and that said

22   deposition shall be signed before the time of

23   trial.

24

25
```

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

```
 1                    APPEARANCES

 2

 3    For Plaintiff:

 4        Mr. Michael W. Shunk

 5        BAKER STERCHI COWDEN &

 6        RICE LLC

 7        2400 Pershing Road

 8        Suite 500

 9        Kansas City, Missouri 64108

10        Phone:  816-471-2121

11        E-mail:  mshunk@bakersterchi.com

12

13    For Defendants:

14        Mr. Joseph Ott

15        OTT LAW FIRM

16        75 West Lockwood

17        Webster Groves, Missouri 63119

18        Phone:  314-303-9360

19        E-mail:  joe@ott.law

20

21

22

23

24

25
```



```
 1                    (The deposition commenced at

 2             8:10 a.m.)

 3                    MICHAEL PAUL MICHIO,

 4   (of lawful age, having been duly sworn, testified

 5   as follows:)

 6   EXAMINATION BY MR. SHUNK:

 7     Q.  Please state your name.

 8     A.  Michael Paul Michio.

 9     Q.  Do you prefer to go by Mr. Paul or

10         Mr. Michio?

11     A.  Doesn't matter either way.

12     Q.  When did you start going by Michael Paul?

13     A.  As long as I can remember.

14     Q.  Okay.  So throughout your life you've gone

15         by both Michael Paul and Michael Michio?

16     A.  Yes.

17     Q.  Wouldn't that be confusing?

18     A.  I'm not sure, sir.

19     Q.  So that doesn't create confusion in your

20         life to have two different last names?

21                    MR. OTT:  I'm going to object on

22             the basis of relevance with respect to

23             questions about Mr. Paul's preferred

24             name.

25     A.  It's just the name provided to me, so it is
```

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



Michael Paul Michio
January 26, 2026

Page 6

```
 1        what it is.
 2   Q.  (By Mr. Shunk)  What name do you use on
 3        your tax returns?
 4                  MR. OTT:  Same objection.
 5   A.  Full name, Michael Paul Michio.
 6   Q.  (By Mr. Shunk)  Okay.  Do you have any
 7        background in the construction trades, such
 8        as electrical, plumbing, framing, roofing
 9        or any of the other construction trades?
10   A.  Only via -- just on -- on the job, working
11        with those types of vendors throughout my
12        career -- throughout my career, but I hold
13        no licensing in those trades.
14   Q.  In what capacity have you worked with folks
15        in the construction trades?
16   A.  As a building owner, as a building
17        consultant, as an insurance professional.
18   Q.  When did you work as a building consultant?
19   A.  Throughout my life, dating back to 2010.
20   Q.  And you've acted as a building consultant
21        in a professional capacity; in other words,
22        you've provided services for a fee to other
23        people as a building consultant?
24   A.  For the purpose of expert testimony, yes.
25   Q.  Okay.  So you've served as a building
```

888-893-3767
www.lexitaslegal.com

Lexitas operates all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



Michael Paul Michio
January 26, 2026

```
 1        consultant for the purpose of providing
 2        expert testimony; is that correct?
 3   A.   Yes, counselor.
 4   Q.   And have you ever done that outside the
 5        context of testifying as an expert?
 6   A.   I mean I guess I do that, you know, every
 7        day --
 8   Q.   Okay.
 9   A.   -- in my daily life.  So that's kind of
10        like my -- I really look at that as like my
11        overall work, if you will, other than being
12        a real estate investor.  That's my
13        expertise.
14   Q.   What training have you received in order to
15        become a building consultant?
16   A.   It's mostly through my insurance industry
17        work, through being licensed as an agent,
18        independent adjuster and public adjuster.
19   Q.   So you're saying it's all on-the-job
20        training through your work in the insurance
21        industry that you are qualified to serve as
22        a building consultant?
23   A.   Yes, sir.
24   Q.   And then what training did you receive to
25        become a public adjuster?
```

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

 LEXITAS

Michael Paul Michio
January 26, 2026

1    A.   A 40-hour course, passing an exam.

2             Somebody just knocked on my door.  Can

3         you give me one moment?

4    Q.   Yeah, sure.

5    A.   Sorry about that.

6    Q.   That's okay.

7             So I just want to be clear that beyond

8         your work in the insurance industry --

9         well, there was a pending question when you

10        got up.  I asked what training you received

11        to become a public adjuster.  You

12        referenced a 40-hour course and passing an

13        exam.  Was there any other training that

14        you received --

15   A.   I guess I just --

16   Q.   -- to become a public adjuster?

17   A.   It would just be, you know, passing

18        multiple state course examinations and then

19        also just testifying as an expert witness

20        really in this capacity.  That's really the

21        -- I don't know if that's considered

22        training or not, but that's my involvement.

23   Q.   Okay.  And beyond your work in the

24        insurance industry, do you have any

25        specialized education or training in

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

Michael Paul Michio
January 26, 2026

Page 9

1        plumbing?

2   A.   No.

3   Q.   Same question for roofing?

4   A.   No, sir.

5   Q.   Same question for framing?

6   A.   No.

7   Q.   Same question for electric, electrical?

8   A.   No.

9   Q.   Okay.  Do you have any specialized training

10       or education in the field of architecture?

11  A.   No.

12  Q.   Do you have any specialized training or

13       education in the field of engineering?

14  A.   No.

15  Q.   And so aside from the things that you have

16       to do in order to become licensed, there

17       would be nothing else that you did in order

18       -- in the way of training or education that

19       you did necessary to become a public

20       adjuster; is that right?

21  A.   The only other thing would be on-the-job

22       training and taking courses within The

23       Institutes.

24  Q.   What's the name of an institute that you've

25       taken a course from?

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



Michael Paul Michio
January 26, 2026

1    A.   It's called The Institutes.  It's an

2         insurance certification company.

3    Q.   Okay.  Who do they certify?

4    A.   Insurance professionals.

5    Q.   Does that include public adjusters?

6    A.   It would.

7    Q.   Are you certified by The Institutes?

8    A.   I need to look back on my transcript with

9         them.  I am in the midst of my CPCU

10        matriculation.  I may have my AIC

11        designation and I think I'm one course away

12        from the AINS designation.

13   Q.   So what's a CPCU?

14   A.   Chartered property casualty underwriter.

15   Q.   And underwriting is a different thing than

16        public adjusting, isn't it?

17   A.   Yes.

18   Q.   So do you plan to do work as an

19        underwriter?

20   A.   I don't know.

21   Q.   Why are you obtaining a CPCU certification?

22   A.   I know the name may allude to underwriting

23        specifically, but it's really just a --

24        it's the highest designation within the

25        insurance industry that I'm aware of.

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179
LEXITAS

Michael Paul Michio
January 26, 2026

```
 1   Q.   Okay.  What is the AIS -- AINS
 2        certification?
 3   A.   That one I do not -- I do not know what
 4        that acronym stands for, sir?  It's AINS.
 5        I would need to look it up.  I'm not sure.
 6   Q.   But you're working on getting a
 7        certification for that?
 8   A.   Yes.
 9   Q.   Do you know generally what it involves?
10   A.   It involves claims handling, general
11        insurance knowledge.  I think that that's
12        probably the best description.
13   Q.   Did you undergo any training in order to
14        become an estimator?
15   A.   I did the Xactimate online training courses
16        through Xactimate.
17   Q.   How long are those courses?
18   A.   It's really based on your -- I guess your
19        skill in writing in the system, but you can
20        go as long as you want.  I mean it's like a
21        never-ending learning tool.
22   Q.   Does Xactimate provide different levels of
23        certification?
24   A.   They do.
25   Q.   What level are you?
```



1    A.   I do not have any of the designations

2         through Xactimate.  I've only performed the

3         training online.  I did not sit for the --

4         I did not sit for the Level 1, 2 or 3

5         Xactimate.  I think there's also a Level 4

6         level training.  I did not sit for the

7         exam.

8    Q.   So they have four levels of certification

9         and you haven't been certified for any of

10        the four levels; is that correct?

11   A.   That's correct.

12   Q.   Have you obtained any other training in

13        order to become an estimator?

14   A.   Just on-the-job training.

15   Q.   Okay.  And when you say on the job, you're

16        referring to which job?

17   A.   Building consulting, appraising, umpiring,

18        public adjusting, independent adjusting.  I

19        think that that would probably provide a --

20        and I guess just general consulting, but

21        that would probably provide a pretty full

22        and accurate list.

23   Q.   Have you ever held yourself out as an

24        appraiser for purposes of insurance claims?

25   A.   Yes.

Michael Paul Michio
January 26, 2026

1  Q.  Okay.  Is that something that you do in

2      addition to your day job or has it ever

3      been your day job?

4  A.  **That's just something I do.  I probably**

5      **take on between ten and a hundred**

6      **appraisals a year, dating back -- dating**

7      **back to 2008.**

8  Q.  Who hires you for these appraisals?

9  A.  **Typically law firms.  Sometimes public**

10     **adjusting firms, sometimes directly through**

11     **the insured.**

12 Q.  And what do you mean when you say you're

13     doing appraising?  I mean I'm familiar with

14     different kinds of appraising.  What kind

15     of appraising are you referring to?

16 A.  **Cost analysis appraising.  It's the -- it's**

17     **the appraisal of the total amount of loss**

18     **of damage sustained to a property.**

19 Q.  And what training did you receive in order

20     to become an appraiser, that type of

21     appraiser?

22 A.  **Just on-the-job training and all of the**

23     **previous testimony regarding what we**

24     **previously spoke about, nothing else.**

25 Q.  Are there licenses and/or certifications

```
 1        that a person can become -- that a person

 2        can obtain or hold for appraising the type

 3        that you referred to, cost analysis

 4        appraising?

 5   A.   I don't believe there's any licensure, none

 6        that I'm aware.  There are a number of

 7        independent certification courses, none of

 8        which I have attended.

 9   Q.   Why not?

10   A.   It doesn't prevent me from acting as an

11        appraiser, so I've just never sought it

12        out.

13   Q.   Okay.

14   A.   It's really more or less becoming part of a

15        network group and I don't really know how

16        much weight those certifications hold.

17   Q.   What about umpiring, can I ask you the same

18        series of questions?  Have you ever just

19        held yourself out exclusively as an umpire

20        and that was your day job or was this just

21        something that you kind of did on the side

22        in addition to your day job?

23   A.   I would say that it's something I've done

24        dating back to probably 2014.  It's not

25        something I do very often.  I'm on a number
```



1    of lists to be an umpire, but you have to

2    be selected by a panel.  Umpire work is not

3    a main part of my daily life.

4  Q.  Have you ever been selected as an umpire?

5  A.  Yes.

6  Q.  How many times?

7  A.  Less than ten.

8  Q.  Okay.  And in each of those times, were you

9    the appraiser that was being offered by the

10   insured as opposed to the insurance

11   carrier?

12  A.  No, this was -- this would have been when I

13    was selected as the neutral third party for

14    the appraiser for the insured and appraiser

15    for the insured to present their

16    differences regarding a dispute.

17  Q.  Yeah, I understand.  So there must have

18    been a panel of appraisers offered by each

19    side and then a court would then designate

20    one of those appraisers to serve as an

21    umpire; is that right?

22  A.  Well, it's a three-party panel and so the

23    two appraisers would have had to have

24    selected me as the umpire.

25  Q.  Okay.  Okay.  Have you ever been involved



Michael Paul Michio
January 26, 2026

Page 16

```
 1        in any cases in any capacity involving the
 2        collapse of a warehouse roof?
 3   A.   Yes.
 4   Q.   Can you tell me where that building was
 5        located?  And I should -- let me back up
 6        and just ask, is it one occasion or more
 7        than one occasion?
 8   A.   I really thought through that as you asked
 9        the question.  That's right where my head
10        went.  It's probably less than a dozen
11        cases, some of them involving fire.  I'd
12        really have to go back and think about
13        this.  You know, I've handled like 10,000
14        of these claims in my lifetime, somewhere
15        around that number, maybe 5,000.  I don't
16        know.
17   Q.   So for any of the cases involving the
18        collapse of a roof -- and if it includes a
19        fire, that's fine.
20   A.   Uh-huh.
21   Q.   But I'm just asking about a warehouse
22        collapse of a roof.  Can you tell me the
23        location of any buildings where you served
24        as either a public adjuster or building
25        consultant or in any capacity at all?
```

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



Michael Paul Michio
January 26, 2026

1   **A.   I need to think about this and look to see**
2       **if there were claims of collapse.**
3   Q.   Okay.  Can you think of the location of any
4       one such building?
5   **A.   I can't off the top of my head, I cannot.**
6   Q.   Or can you think of who you were working
7       for for any such instance?
8   **A.   I would have been working directly for an**
9       **insured.  And we're going back a number of**
10      **years, so it's -- it's not something I can**
11      **just pull out of the top of my head.  I'm**
12      **sorry.**
13  Q.   Okay.  Yeah.  So there is no information
14      that you could provide me today that would
15      help me identify which building was
16      involved in a prior case where you were
17      involved in any capacity in a case where a
18      warehouse roof collapsed?
19  **A.   I couldn't provide you the specific**
20      **information off the top of my head, sir,**
21      **no, I could not.**
22  Q.   Okay.  As a public adjuster, are you always
23      advocating for the insured and against the
24      insurance carrier?
25  **A.   Yes.**

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

1    Q.   Is that the nature of public adjusting?

2    A.   **Yes.**

3    Q.   And no matter what the insurer has agreed

4         to do in terms of scope of repair or cost

5         of repair, you demand that the insurer --

6         you as the public adjuster demand that the

7         insurer do more or pay more; is that

8         correct?

9    A.   **Well, we only take on assignments in which**

10        **there is a validity to request more funding**

11        **or a different position based on the**

12        **insurance company's analysis, but if we do**

13        **take on a project in that capacity, that is**

14        **the purpose of the profession.**

15   Q.   Okay.  So after being hired as a public

16        adjuster, have you ever looked at a claim

17        and concluded that the insurance carrier

18        was paying all it owed on a claim such that

19        there was nothing more that you could do to

20        increase the value of a claim?

21   A.   **Yes.**

22   Q.   Can you give me any specific information

23        that would allow us to track down when that

24        happened and verify that it happened?

25   A.   **Yeah.  I know there's one for a commercial**



1       property owner, Josh Zieglowski.

2   Q.  How do you spell the last name?

3   A.  Z-i-e-g-l-o-s-k-i, out of Texas.

4   Q.  Okay.  So he hired you as an insured to

5       look at a claim, a property damage claim,

6       you looked at it and concluded there wasn't

7       anything you could do for him?

8   A.  Yes.

9   Q.  Where in Texas was Mr. -- was Josh's

10      building or his property?

11  A.  Denton is coming to mind, but I can't say

12      for certain.  I can't recall exactly.

13  Q.  What kind of a property was it?

14  A.  Large commercial structure, industrial.

15          There was -- there's a lot of these,

16      counselor, so I'm just trying to think of

17      ones like off the top of my head.  But

18      there's a number of claims that in the past

19      I've been engaged in, advised the insured I

20      could not proceed forward, there was

21      nothing else I could do for them.

22  Q.  How many times do you think that happened?

23      You say a lot.

24  A.  At least a hundred.

25  Q.  Okay.  Where are you currently licensed as

888-893-3767                    Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com          Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

Michael Paul Michio
January 26, 2026

1       a public adjuster?

2   **A.   I don't believe anywhere at this time.**

3   Q.   Where have you been licensed as a public

4       adjuster?

5   **A.   It's somewhere between 25 to 35 states.**

6   Q.   Why are you no longer licensed in any

7       states as a public adjuster?

8                   MR. OTT:   Objection, relevance.

9   **A.   I shifted to working in the real estate**

10      **professional sector and building**

11      **consultancy sector, acting as a risk**

12      **manager.  And part of my plan was just to**

13      **not renew the remainder of my licenses.**

14      **There's also one state in which my license**

15      **was revoked from me.**

16  Q.   (By Mr. Shunk)  Which state?

17  **A.   That was Iowa.**

18  Q.   Why was it revoked?

19  **A.   There was an administrative hearing in**

20      **which it was revoked -- I would defer to**

21      **the documents in relation to the**

22      **administrative hearing, but essentially it**

23      **was a business relationship that I had with**

24      **a roofing company that involved the**

25      **distribution of funds in which the State**

 1          believed that I did not handle that matter

 2          appropriately.

 3     Q.   Hang on just a second.

 4     A.   No problem.

 5     Q.   All right.  Can you see my screen?

 6     A.   I could but then it disappeared.  Oh, there

 7          we go.  Yeah, I can see it.

 8     Q.   Okay.

 9               MR. OTT:  Let me just object for

10          the record to this exhibit as being

11          hearsay, not within any exception, and

12          then also as to relevance.

13               MR. SHUNK:  Okay.

14     Q.   (By Mr. Shunk)  So, Mr. Michio, do you see

15          what I've got on the screen here, it's been

16          marked as Exhibit No. 11?

17     A.   Yes, counselor, I do.

18     Q.   Is this the Iowa State you were referring

19          to a minute ago?

20     A.   Yes.

21     Q.   Now, in this case -- hang on a second.  Are

22          you the Michael Michio that's referenced in

23          the headline there?

24     A.   Yes.

25               MR. OTT:  Hold on one second.



Michael Paul Michio
January 26, 2026                                                    Page 22

```
 1                 Let me just for the record make a
 2                 running objection.  Is that okay,
 3                 Michael, as to this line of
 4                 questioning?
 5                       MR. SHUNK:  Yeah.
 6                       MR. OTT:  So I would like a
 7                 running objection to this line of
 8                 questioning as being irrelevant and
 9                 improper character evidence and then in
10                 addition, that it -- as to this one in
11                 particular, it's hearsay, not within
12                 any exception.
13     Q.  (By Mr. Shunk)  So, Mr. Michio, in this
14         case, did the Iowa Insurance Commissioner
15         revoke your nonresident public adjuster
16         license?
17     A.  Yes.
18     Q.  And did the Insurance Commissioner also
19         permanently ban you and your company,
20         Claims Adjuster Group, Inc., from applying
21         for public adjuster's license?
22     A.  Yes, sir.
23     Q.  Did the Iowa Insurance Commissioner also
24         order you to pay more than $1 million in
25         restitution?
```



Michael Paul Michio
January 26, 2026

Page 23

1    A.   Yes.

2    Q.   Did the Insurance Commissioner also order

3         you to pay a civil penalty of $235,000?

4    A.   Yes.

5    Q.   Did the Insurance Commissioner also order

6         you to pay 68,000 plus some change in

7         investigation and prosecution costs?

8    A.   Yes.

9    Q.   Okay.  And in this case you had a contract

10        to provide public adjuster services to

11        clients of an Iowa contractor in 2020; is

12        that correct?

13   A.   Well, we were working directly with a

14        general contractor that was providing us

15        with direct referrals and so we had signed

16        up those clients and then there was a

17        business dispute between our firm and the

18        general contracting company.  And this is

19        basically what has stemmed out of that.

20   Q.   Okay.  Now, in that case, the Iowa

21        Insurance Division said that you endorsed

22        checks on behalf of insureds and banks

23        without proper authorization.  Was that

24        their allegation?

25   A.   That was their allegation, yes.

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



Michael Paul Michio
January 26, 2026

1    Q.   And did you in fact make -- did you in fact

2         endorse checks on behalf of insureds and

3         banks without proper authorization?

4    A.   No.

5    Q.   It was also alleged in that case that you

6         failed to release client funds.  Is that

7         correct, was that their allegation?

8    A.   Yeah.  Like I stated prior, it was a

9         business-related matter, business to

10        business, in which there was some

11        litigation involved.  The State stepped in

12        and this is the order.  We disagree with

13        the order.  The matter was, you know,

14        thoroughly investigated and resolved.  But,

15        yes, everything that you're reading was

16        alleged.

17   Q.   How about the failure to release client

18        funds, did you in fact fail to release

19        client funds?

20   A.   Absolutely not, no.

21   Q.   What about the failure to communicate or

22        respond to inquiries from insureds, did you

23        do that?

24   A.   No.  No.

25   Q.   Okay.

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179


1   A.   Counsel, we hired counsel which resolved

2        everything.

3   Q.   Okay.  So what about the taking of higher

4        fees to -- okay, let me just go back.

5             In that case the Commissioner alleged

6        that you took higher fees than you were

7        entitled to take, right?

8   A.   Yes, that's accurate.

9   Q.   Okay.  But do you agree that you in fact

10       took higher fee amounts than you were

11       entitled to take?

12  A.   No, sir.

13  Q.   So let's look at Exhibit No. 11.  It's

14       pretty short.  Yeah, it's a pretty short

15       article.  I can either increase the size of

16       it and we can scroll so you can read it --

17  A.   No, I can see it.  I can see it.

18  Q.   So what I'm going to -- just the only thing

19       I'm going to ask you is, is there anything

20       in this article that you -- that you

21       disagree with or believe is not true?  And

22       the only proviso I have with that is that

23       it's saying that there were complaints of

24       certain things that you did.

25            Now, I'm not -- by acknowledging the



1        truth of the statements in this article,

2        you're not acknowledging that you did any

3        of these things, you're just acknowledging

4        what the article says, which says that

5        there were complaints.

6             So with that proviso, I'm just going to

7        ask, is there anything in here that you

8        believe is factually incorrect in this

9        article?  And you can take your time

10       reading it.

11   A.  Yeah, no problem.  So, you know, we

12       disagreed with the order, we disagree with

13       the allegations.  We hired counsel that

14       resolved the matter, but the article does

15       speak for itself.  So disagree with the

16       assertions but understand the allegations.

17       And again, the matter was thoroughly

18       investigated.  We hired counsel and the

19       matter was resolved.

20   Q.  But do you dispute the truth of any of the

21       statements contained in the article?

22   A.  Yes.

23   Q.  And if you do, just -- okay.  Which one?

24   A.  All of them.

25   Q.  Well, for example, how about the first

888-893-3767                    Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com        Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

Michael Paul Michio
January 26, 2026                                                  Page 27

1          sentence?

2    **A.   Okay, let me read it.**

3    Q.   Yeah.

4    **A.   I don't dispute the first sentence.**

5    Q.   Let's look at the next sentence.  We kind

6          of went through that.

7    **A.   I don't dispute the second sentence.**

8    Q.   Okay, let's go to the next sentence.

9    **A.   I don't dispute the third sentence.**

10   Q.   Let's go to the headline.

11   **A.   I don't dispute the headline.**

12   Q.   Okay.  Let's go to the fourth sentence

13         starting with As of May 30, 2024.

14   **A.   Yeah.**

15   **       I disagree with the first sentence.**

16   Q.   Wait a second.  You said the first

17         sentence?

18   **A.   I'm sorry.  In the second paragraph, first**

19   **       sentence.  Because we entered into**

20   **       contracts directly with the clients, but**

21   **       they were sent over by an Iowa contractor.**

22   Q.   Okay.  What about the second sentence that

23         starts with As of May 30?

24   **A.   Yes, dispute that sentence as well that**

25   **       starts with As of.**



1   Q.  And I believe the next paragraph is just

2       one long sentence.  It starts with The Iowa

3       Insurance Division.

4   **A.  Uh-huh, let me read it.**

5   Q.  Okay.

6   **A.  I don't know if I have enough information**

7   **    to answer that because I don't know what**

8   **    complaints they would have received, but I**

9   **    do dispute the allegations in relation to**

10  **    it.  At this point in time, it was being**

11  **    handled by counsel.**

12  Q.  Okay.  So you dispute the -- you dispute

13      the complaints, but do you dispute the fact

14      that these complaints were made?

15  **A.  I just don't have the information and**

16  **    knowledge as to that, sir.**

17  Q.  Fair enough.  Let's go to the next

18      paragraph that starts with a quote --

19          First of all, do you deny that this

20      quote was set -- that this statement was

21      made by Chance McElhaney or do you have any

22      information in that regard?

23  **A.  I have no information, sir.**

24  Q.  Do you have any reason to dispute that the

25      statement was made?

Michael Paul Michio
January 26, 2026

1    **A.   I just have no knowledge of it.**

2    Q.   Okay.  So -- okay.

3         Your name appears in a case called

4    Breaux, B-r-e-a-u-x, versus Louisiana

5    Citizens Prop Insurance Corp.  Does that

6    case name ring a bell?

7    **A.   Yeah, it does.**

8              MR. OTT:  Let me just -- again,

9         let me object.  Let me again object as

10        to the relevance of questions regarding

11        this case.  It has no bearing on the

12        facts at issue.

13             Subject to that, you can answer

14        if you know.

15   **A.   I'm aware -- I'm aware of the case.**

16   Q.   (By Mr. Shunk)  Okay.  And as I understand

17   it, in this case, there was a dispute over

18   whether you submitted a detailed estimate

19   of damages to Allstate.  Does that sound

20   right?

21             MR. OTT:  Same objection.

22   **A.   I think that the legal complaint in its**

23   **entirety would be really the forefront of**

24   **the -- of the disagreement regarding the**

25   **insured and insurance company in that**

Michael Paul Michio
January 26, 2026                                                    Page 30

1        matter.

2   Q.  (By Mr. Shunk)  I understand, but the -- so

3        there may have been other issues in the

4        case and this may have just been a side

5        issue, but I'm just asking you, was there a

6        dispute in that case over -- between you

7        and Allstate over whether or not you

8        submitted a detailed estimate of damages to

9        the insurance company?

10  A.   That's not something that -- that's not

11       something --

12                   MR. OTT:  Let me object as to

13            relevance and mischaracterization of

14            testimony.

15                   You can answer if you know.

16  A.   I don't recall this being a major issue.

17  Q.  (By Mr. Shunk)  I'm not asking -- you have

18       to let me finish.  Well, I mean we have to

19       talk one at a time or Mary is going to yell

20       at us.

21       So I'm not asking if it was a major

22       issue in the case.  I know there may have

23       been other issues in the case, but I'm just

24       -- I'm just asking you, was that an issue,

25       whether or not you submitted a detailed

Michael Paul Michio
January 26, 2026                                                    Page 31

1        estimate of damages to Allstate?

2   A.   That may have been an alleged defense, but

3        I don't recall that being any -- we had to

4        meet with the insurance company on this.  I

5        had to give them an estimate to meet with

6        them.  We met with them multiple times.

7             I don't even know where the allegation

8        came from, but if it's in the -- some form

9        of response to a complaint or an allegation

10       made by defense counsel, perhaps it's in

11       there.  I --

12  Q.   Okay.

13  A.   We are going back to 2012, so it's quite

14       some time ago.

15  Q.   Are you familiar with a case --

16                MR. SHUNK:  And you can have a

17           standing objection to this, Joe.  Okay?

18           Hello?

19                MR. OTT:  Okay.  I will maintain

20           a standard objection -- or a standing

21           objection, but if there's additional

22           items, you know -- a standing objection

23           as to relevance and then improper

24           character evidence per Rule 404(b), but

25           if there's something else, then I'll

```
 1            step in and object again.
 2                 MR. SHUNK:  Okay.
 3   Q.  (By Mr. Shunk)  So are you familiar with
 4       the case Burks versus State Farm?
 5   A.  I am.
 6   Q.  I think in that case the insurer was FEMA;
 7       is that right?
 8   A.  These are all flood-related cases that
 9       you're talking about, so, yeah, they're all
10       either what are called WYO, write your own,
11       write flood or national flood insurance
12       program cases in relation to Hurricane Ian
13       2012, Laplace, Louisiana and the greater
14       Louisiana area.
15   Q.  And if you're mentioned by name in that
16       case, I mean you were -- you were involved
17       in a case called Burks versus State Farm,
18       correct?
19   A.  It's Ivory Burks, yeah, I believe.  And,
20       yes.
21   Q.  Okay.
22   A.  Yes.
23   Q.  Now, in that case, just -- if you don't
24       remember this, this is fine, but it says
25       that you were alleging that you had sent a
```

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

```
 1        third proof of loss that was signed by the
 2        insured claiming over $300,000 in
 3        additional payments and the insurer was
 4        denying that that was ever sent and said
 5        that they had no record of that proof of
 6        loss.  Do you recall that issue in the
 7        case?
 8   A.   I do not recall that.
 9   Q.   Okay.  Now, in that case, the information
10        that I have says that you're working for a
11        company called ProClaim.  Are you familiar
12        with ProClaim?
13   A.   Yes.
14   Q.   When did you work with ProClaim?
15   A.   That was a company I owned from 2009 to
16        2017 maybe, maybe 2016.
17   Q.   Okay.  Just as a quick aside, is Paul a
18        family name?
19   A.   Yes.
20   Q.   What part of the family is it?
21   A.   Grandmother's maiden name.
22   Q.   Grandmother's maiden name?
23   A.   Yes.
24   Q.   So just a couple more cases here.  Cotton
25        versus Scottsdale Insurance Company, does
```



Michael Paul Michio
January 26, 2026

Page 34

```
 1        that name ring a bell?
 2   A.   Yes.
 3   Q.   And were you involved in this case as a
 4        public adjuster?
 5   A.   Yes.
 6   Q.   Okay.  And in this case, you testified that
 7        you submitted a proof of loss while the
 8        insurance carrier denied ever receiving it
 9        or being made aware of it, do you recall
10        that issue?
11   A.   I recall testifying to it, but I don't
12        recall them disputing receiving it.
13   Q.   Scieaneaux versus Allstate, does that ring
14        a bell?
15   A.   It's all part of the same storm, so, yeah,
16        it does.  I think it's Albert Scieaneaux.
17             Was there a question, counselor?  I'm
18        sorry.
19   Q.   No, no, just looking.
20   A.   Okay.
21   Q.   In 2015, did you apply for reinstatement of
22        your Oklahoma public adjuster's license?
23   A.   If you have record that reflects that, I'm
24        sure I did.
25   Q.   Okay.  So according to an administrative
```



1      order out of -- from the Insurance

2      Commissioner for the State of Oklahoma, it

3      says that you -- it says that you denied

4      having been named or involved as a party in

5      an administrative proceeding, including

6      FINRA sanction or arbitration proceeding,

7      regarding any professional or occupational

8      license or registration.  Do you recall

9      that?

10  A.  Yeah.

11              MR. OTT:  And let me also just

12          -- let me also just object as to

13          improper impeachment.  For all these

14          questions, he has not shown the witness

15          the document, and that's improper

16          impeachment.

17              And also, he hasn't shown that

18          he testified differently in --

19          otherwise, in addition to my relevance

20          and other objections.

21              MR. SHUNK:  Okay.

22              MR. OTT:  You can answer.

23  Q.  (By Mr. Shunk)  Do you recall having denied

24      --  well, let me just refer back to my

25      prior question.

888-893-3767                 Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com         Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

Michael Paul Michio
January 26, 2026

```
 1              MR. SHUNK:  Can you read it,
 2         Mary?
 3              (Whereupon, the record was read
 4         as follows:
 5              "QUESTION:  So according to an
 6         administrative order out of -- from the
 7         Insurance Commissioner for the State of
 8         Oklahoma, it says that you -- it says
 9         that you denied having been named or
10         involved as a party in an
11         administrative proceeding, including
12         FINRA sanction or arbitration
13         proceeding, regarding any professional
14         or occupational license or
15         registration.  Do you recall that?")
16              MR. OTT:  Same objection.
17  A.   Yeah.  So this all stems back to a
18       complaint that my office did not believe
19       was a FINRA sanction or administrative
20       sanction.  And so you're going to find I
21       think a number of these, like five or six
22       -- five or six of these where there are
23       clerical errors made by my office in
24       filling out my applications in which they
25       selected the no box while they were filing
```

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F - California Firm Registration #179

LEXITAS

1       for like five or six reinstatements or

2       renewals of my licensure.

3            And you're going to find the same --

4       the same type of complaint, small fine, and

5       then approval for licensure in all of those

6       jurisdictions.  And they all involve the

7       same thing.

8   Q.  (By Mr. Shunk)  So you're saying in the

9       Oklahoma administrative proceeding you were

10      eventually granted your public adjuster's

11      license?

12  A.  **Yes, almost immediately after that document**

13      **was produced.**

14  Q.  Okay.  But in a -- do you dispute that in a

15      June 23, 2015 order the Insurance

16      Commissioner concluded that you

17      misrepresented information on your

18      reinstatement application in violation of

19      one of their insurance regulations?

20            MR. OTT:  Same objection as to

21         improper impeachment.

22            You can answer if you know.

23  A.  **Yeah, it was an -- so it was an**

24      **administrative error by one of our**

25      **secretaries filling out the application.  I**

LEXITAS

1      think we paid a $50 fine and they

2      immediately reinstated or just continued my

3      licensure.  If it -- if the department

4      categorized it as that, we didn't dispute

5      it.  We paid the fine, accepted the license

6      and moved on.

7   Q.  (By Mr. Shunk)  Okay.  So if the Insurance

8      Commissioner concluded that you

9      misrepresented information on your

10     reinstatement application in violation of

11     one of the Oklahoma insurance regulations,

12     you don't dispute that?

13  A.  I would --

14              MR. OTT:  Same objection.

15  A.  I'll say this.  Whatever they categorized

16     it as, they categorized it as that.  This

17     was not a major issue.  I likened it to

18     like a parking ticket.  So whatever they

19     characterized it as, they characterized it

20     as.

21          I can't change the way they

22     characterized the statement, but I would

23     disagree with the characterization.  But

24     whatever they characterized it as, that's

25     -- that's what it is, counselor.

Michael Paul Michio
January 26, 2026                                                          Page 39

```
 1   Q.  (By Mr. Shunk)  So my question was, do you
 2       have any reason to disagree that that's
 3       what the Insurance Commissioner concluded
 4       after its investigation?
 5   A.  There was no investigation.
 6   Q.  Okay.  Do you have any reason to disagree
 7       that that's what the Insurance Commissioner
 8       concluded in this Oklahoma administrative
 9       proceeding?
10   A.  There was no --
11               MR. OTT:  Objection, relevance.
12   A.  There was no --
13               MR. OTT:  Objection, relevance.
14       I also said improper impeachment per
15       Rule 608.
16               You can answer, Michael.
17   A.  Yeah, I do object because there was --
18       there was no -- or I disagree because there
19       was no administrative proceeding in this
20       case.
21   Q.  (By Mr. Shunk)  I'll just try this one more
22       time and then we'll let it go.  But do you
23       have any reason to disagree that in June --
24       in a June 23, 2015 administrative order by
25       the Oklahoma Insurance Commissioner, that
```

LEXITAS

Michael Paul Michio
January 26, 2026

1        the Commissioner concluded that you

2        misrepresented information on your

3        reinstatement application in violation of

4        one of the Oklahoma insurance regulations?

5                    MR. OTT:  Same objection.  And

6              in addition, asked and answered.

7    A.  Whatever the document says, counselor, it

8        states, but I do disagree with the -- with

9        the allegations.  There was no hearing,

10       there was no administrative proceeding.

11       There was an application, there was a fine

12       and there was licensure immediately after.

13       So I don't know any other way to answer it.

14   Q.  (By Mr. Shunk)  Okay.  Let's talk about the

15       building at 4501 Gustine.  When I reference

16       that address, can we agree that that's the

17       warehouse that's the subject of this

18       insurance claim in this lawsuit?

19   A.  Yes, counselor.

20   Q.  Have you ever been to that property?

21   A.  Yes.

22   Q.  How many times?

23   A.  20, plus.

24   Q.  When did you first go to the property?

25   A.  I'd need to refer to the purchase

888-893-3767                    Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com            Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

Michael Paul Michio
January 26, 2026

Page 41

1      **agreement, but sometime shortly before**

2      **there.**

3   Q.  Do you know -- when you say "sometime," can

4       you give me days, weeks, a couple of

5       months?

6   A.  **Within the month.**

7   Q.  So during the 30-day period before the

8       property purchase was finalized you had

9       been to the building; is that correct?

10  A.  **Yes.**

11  Q.  How many times during that 30-day period,

12      once or more?

13  A.  **Leading up to purchase, just that one time.**

14  Q.  Okay.  So prior to the building being

15      purchased and the documents signed, you had

16      been to the building one time; is that

17      right?

18  A.  **To the best of my recollection, yes.**

19  Q.  What did you do during that visit?

20  A.  **I came to the building, I met with Bill**

21      **Nottke who was selling the building.  Bill**

22      **had showed me the area where the parking**

23      **lot had experienced the pipe burst.  There**

24      **was -- he explained to me the geyser effect**

25      **of the water and it accumulating frost or**

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179
LEXITAS

Michael Paul Michio
January 26, 2026

1    snow, shooting onto the roof.

2        I then walked to the rear of the

3    building, I put a ladder up, I climbed on

4    to the roof.  I spent a couple hours on the

5    roofing system just looking at everything

6    that had happened.

7        I think after that then I packed up my

8    stuff.  Bill was then there meeting with I

9    think his attorney and real estate agent,

10   and I left the building at that time.

11   Q.  Okay.  So you arrived at the property, you

12       walked around the parking lot because Bill

13       showed you kind of what happened with the

14       leak and the water getting on the roof; is

15       that right?

16   A.  Yeah, he was showing me that there was a

17       burst water main in the parking lot and he

18       was showing me where, you know -- what had

19       happened essentially.

20   Q.  Okay.  And then you had a ladder with you

21       or did someone provide you a ladder?

22   A.  I bought a ladder on my way there.

23   Q.  Okay.  And you used the -- after your

24       discussion with Bill in the parking lot,

25       you got the ladder that you purchased on



Michael Paul Michio
January 26, 2026                                                        Page 43

1        the way to the property and where did you
2        set the ladder up?
3    A.  Rear left elevation.
4    Q.  And then you got on the roof and looked
5        around for a couple of hours, you said?
6    A.  Yes.
7    Q.  Did you take any photographs while you were
8        up there?
9    A.  No.
10   Q.  Why not?
11   A.  I didn't really think there was a point in
12       taking any photos.
13   Q.  Okay.  And then after you had been on the
14       roof for a couple of hours, then you got
15       back down off the roof.  You said Bill was
16       there talking with his attorney and his
17       real estate guy and then you left; is that
18       right?
19   A.  That's correct.  I think SERVPRO may have
20       been there as well.
21   Q.  Did you do anything else on the property
22       other than what you just told me about
23       during that first visit?
24   A.  I mean I walked through the property with
25       Bill.  We went inside.  We looked at their

Michael Paul Michio
January 26, 2026

1       operation.

2   Q.  Where did you go inside?

3   A.  **We entered through the front door to the**

4       **right of the bay doors.**

5   Q.  Okay.  So did you go to the office area?

6   A.  **I didn't walk up into the office area at**

7       **that time.**

8   Q.  Did you --

9   A.  **But they had -- they had like a -- like a**

10      **production set right in the front, right by**

11      **the leak area or where the collapsed roof**

12      **was.**

13  Q.  Did you walk around in the warehouse

14      anywhere beyond that area?

15  A.  **Yeah, I walked all the way back to the back**

16      **bays --**

17  Q.  Okay.  What was the --

18  A.  **-- of the warehouse.**

19  Q.  What was the purpose of doing that?

20  A.  **Well, we were going to buy the building, so**

21      **I wanted to see it.**

22  Q.  Were you there in the capacity of an

23      inspector?

24  A.  **No.**

25  Q.  Okay.  Were you there in the capacity as an

Michael Paul Michio
January 26, 2026

1      agent for Wombat?

2  A.  I'm just thinking about the

3      characterization of agent for Wombat.  Can

4      you define that for me?

5  Q.  Yeah, someone who's representing another

6      person or company.  I can use the word

7      "representative" if you prefer.  Were you

8      there as a representative of Wombat?

9  A.  Yeah, I mean I was there as a prospective

10     buyer, so, yes.

11 Q.  Okay.  So you yourself were the buyer?

12 A.  No.

13 Q.  But you were representing the buyer?

14 A.  Well, representing the buyer, but I am -- I

15     am part of the ownership group.

16 Q.  And the ownership group is what?

17 A.  So Wombat Acquisitions owns the property

18     and I own a company called Irish Cowboys

19     Capital that owns a part of that company.

20 Q.  So you own a company called Irish Cowboys

21     Capital which owns a part of Wombat

22     Acquisitions?

23 A.  Yes.

24 Q.  Who are the other owners of Wombat

25     Acquisitions?



Michael Paul Michio
January 26, 2026

1   A.   I would have to look at the specific LLC

2        names.

3   Q.   How many other owners are there?

4   A.   There's two other entities.

5   Q.   Can you name either one of them?

6   A.   I believe it's Cashey, LLC.

7   Q.   How do you spell that?

8   A.   C-a-s-h-e-y, LLC.

9   Q.   How about the other member?

10  A.   The other member is -- I'm just trying to

11       think of the LLC name, so bear with me.

12  Q.   Sure.

13  A.   I think it's Passive Investing something

14       LLC.  I mean I know my -- I know my

15       partners' names, but I don't like know

16       specifically which LLC they utilized to

17       purchase this entity, if that --

18  Q.   Sure.

19  A.   -- helps you understand why I'm struggling.

20       I don't -- I don't know what --

21  Q.   What are your partners' names?

22  A.   Javier Hinojo and Patrick Grimes.

23  Q.   And which one is Hinojo's LLC?  Is it

24       Passive Investing?

25  A.   No, it's Cashey.

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



1  Q.  And then Patrick Grimes did you say?

2  **A.  Yes.**

3  Q.  Is his LLC Passive Investing?

4  **A.  Yes.**

5  Q.  So for purposes of this transaction, you

6      were not only a part of the ownership group

7      but you were also there representing the

8      ownership group for purposes of this

9      insurance claim or for purposes of the

10     sale?  What was -- what was your role here?

11 **A.  Yeah, it was just a general walk-through to**

12     **see if we want to buy the property.**

13 Q.  Okay.  So you were just there as a

14     representative of the owner to see if you

15     wanted to buy the property?

16 **A.  Yeah, and I am the owner.**

17 Q.  And you are the owner, okay, got it.

18 **A.  Or one of -- you know, my -- one of my**

19     **companies is one of the owners, so --**

20 Q.  Okay.

21 **A.  Yes.**

22 Q.  All right.  Okay.  So we've been going

23     about an hour and fifteen minutes.  It's up

24     to you guys.  I can go for a little bit

25     longer, we can take a break.  You know

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F - California Firm Registration #179



Michael Paul Michio
January 26, 2026

1          what?  For Mary's sake, I think we are

2          going to take a short break.

3    **A.   Okay.**

4                    (Whereupon, a break was taken.)

5    Q.   (By Mr. Shunk)  Mr. Paul, before we resume

6          where we left off, I've got a couple of

7          kind of loose end questions.

8          Has your license been revoked in any

9          other jurisdictions other than Iowa?  And

10         by license I mean your license as a public

11         adjuster.

12                   MR. OTT:  I'm going to object as

13              to relevance.  The only purpose of this

14              is to harass my client.  There has been

15              no raising of this issue in the

16              plaintiff's answer to our counterclaim.

17              No discovery produced has indicated any

18              relevance as to this information, and

19              we continue to maintain our objection

20              to the same.

21   **A.   To the best of my knowledge, I am -- I**

22        **could practice in any other state besides**

23        **Iowa.  I don't know of any revocations of**

24        **my license.  I just did not renew.**

25             **If you want to look back to like**

Michael Paul Michio
January 26, 2026

1    Colorado, I didn't have an active bond in I

2    think 2014.  I don't know if they revoked

3    my license, but I think they suspended my

4    license and reactivated it.

5         In the State of Indiana, I had one open

6    claim.  I was representing an insured and

7    my license expired in the middle of the

8    representation and we did not renew the

9    license timely.  I had to reach what was

10   called an agreed order with the

11   Commissioner.

12 Q.  Okay.

13 **A.  Those are the only other -- those are the**

14   **only other times I can think of that**

15   **happening.**

16 Q.  So right now we are just talking about

17   revocations and it sounds like to me that

18   the only time that you can recall your

19   license being revoked in any jurisdiction

20   is in Iowa?

21 **A.  Yes.**

22 Q.  Okay.  And then it sounds like in Colorado

23   there may have been a situation where your

24   license was suspended for awhile and then

25   later reinstated; is that correct?

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F - California Firm Registration #179

LEXITAS

1    **A.   Yes.**

2    Q.   Okay.  Are there any other jurisdictions

3         other than Iowa and Oklahoma where any

4         action was taken against your license,

5         whether it be to revoke it or to suspend it

6         or any other type of administrative action

7         against your license?  We have already

8         identified Colorado, Oklahoma and Iowa.  So

9         other than those.

10   **A.   Nevada was the --**

11   Q.   Let's talk about that one and then we'll go

12        to the next.

13   **A.   Yeah, clerical error on an application.**

14   Q.   Was that a similar matter as Oklahoma

15        where - --

16   **A.   Yes.**

17   Q.   -- the question was -- and you got to wait

18        for me to ask.

19             But the question was asked whether or

20        not you had been a party to any type of

21        administrative proceeding and the answer

22        was -- the question was answered in the

23        negative; is that right?  That's

24        essentially what happened in Oklahoma.  Is

25        that what happened in Nevada?

Michael Paul Michio
January 26, 2026

1   A.   Yes, they -- my secretary at the time

2        filled out about five or six state

3        applications all with the same no answer.

4        Nevada was one of the states, Oklahoma was

5        one of the states, I believe Ohio was one

6        of the states.

7             I can't think of any others where --

8        and basically they provided me with like a

9        -- you know, a small fine, $50, and then

10       immediately just issued the license.

11  Q.   Okay.  All right.  So in terms of any

12       states where any type of action has been

13       taken against your license, and we have

14       talked about the varying degrees of

15       severity, we've got Iowa, Oklahoma, Nevada,

16       Colorado, Ohio.  Did I miss any?

17  A.   Indiana.

18  Q.   And Indiana, okay.  Is that a comprehensive

19       list?

20  A.   I believe so.

21  Q.   Okay.  I asked you earlier about this --

22       about your work for ProClaims and you told

23       me that that was a company that you own?

24  A.   Yes.

25  Q.   Do you recall that?

888-893-3767                Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com        Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

1          When I took your deposition before as a

2     corporate representative of Wombat, you

3     didn't tell me about ProClaims.  Do you

4     know why?

5                MR. OTT:  I'm going to move --

6          so let me object again as to relevance

7          and then, you know, during the course

8          of the corporate designee, we also

9          objected to you asking him questions

10         about his personal scope.

11              I think the only purpose of

12         these questions is to unreasonably

13         embarrass my client.  It has nothing to

14         do with any of the claims or defenses

15         in this case.

16              If we continue with this line of

17         questioning, we'll continue -- we'll

18         consider moving to suspend the

19         deposition.

20  A.  I'd have to refer to the question that you

21     asked me.  Can you -- can you read the

22     question and answer?

23  Q.  (By Ms. Shunk)  From the prior deposition?

24  A.  Yes.

25  Q.  Well, I can -- I can recall.  I basically

Michael Paul Michio
January 26, 2026

```
1      asked you to tell me about all the

2      different places where you worked, you

3      know, from the time that you got out of

4      college until the present time.  So we did

5      sort of a chronology.  But --

6                MR. OTT:  Objection, improper

7           impeachment.  Sorry, I thought you were

8           done.

9   Q.  (By Mr. Shunk)  Can you think of any reason

10      why you didn't tell me about ProClaims?

11  A.  It's just a d/b/a.

12                MR. OTT:  Let me just object --

13           I'm sorry, objection, improper

14           impeachment.

15                You can answer if you know.

16  A.  ProClaim is not an LLC.  ProClaim is a

17      d/b/a to an LLC.  So I probably mentioned

18      the LLC, the actual proper legal name, but

19      perhaps I did not mention the d/b/a, sir.

20      That's the only thing I can think of.

21  Q.  (By Mr. Shunk)  Makes perfect sense.  Okay.

22          Are there any other places that you've

23      worked that you might not have mentioned in

24      the first deposition that you now can

25      remember working?
```

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

Michael Paul Michio
January 26, 2026                                                    Page 54

1   A.   I think I give you a full, comprehensive

2        list on the first.  If I only gave you an

3        LLC name and there's some subset d/b/a --

4   Q.   I get it.

5   A.   I did my best to answer the question as

6        complete as possible, counselor.

7   Q.   I get it.  I was asking you about your

8        visits to the building at 4501 Gustine.

9        And you told me that roughly in the 30-day

10       period before the building was sold, you

11       had been there and you told me about what

12       you did during that visit, right?

13  A.   Yes.

14  Q.   So is there a record of that visit

15       somewhere?  I assume that you have

16       correspondence with Mr. Nottke confirming

17       that you're going to be there on a certain

18       date and time or something else?

19  A.   I'm sure I have -- I could dig up flight

20       records.

21  Q.   So you would have flight records.  Would

22       there be correspondence with Mr. Nottke

23       saying that I plan to arrive on this date

24       and time?

25  A.   I don't know because I wasn't handling the

Michael Paul Michio
January 26, 2026

1    acquisition, so -- it probably was a phone
2    call.  Bill was pretty old school.  He
3    didn't do a lot of e-mailing.
4  Q.  Okay.
5  A.  I think I called him that day, but Javier
6    probably would have been the one in contact
7    with Bill at that time.
8  Q.  Do you recall when you next visited the
9    property?
10 A.  Probably shortly after closing.
11 Q.  Do you recall what you did then?
12 A.  I had some things to go over with Bill and
13    Mark Gray.  Mark Gray was the onsite person
14    working for Bill.
15 Q.  Okay.  So at that time --
16 A.  I had to get --
17 Q.  Go ahead.  Sorry.
18 A.  I had to get bills changed, like -- I had
19    to get financials, financials like bills
20    changed over, utilities changed over.  We
21    also knew that the temporary repair work
22    was insufficient because there were leaks
23    into the building, so we started to address
24    that.  Just basic things of that nature.
25 Q.  Do you recall who else was there other than

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



Michael Paul Michio
January 26, 2026                                                          Page 56

```
 1        Bill and Mark, anybody?
 2   A.   No, just that.  Maybe some employees for
 3        their company, but I don't know their
 4        names.
 5   Q.   Okay.  Do you recall anybody else being
 6        present during your first visit to the
 7        property other than Bill and Mark?
 8   A.   SERVPRO was there.  I think -- I think at
 9        some point either Bill's realtor or
10        attorney was there as well.
11   Q.   Okay.  Anybody else you can recall being
12        there during your first visit?
13   A.   Not off the top of my head.
14   Q.   You said Mark was probably there during the
15        second visit.  Are you sure he was there
16        during the first visit, too, or did I just
17        say that?
18   A.   I feel like Mark was always there.
19   Q.   Okay.  All right.  Did Wombat or All States
20        engage an engineer or an architect to
21        inspect the building at any time?
22   A.   Yes.
23   Q.   When did that happen?
24   A.   After we hired counsel.
25   Q.   Is the engineer you're referring to, is it
```



Michael Paul Michio
January 26, 2026

```
 1        Vanessa Malone?
 2   A.   I believe so, yes, counselor.
 3   Q.   Are you aware of any other engineers that
 4        were hired by Wombat or all states to
 5        inspect the building?
 6   A.   I believe there's one other mechanical
 7        engineer.
 8   Q.   So there's another gentleman by the name of
 9        Dr. David Paulus who we've deposed in this
10        case.  He's prepared a report.  Is that the
11        mechanical engineer you're referring to?
12   A.   I believe so, yes, counselor.
13   Q.   So aside from Vanessa Malone and
14        Dr. Paulus, are you aware of any other
15        engineers who inspected the building at any
16        time on behalf of Wombat or All States?
17   A.   No.
18   Q.   So same series of questions for architect.
19        At any point in time, are you aware of any
20        architect being retained or hired by All
21        States or Wombat to inspect the building on
22        their behalf?
23   A.   If it was done through our counsel, then I
24        would defer to that; otherwise --
25   Q.   Okay.  So anybody who -- if an architect
```

1    was ever engaged to inspect the building on
2    behalf of the owners, the new owners, that
3    would have been done after litigation in
4    this case?
5  A.  That's accurate.
6  Q.  Okay.
7  A.  We got to litigation rather quickly because
8    -- I mean we -- there wasn't much
9    pre-litigation.  We were basically -- after
10   we turned in our assignment, the adjuster
11   on file, Jostes, pretty much told us that
12   he was not accepting the assignment and
13   that there was no benefit to him doing so.
14       So then I -- at that point in time, the
15   claim pretty much moved to the litigation
16   phase rather quickly.
17 Q.  Okay.
18 A.  So there wasn't much time to engage other
19   parties, like architects or engineers or
20   anything like that, before litigation
21   ensued.  We just -- there was no time
22   because we didn't even have the chance to
23   get there.
24 Q.  Do you consider yourself a roofing expert?
25 A.  Yes.

```
 1          but it just says the address.  Do you know
 2          why it says the address instead of the name
 3          of the claim representative?
 4     A.   It's just like a form you can fill in, so
 5          -- it's not a -- it's not a required field.
 6     Q.   Okay.  Did you know the name of the claim
 7          representative at this time?
 8     A.   Meaning Dave Jostes?
 9     Q.   Yeah.
10     A.   Yeah, but I don't think that that is like a
11          spot for his name to be filled in.  That
12          would be like if there was a claim rep on
13          our side, if we were represented by a
14          public adjuster or something.
15     Q.   So in this case there was no public
16          adjuster, so it didn't make any sense to
17          put anything in there?
18     A.   That's right.
19     Q.   So let's go down here.  And the next one
20          says Estimator.  And what's supposed to go
21          there?
22     A.   It's an optional field of where you put the
23          person's name that authors the estimate.
24     Q.   And on Exhibit 4, for estimator it says
25          4501 Gustine, correct?
```



Michael Paul Michio
January 26, 2026

1    A.    That's right.

2    Q.    It doesn't say the name of the estimator,

3          correct?

4    A.    It does not.

5    Q.    Why not?

6    A.    It's an optional field and -- I don't know.

7          I mean when I was filling out the cover

8          page, I guess that's what I put in, just --

9          I just put in 4501 Gustine.

10   Q.    Okay.  But you could have put your name?

11   A.    I suppose I could have, yeah.

12   Q.    Who was the estimator on this?

13   A.    I wrote the estimate with a peer review of

14         Lucero.

15   Q.    Okay.  So you were the estimator, correct?

16   A.    Yes.

17   Q.    But instead of writing your name, you wrote

18         4501 Gustine, correct?

19   A.    Yeah.  I mean we are looking at the

20         document, so, yeah, that's what's there.

21   Q.    Okay.  Now, it looks like this estimate was

22         prepared on -- I guess I'll just have to

23         ask you.  It says, This estimate -- this is

24         on the front page of Exhibit 4.  It says,

25         This estimate was written on or about

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

Michael Paul Michio
January 26, 2026

```
 1          June 10, 2024 but has been updated as of
 2          August 3rd, 2024.  Any and all subsequent
 3          estimates shall supersede and replace this
 4          estimate.
 5              Did I read that correctly?
 6   A.  That's accurate.
 7   Q.  Okay.  So is there any way to determine on
 8          this document which information was entered
 9          on June 10, 2024 and which information was
10          entered on August 3rd, 2024?
11   A.  I don't think so.
12   Q.  But what we are looking at here, which is
13          Exhibit 4, is the -- is the August 3, 2024
14          version of this estimate; is that fair?
15   A.  Yeah.  If you'll just scroll down, I can
16          confirm that on the next page.  Keep going.
17          Go to the bottom of that page.  There you
18          go.  Yeah.  You can see at the bottom of
19          the page where it says page 2, you can see
20          the last update to the left of that,
21          8/3/2024.
22   Q.  How many of these types of estimates have
23          you -- let me start the question over
24          again.
25              How many estimates of this type have
```

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

Michael Paul Michio
January 26, 2026

1       you prepared in your career?

2   A.  Thousands.

3   Q.  And how many relating to commercial roofs?

4   A.  Thousands.

5   Q.  And how many relating to commercial roof

6       collapses?

7   A.  Less than a dozen.

8   Q.  If we were to -- how many -- how many

9       relating to commercial roof collapses due

10      to snow, ice or water?

11  A.  Some, but probably five or less.

12  Q.  And can you give me the specific details of

13      any of those claims, whether it be the name

14      of the insured, the location of the

15      building, the owner of the building,

16      anything?

17  A.  I just -- I need to remember back.  It's

18      just -- it's been some time.

19  Q.  I'll give you a minute if you want.

20  A.  That's not going to help me right now.  I

21      mean --

22  Q.  Okay.  So you're saying you don't recall?

23  A.  I don't recall.

24  Q.  Okay.  Was this estimate intended to be a

25      comprehensive estimate of the entire cost



1        of all of the work necessary to repair the

2        building and remediate the water damage or

3        was it intended to be a supplement to a

4        prior estimate that was prepared by SERVPRO

5        and Tom Ziegloski; in other words, prior

6        estimates prepared by the insurance

7        carrier, the folks hired by Mr. Nottke

8        after the claim was initially opened?

9    A.  Would you scroll down for me so I can just

10       look through the estimate to answer that

11       question?

12   Q.  Sure.  Just let me know where to --

13   A.  You can keep going.

14            Slow down.  Go up a little bit.

15            Up a little higher, sir.

16            Okay, you can go down.  Thank you.

17            Keep going.

18            Keep going.

19   Q.  I'm going to make it bigger so --

20   A.  Yeah.  That actually -- okay, there we go.

21            Okay, keep going.

22            Okay, keep going.

23            It's a full and complete estimate up

24       until the date of August 3rd, 2024 that may

25       not include all incurred costs and



1       additional damages that have occurred in

2       relation to this loss subsequent to this

3       estimate preparation.

4            But at the time that it was authored,

5       it included the original estimate by the

6       insurance company and SERVPRO and then an

7       additional -- additional items in relation

8       to the remainder of the loss.

9   Q.  So where in this estimate are the -- is the

10      original estimate of SERVPRO accounted for?

11  A.  Can you scroll up?

12           Okay, so that's one right there, line

13      item 51.

14  Q.  So this is for -- oh, SERVPRO budgeted

15      items; is that correct?

16  A.  Yes.

17  Q.  And do you know whether or not SERVPRO had

18      already been paid for these items?

19  A.  It's my understanding that they have been

20      paid for those.

21  Q.  Okay.

22  A.  However, they unfortunately did not

23      actually perform all of them, but they were

24      paid for them.

25  Q.  All right.  And do you know whether they



```
 1        were paid for them prior to the time that
 2        you prepared this estimate?
 3   A.   Paid prior.
 4   Q.   Okay.  So if they were paid for this prior
 5        to the time of the estimate, why is this
 6        included as an additional line item in your
 7        estimate?
 8   A.   It's to provide a full and comprehensive --
 9        total amount of loss up to the date that
10        this estimate was written to include
11        everything.
12   Q.   That's what I -- that's what I was trying
13        to understand.  I think I understand now.
14        So everything that would have been in Tom
15        Ziegloski's estimate or SERVPRO's
16        estimates, all of those items are going to
17        appear also in your estimate?  Now, the
18        amounts may be different, but you would
19        have included those in your estimate as
20        well?
21   A.   Yes, counselor.
22   Q.   Can you tell me anything specific that
23        Mr. Lucero had input on in Exhibit No. 4?
24   A.   Yeah, I mean review of the entire estimate
25        with me.
```

Michael Paul Michio
January 26, 2026                                                              Page 83

```
 1   Q.   Okay.  Do you know anything about
 2        Mr. Lucero's background or qualifications
 3        to be a public adjuster?
 4   A.   He's a licensed public adjuster.  He's an
 5        ex-Allstate adjuster.
 6   Q.   Does this estimate -- does this estimate
 7        assume that the entire roof needs to be
 8        replaced?
 9   A.   Yes.
10   Q.   Who told you that the entire roof needs to
11        be replaced?
12   A.   That was based on my assessment of the
13        damages.
14   Q.   And what were your qualifications to make
15        that assessment?
16   A.   All of my previous testimony about my
17        expert testimony, my licensure and previous
18        work history.
19   Q.   Okay.  So that would be your expert
20        testimony as a building consultant?
21   A.   My work as a public adjuster, my work as an
22        independent adjuster, work as an appraiser,
23        work as an umpire, all of those things.
24        Just a comprehensive body of my work in the
25        insurance industry.
```

888-893-3767                   Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com           Nevada Registration #116F  -  California Firm Registration #179
LEXITAS

Michael Paul Michio
January 26, 2026

1   Q.   Okay.  And aside from any experts who have

2        been retained in this litigation, have you

3        spoken with anybody else who has told you

4        that the entire roof needs to be replaced

5        as opposed to just the portion of the roof

6        that collapsed and the surrounding affected

7        structural members?

8   A.   **Only Mr. Lucero and the experts mentioned.**

9   Q.   Did Mr. Lucero tell you that the entire

10       roof needed to be replaced as opposed to

11       just the area of the roof that collapsed

12       and the surrounding affected members?

13  A.   **I believe I made that call, but he peer**

14       **reviewed it with me and didn't correct me**

15       **on it.**

16  Q.   Okay.  So it's you and Mr. Lucero and did

17       you say somebody else or is that it?

18  A.   **Just the -- just the experts retained.**

19  Q.   Okay.  Since you prepared thousands of

20       these, you know what kind of information

21       needs to be included in an Xactimate

22       estimate, correct?

23  A.   **Yes.**

24  Q.   Does a contractor's overhead, should that

25       be included in an Xactimate estimate?

1    tired of dealing with this, he was

2    frustrated, he did not want to be involved.

3    He was -- every time I met with him, he was

4    tired.  He did not want to deal with this.

5         And essentially -- you know, I was

6    asking them to -- I was triggering what I

7    call the cooperation clause and Bryan West

8    is saying, Look, Bill doesn't want anything

9    to do with this.  He is a man that is, you

10   know, not in great health and he wants

11   nothing to do with this.

12        And so basically I guess we had, you

13   know, a dying man essentially selling off

14   his building, not wanting to deal with this

15   matter that he viewed as frustrating.  It

16   wasn't something that he wanted to deal

17   with.

18 Q.  Okay.  What was it that you were asking him

19     to submit to the insurance carrier?

20 A.  The demand for appraisal as far as I

21     recall.

22 Q.  And is it your understanding that he

23     eventually did submit that demand for

24     appraisal to the insurance carrier?

25 A.  Well, he signed the demand for appraisal at

Michael Paul Michio
January 26, 2026

Page 183

```
 1        the same time he signed the assignment.
 2        And, yes, it was submitted by his attorney,
 3        Bryan West, directly to Dave Jostes.
 4   Q.   Okay.  All right.  We have talked about
 5        Exhibits 12 and 13.  Let me check my notes
 6        and -- just give me a second off the
 7        record.  We may be done.
 8   A.   Okay.
 9                  (Off the record.)
10   Q.   (By Mr. Shunk)  So we have been going for
11        awhile now.  Early on in this deposition, I
12        asked if you could provide any -- I think
13        your testimony was, and correct me if I'm
14        wrong, that the number of cases that you've
15        been involved with in any capacity that
16        involved collapse of a warehouse roof would
17        be fewer than 12; is that correct?
18   A.   Yes.
19   Q.   Okay.  And can you be more specific than
20        that in terms of number or is that as
21        specific as you can get?
22   A.   Probably as specific as I can get.  I mean
23        I -- are we back on the record?
24   Q.   Yes.
25   A.   Okay.  I would need to look back through
```

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



Michael Paul Michio
January 26, 2026

Page 184

```
 1        files that I don't even have on when we

 2        claimed metal roof decking for collapse

 3        associated with some form of a heavy weight

 4        of snow or a windstorm or hailstorm which

 5        caused, you know, water penetration to a

 6        roofing system, and I just don't know how

 7        I'm going to find that, sir.  It's just --

 8   Q.   My original question was had to do with

 9        just roofs, roof collapses, and then we

10        narrowed it down to roof collapses as a

11        result of snow, water or ice.  So when I

12        just asked you about roof collapses, you

13        gave me the figure 12 or fewer, correct?

14   A.   Yep.

15   Q.   And then when I asked you about roof

16        collapses attributable to snow, water or

17        ice, I think you might have said six or

18        fewer, but I'm not sure.  Can you correct

19        me?

20   A.   That sounds about right.  The other half

21        would be fire and I just --

22   Q.   Okay.  That's fine.  So --

23   A.   I can't remember these clients' names like,

24        you know, ten plus years in the past.  It's

25        just -- I've handled too many files.
```

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



Michael Paul Michio
January 26, 2026

Page 185

```
 1   Q.  I understand.  So with respect to the 12 or
 2       fewer claims that involved the collapse of
 3       a roof either due to fire or due to water,
 4       snow and ice, do you have any information
 5       you can provide me that would help me
 6       identify those cases?
 7   A.  Not off the top of my head.  I need to -- I
 8       need to think about it.
 9   Q.  Okay.  So you wouldn't be able to tell me
10       the name of your client, the insured,
11       correct?
12   A.  No.
13   Q.  And you wouldn't be able to tell me the
14       name of the insurance carrier that you were
15       dealing with?
16   A.  I would not.
17   Q.  Okay.  Or any other particulars that would
18       help me track down that information
19       independently, correct?
20   A.  Not off the top of my head, sir.  Nothing I
21       can think of right now.
22   Q.  All right.  So in your previous deposition,
23       you referenced an attorney that you were
24       talking to at some point named Loren.
25       First of all, I'm not a hundred percent
```

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



```
 1        sure.  In the deposition transcript, it's
 2        spelled as L-o-r-e-n.  I don't know if
 3        that's a correct spelling.  Is it?
 4   A.   I don't know because I barely know this
 5        guy, but he was our transactional attorney
 6        in the midst of the purchase of this
 7        property, and I know he's a St. Louis guy,
 8        he's a Missouri guy.  I can't remember -- I
 9        can't imagine there's many male attorneys
10        named Loren.  He's a male, though.
11   Q.   Okay.  And you think it was spelled
12        L-o-r-e-n or do you know?
13   A.   I don't know.
14   Q.   And any recollection of his last name at
15        all?
16   A.   No.
17   Q.   Do you recall if this person was with a law
18        firm or independent?
19   A.   Law firm.
20   Q.   Do you recall anything about the name of
21        the law firm?
22   A.   No.  I've got the sense medium to large
23        size firm because they kept running
24        conflicts.
25   Q.   And did you ever go see this -- and Loren
```

Michael Paul Michio
January 26, 2026

1        was the first name, right?

2    A.   Yes.

3    Q.   Did you ever go see Loren at his office?

4    A.   No.

5    Q.   All right.  That's all I've got.

6                  MR. SHUNK:  I don't know,

7            Mr. Ott, do you have any followup?

8                  MR. OTT:  Yeah, I just have a

9            few followup -- I have a few followup

10           questions.  Let me just send in a

11           request or replace current share.  I

12           guess I can do that.

13   EXAMINATION BY MR. OTT:

14   Q.   So I just want to ask you a little bit

15        about the timeline, Michael, and -- let's

16        see.  So we were talking before about this

17        call with Mr. Jostes on May 24 and when

18        Mr. Jostes or I guess Jostes told you that

19        he would not accept the assignment, do you

20        recall the character of that communication,

21        like was he angry or how did you perceive

22        him to be acting?

23   A.   I think -- well, first I think I caught him

24        off guard.  He was -- he didn't know who I

25        was.  He seemed to not want to be talking

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179


Michael Paul Michio
January 26, 2026

1    to me.  And then he became like kind of

2    flippant about the situation.

3          He was like, Well, why would I ever

4    accept one of these assignments?  I mean

5    how the hell could it benefit me?  How

6    could it benefit Acuity?  I know what

7    you're going to do, you're going to ask for

8    more money.

9          So he said the first -- I mean he said,

10   My first -- my first train of thought is

11   that if you accept the assignment, we might

12   as well just sue you.  But he said, I want

13   to consult with my counsel first and you

14   get me the paperwork and we'll go from

15   there.

16         But he was -- he was not -- he was not

17   a happy camper with me.  He did not want to

18   be having the conversation.

19   Q.  Okay.  Now, similarly, later in June of

20       2018 or --

21             MR. SHUNK:  Joe, I'm sorry to

22         interrupt.  Can we go back just so I

23         can get the date of that, the note you

24         were referencing?

25             MR. OTT:  Yes, that was the

Michael Paul Michio
January 26, 2026

```
 1                    May 24, 2024 note on the document
 2             marked Acuity 14.
 3                    MR. SHUNK:  Thank you.
 4   Q.  (By Mr. Ott)  So, Mr. Paul, I'm now going
 5             to direct your attention to the bottom of
 6             that document, and there's a note on
 7             June 18th.  There's a quote in here where
 8             Mr. Jostes indicates, I advised I would
 9             follow up with our attorney and see if I
10             could set a deadline for the review.
11                    My question for you is did you sense at
12             this point that the claim was still being
13             investigated and that that was the reason
14             that they needed to follow up?
15   A.  Yeah.  Well, Dave, you know, had another
16             conversation with me and, yeah, he
17             basically said, Look, I don't -- if it's up
18             to me, we are not accepting this
19             assignment, but I need to run through this
20             legal counsel.  I'm going to -- I'm going
21             to defer to my legal counsel and their
22             advice on this.  I'm not going to just make
23             the final call.
24                    I said, Can I talk to your manager?  He
25             said, It's going to be the same answer.  We
```

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

1      need to speak with legal counsel to get

2      advice on this matter so that we can get

3      you a final decision.

4           So, yes, it was still at that point in

5      time up in the air because we didn't know

6      what they were going to do and as far as my

7      understanding of what Mr. Jostes told me,

8      he didn't know what they were going to do

9      at that time.  They were waiting on the

10     advice of counsel.

11  Q.  Right.  And in fact, it even says if I

12     could set a deadline for the review.  Is

13     that to say that you were -- it was in the

14     same status, pending, being reviewed by

15     legal counsel, for I guess the remaining

16     month?

17              MR. SHUNK:  Object to form.

18          Object to form.  Lacks foundation.

19          Calls for speculation and it's also a

20          leading question.

21  Q.  (By Mr. Ott)  Okay.  So go ahead, Mr. Paul.

22  A.  So Jostes had just told me, Look, I need to

23     some time to get this reviewed by counsel.

24     Allow me -- allow me the time to get it

25     reviewed by counsel.

Michael Paul Michio
January 26, 2026

1          You know, he basically told me, I don't

2      know where this thing is going right now.

3      Just let me get it reviewed by counsel.

4      We'll discuss it with them and then from

5      there we'll make our decision.

6   Q.  Let me just ask you the same thing in a

7      little bit more clean way.  What did

8      Mr. Jostes mean when he said set a deadline

9      for the review?

10             MR. SHUNK:  Object to form.

11         Lacks foundation, calls for

12         speculation.

13  A.  I had --

14  Q.  (By Mr. Ott)  Hold on, let me restate it.

15     What did you understand Mr. Jostes to be

16     setting a deadline for at that time?

17  A.  It was a deadline for review as to whether

18     or not the assignment was valid.  And so he

19     was consulting with legal counsel regarding

20     that matter because he recognized at that

21     point in time that we had submitted an

22     assignment and he didn't want to make a

23     decision just based off of his direct

24     feelings for it, even though he told me his

25     direct feelings were that he would not

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



Michael Paul Michio
January 26, 2026

```
 1        accept it and that Acuity never accepts
 2        these, but he told me let me -- let me get
 3        a final call from counsel on this so that I
 4        can then provide you with a definitive
 5        answer.
 6   Q.   Right.  And so recall we were looking at
 7        that August 3rd communication wherein you
 8        cited those legal cases.  Why did you --
 9        why did you think that it was beneficial to
10        include those legal cases about post-loss
11        assignment of benefits under Missouri law
12        when you sent the August 3rd communication?
13   A.   I was trying to bring to the forefront that
14        this matter has been discussed in the State
15        of Missouri.  I had discussed this matter
16        with legal counsel, at least with Merlin
17        Law Group at that time.  I don't know if I
18        had discussed it with you or just watched
19        your videos.
20             But I provided the citations to the
21        lawsuits in an effort to try to -- again, I
22        think I -- like I testified earlier, I
23        wanted this to be easy, simple and fair,
24        and I tried to express that citation to
25        Jostes so that he would see the light, that
```

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

Michael Paul Michio
January 26, 2026                                                    Page 199

```
 1  A.  No, sir.  I've provided it all to the best
 2      of my memory.
 3                 MR. SHUNK:  Okay.  That's all
 4          I've got.
 5                 MR. OTT:  Okay.  I have nothing
 6          further at this time.
 7                 MR. SHUNK:  Sorry, I do have one
 8          more thing.
 9  Q.  (By Mr. Shunk)  Well, I think this has been
10      asked and answered.  Yeah, I think it's
11      been asked, but I'm going to ask again just
12      to be clear.
13          Did Mr. Jostes ever tell you at any
14      point in time that Acuity consented to the
15      assignment?
16  A.  No.
17                 MR. SHUNK:  Okay.  Yeah, that's
18          all I have.
19                 MR. OTT:  I have nothing
20          further.  And then he will read and
21          sign.
22                 COURT REPORTER:  Transcript
23          orders on the record, please?
24                 MR. SHUNK:  E-trans, yeah.
25                 MR. OTT:  Which company is this?
```

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



```
 1   We'll send you an order later, but he

 2   does want to read and sign.  I mean I

 3   assume we'll order it, but I'm not

 4   going to commit on the record because

 5   sometimes -- I've had problems with

 6   some of these big companies, they just

 7   send you like $3,000 bills.  So, you

 8   know, you can put that on the record

 9   because sometimes they send you this

10   bill with all these added things in it.

11        COURT REPORTER:  Okay.  Yes,

12   sir.

13        MR. SHUNK:  All right.  Thanks,

14   everybody.

15        (The deposition concluded at

16   1:45 p.m.)

17

18

19

20

21

22

23

24

25
```

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



1                        CERTIFICATE

2           I, MARY KERKVLIET IVEY, Certified Court

3     Reporter within and for the State of Missouri and

4     Certified Shorthand Reporter within and for the

5     State of Kansas, hereby certify that the

6     within-named witness appeared at the time and

7     place set forth in the caption thereof, was by me

8     first duly sworn to testify the whole truth

9     concerning this matter in controversy; was

10    examined and said examination then and there

11    written by me in machine shorthand, afterwards

12    reduced to writing under my direction, is

13    correctly and accurately set forth in the

14    foregoing pages; and that said deposition is now

15    herewith returned.

16          I further certify that I am not court

17    reporter, employee, counsel, attorney or relative

18    of either party, or otherwise interested in the

19    event of this suit.

20          I have hereunto set my hand at my office in

21    Shawnee, Kansas, this 29th day of January, 2025.

22

23

24    MARY KERKVLIET IVEY
      CERTIFIED COURT REPORTER MO529
25    CERTIFIED SHORTHAND REPORTER KS863

```
 1                    LEXITAS LEGAL
                    1608 Locust Street
 2               Kansas City, Missouri 64108

 3


 4     January 29, 2026

 5     Mr. Joseph Ott
       OTT LAW FIRM
 6     75 West Lockwood
       Webster Groves, Missouri 63119

 7
             Re:  Acuity, a Mutual Insurance Company vs.
 8                Riverdale Packaging Corporation, et
                  al.
 9           Deposition of:  Michael Paul Michio

10
       Mr. Ott:
11
       Attached you will find a copy of the deposition
12     of the witness referenced above.

13     Please have the witness read the transcript,
       indicate any changes and/or corrections on the
14     Errata Sheet, and sign the Signature Page before
       a notary public.
15
       After completing the above-mentioned tasks,
16     forward only the Errata Sheet and notarized
       Signature Page to Mr. Michael W. Shunk, Baker
17     Sterchi Cowden & Rice LLC, 2400 Pershing Road,
       Suite 500, Kansas City, Missouri 64108,
18     mshunk@bakersterchi.com, copying same to all
       counsel of record and Lexitas Legal.
19
       I appreciate your prompt attention to this
20     matter.

21
       Sincerely,
22     /s/ Mary K. Ivey
       Mary K. Ivey
23     Certified Court Reporter MO529
       Certified Shorthand Reporter KS863

24

25     cc:  File
```

