UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ACUITY, A MUTUAL INSURANCE COMPANY, | |
| Plaintiff, | |
| v. | |
| RIVERDALE PACKAGING CORPORATION, | Case No.: 4:24-cv-01277 |
| and | |
| LORA PROPERTY INVESTMENTS, LLC | |
| and | |
| WOMBAT ACQUISITIONS LLC, | |
| Defendants. | |

## ACUITY'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW plaintiff Acuity, by and through their undersigned counsel of record, and pursuant to Rule 56 and Local Rule 4.01(A), submits the following memorandum in support of its motion for summary judgment.

## TABLE OF CONTENTS

I.     Summary Judgment Standard....................................................................4

II.    Argument and Authorities ....................................................................5

       A.    The Cases ............................................................................5
             1.    *Bowden v. Am. Mod. Homes Inc. Co.* ...................................5
             2.    *Magers v. Nat. Life & Accident* ........................................7
       B.    Why *Bowden* and *Magers* Do Not Apply Here ...................................8
             1.    The Personal Nature of the Insurance Contract ....................... 9
             2.    Public Policy .............................................................. 12

## TABLE OF AUTHORITIES

**Cases**

*Adkins v. Children's Hosp.,* 261 U.S. 525, 43 S. Ct. 394, 395 (1923) ............................. 14

*Advance-Rumely Thresher Co. v. Jackson,* 287 U.S. 283, 288, 53 S.Ct. 133 (1932) ...................... 14

*Allied Pipe Line Corp. v. Studley,* 191 S.W.2d 317, 320 (Mo. App. 1946) ................................... 10

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ....................................... 4

*Bowden v. Am. Mod. Homes Ins. Co.,* 658 S.W.3d 86 (Mo. App. 2022) ......................... 6, 7, 9, 13

*Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)* ...................................... 4, 5

*Flint Frozen Foods, Inc. v. Fireman's Insurance Co. of Newark,* 79 A.2d 739 (N.J. 1951) .......... 8

*Flint Frozen Foods, Inc. v. Firemen's Ins. Co.,* 86 A.2d 673, 675 (N.J. 1952) ................................ 9

*Franta v. Hodge,* 302 S.W.2d 291, 293 (Mo. App. 1957) ............................................... 15

*Govern v. Standard Oil Co.,* 192 F.2d. 962, 965 (Mo. App. 1951)............................................. 15

*Hines v. Government Employees Ins. Co.* ................................................................. 15

*Jaurequi v. Carter Mfg. Co.,* 173 F.3d 1076, 1085 (8th Cir. 1999).............................................. 5

*Kammueller v. Loomis, Fargo & Co.,* 383 F.3d 779, 784 (8th Cir. 2004) ................................... 5

*Katrina Canal Breaches Litigation,* 63 So.3d at 965 .................................................................... 7

*Magers v. Nat. Life & Accident,* 329 S.W.2d 752 (Mo. 1959),.............................................. 8, 9, 13

*Magers v. Nat'. Life & Accident Ins. Co.,* 329 S.W.2d 752, 756 (Mo. banc 1959) ................... 7, 9

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) ............. 4, 5

*Pancoast v. Dinsmore,* 75 Atl. 43, 45 (Me. 1909) ........................................................................ 15

*Quick v. Donaldson Co.,* 90 F.3d 1372, 1377 (8th Cir. 1996) ......................................................... 5

*Reed v. City of St. Charles,* 561 F.3d 788, 790 (8th Cir. 2009) ..................................................... 5

*Smith v. R.B. Jones of St. Louis, Inc.,* 672 S.W.2d 185, 186 (Mo. App. 1984) .............................. 7

*Sympson v. Rogers,* 406 S.W.2d 26, 30 (Mo. 1966) ................................................................... 10

*Tolan v. Cotton,* 572 U.S. 650, 651 (2014) .................................................................................. 5

*Woods v. Daimler Chrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005) ....................................... 4

**Rules**

Local Rule 4.01 .................................................................................................................................. 1

Rule 56 ...................................................................................................................................... 1, 4

## I.  Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials[.]" Rule 56(c)(1)(A). See also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of material fact is genuine if it has a real basis in the record." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992). It is also genuine "when a reasonable jury could return a verdict for the nonmoving party on the question." *Woods v. Daimler Chrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (citing *Anderson*, 477 U.S. at 248) (internal quotation marks omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make a dispute of fact genuine. In sum, a genuine dispute of material fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id*. at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*

*Corp.*, 477 U.S. at 323). The plaintiff may not then simply point to allegations made in its complaint, but must identify and provide evidence of "specific facts creating a triable controversy." *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir. 1999) (internal quotation marks omitted). When considering a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Rule 56(c)(3).

In determining whether a genuine dispute of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587–88. See also *Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather, a "court's function is to determine whether a dispute about a material fact is genuine[.]" *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

## II.  Argument and Authorities

### A.  The Cases

There appears to be just two Missouri cases addressing the issue of an assignment of insurance benefits after a loss has occurred, but for reasons discussed below, both are distinguishable from the case at barz

#### 1.  *Bowden v. Am. Mod. Homes Inc. Co.*

The most recent expression of Missouri law on the subject of assigned insurance benefits is *Bowden v. Am. Mod. Homes Ins. Co.,* 658 S.W.3d 86 (Mo. App. 2022). *Bowden*

involves a homeowners policy issued by Barton Mutual Insurance Company on a residence owned by Sarah Feldbaumer. After the home was destroyed by fire, Douglas and Katherine Bowden entered a note purchase agreement to buy the promissory note and deed of trust to the property. In addition, the Bowdens received an assignment of the benefits of the Barton policy.

Given the fact that the home was completely destroyed it is reasonable to assume that the amount due under the policy was fixed by the blanket limits of insurance based on the agreed value of the property, though the opinion is silent on the matter.

After Barton denied their claim for benefits under the homeowners policy, the Bowdens sued for breach of contract. On appeal, the Southern District concluded the anti-assignment language in the insurance policy did not preclude the assignment of benefits to the Bowdens.

"Generally, an insurance policy cannot be assigned where an assignment is expressly prohibited by the terms of the policy, unless the insurance company assents to the assignment." *Id.* at 92. (quoting *Smith v. R.B. Jones of St. Louis, Inc.,* 672 S.W.2d 185, 186 (Mo. App. 1984).) An exception to that general rule exists when the sale or assignment, as here, takes place *after* the loss has already occurred. *Bowden,* 658 S.W.3d at 92. "As a general rule, an assignment made by the insured after the event has occurred on which liability under an insurance policy is predicated does not violate a policy provision prohibiting assignment of the policy or its benefits." *Id.* (quoting *Magers v. Nat'. Life & Accident Ins. Co.,* 329 S.W.2d 752, 756 (Mo. banc 1959).

According to the *Bowden* court, "the rationale behind this exception is that, at the time of the assignment, the insurer's liability has already become **fixed**." *Id.* (Emphasis

added.) That is, "the insurer's obligations are fixed at the time the loss occurs, and the insurer is obligated to cover the loss agreed to under the terms of the policy." *Bowden* at 658 S.W.3d at 92. (quoting *In re Katrina Canal Breaches Litigation., 63* So.3d 955, 961 (La. App. 2005). It should be noted, however, that the court in *Katrina Canal Breaches Litigation* actually concluded that the anti-assignment clause was enforceable against a post-loss assignment. *Katrina Canal Breaches Litigation,* 63 So.3d at 965.

The *Bowden* case does not apply to the case at bar because Acuity's liability was far from "fixed" at the time of the loss. To the contrary, the partial roof collapse on January 20, 2024, was just the beginning of a *process*—requiring the active engagement of both insured and insurer—to determine the scope and cost of repairs to the building. (SOF ¶¶14-28) No fact in this case demonstrates this point with greater clarity than the estimated cost of repair submitted by a representative of Wombat in an amount that was approximately $8 million greater than the cost of repair estimate prepared by Riverdale's building consultant. (SOF ¶¶29, 41)

### 2. *Magers v. Nat. Life & Accident*

In *Magers v. Nat. Life & Accident,* 329 S.W.2d 752 (Mo. 1959), the plaintiff assignee brought action against the defendant insurance company to recover the cash surrender value of policies of industrial insurance. The specific amount of the cash surrender value was established by reference to a table in the policy. *Id.* at 755. The company denied the claim based on anti-assignment language in the policy.

On appeal, the Missouri Supreme Court framed the issue as "whether the claims presented are matured choses in action which are not controlled by the policy provision against assignment." *Id.* at 755. "In these circumstances," the court held, "the assignments

in aid of the collection of the matured claims did not violate the policy provisions and the
court was properly brought in the name of the plaintiff as assignee." *Id.* at 758.

In support of its holding, the court referenced cases discussed by the court of appeals,
including *Flint Frozen Foods, Inc. v. Fireman's Insurance Co. of Newark,* 79 A.2d 739 (N.J.
1951). In *Flint,* the court upheld a post-loss assignment of the policy without consent of the
insurer where the insurer's liability "had become fixed". *Id.* The *Magers* court neglected to
either notice or mention that the *Flint* decision had been reversed by the New Jersey
Supreme Court.

In *Flint Frozen Foods, Inc. v. Firemen's Ins. Co.,* 86 A.2d 673, 675 (N.J. 1952), the state
supreme court held the assignee was, in fact, precluded from recovery under the policy.
Among its stated reasons was the fact that "the policy did not purport to insure the
assignees interest as owners of the property destroyed." *Flint Frozen Foods, Inc. v.
Firemen's Ins. Co.,* 86 A.2d 673, 675 (N.J. 1952). "After a loss has occurred," the court held,
"a person may not adopt a policy to which he is a stranger and thereby increase the liability
of the insurer." *Id.*

This *Flint* case is particularly resonant here, where Wombat has sought to exploit the
pending insurance claim by submitting grossly inflated repair estimates and threatening
the claim representative with litigation.

Regardless, the court's decision in *Magers* is also distinguishable from the case at bar,
in which Acuity's liability was not fixed at the time of the loss.

### B. Why *Bowden* and *Magers* Do Not Apply Here

The *Bowden* and *Magers* cases are a useful introduction to Missouri law on the
assignment of insurance benefits, but they do not answer the question before this court,

i.e., is such an assignment valid after a loss where the contract remains executory, and the personal qualities of the insured form a material part of the contract. In addition, the *Bowden* and *Magers* cases should not apply here because those cases fail to account for the countervailing public policy that strongly favors the parties' freedom of contract.

### 1. The Personal Nature of the Insurance Contract

"The law is well settled that a contract is not assignable without the consent of both parties where the personal acts and **qualities** of one of the parties from a material and ingredient part of the contract." *Allied Pipe Line Corp. v. Studley,* 191 S.W.2d 317, 320 (Mo. App. 1946). (Emphasis added.) "In such a case, that is, where the **character**, ability, and credit of the party dealt with obviously is of so much importance, one **has a right to select and determine with whom one will contract, and cannot have another person thrust upon him without his consent**." (Emphasis added.) *Id.* An executory contract for personal services that involves a relation of personal confidence may not be assigned without the consent of both parties. *Sympson v. Rogers,* 406 S.W.2d 26, 30 (Mo. 1966).

Here, there can be little doubt that the insurance policy between Acuity and Riverdale remained executory at the time of the assignment. According to the policy, the insured had a continuing duty of cooperation with the insured. (SOF ¶14) And given that the claim was still in the adjustment process, it was incumbent on the insurer and insured to work *together* to arrive at an *agreed* scope of repair. The precise manner of doing so is spelled out in the contract, whereby the insurer can require the insured to complete a statement of loss with supporting documentation for the purpose of determining if there is a disagreement between the insurer and insured. (SOF ¶15) After the statement of loss is

presented, the insurer and insured can either negotiate a resolution of the claim, or in the alternative, they can invoke the arbitration provision. (SOF ¶16)

The arbitration clause invokes a new series of reciprocal obligations under the policy, including the identification of a mutually agreeable appraiser, and if that cannot be accomplished, the appointment of an umpire. (SOF ¶¶14-28) All of these post-loss activities involve the active participation of *both* insurer and insured, and all of them remained to be performed at the time of the purported assignment to Wombat here. Acuity issued this policy to Riverdale Packaging, and that is the party Acuity elected to insure. Acuity cannot and should not be made to accept a new insured in place of Riverdale without its consent. To the extent this argument may beg the question: What difference does it make? The answer is, ***a lot*** — a fact that is brought into stark relief by the specific facts of this case.

At the time of the purported assignment, Acuity had been working assiduously with Riverdale and its contractors to investigate and and remediate the damage caused by the roof collapse. (SOF ¶¶19-29) Most of the remediation work had been completed, and a structural engineer had prepared a report outlining the suggested scope of repair, which included replacing the section of the roof that had collapsed and additional parts of the roof that had been affected by the collapse. In addition, a building consultant had prepared a detailed estimate—totaling $1,179,293—of costs to repair the building outlined by the structural engineering report. (SOF ¶¶19-29) At no time prior to the sale of the building did Riverdale's owner, Bill Nottke, express any dissatisfaction with the scope of repairs, or more generally, with the services being performed by Acuity. (SOF ¶¶31-32)

While Acuity was in the process of working with its insured and its contractors to commence the repair work, it was notified that the building was being sold and that the

insurance benefits were being assigned to the new owner, Wombat, LLC. (SOF ¶¶30, 33) Wombat's representative, Michael Paul Michio, then initiated contact with Acuity's claim specialist, Dave Jostes, informing him Acuity should cease all repair work and that Wombat would have its own contractors perform the work. (SOF ¶¶38-39) In subsequent communications, Mr. Michio raised the prospect of "vexatious refusal" and threatened litigation. (SOF ¶¶46-48) Later, after Mr. Jostes contacted Mr. Nottke to determine if there was a dispute as to the amount of loss, Mr. Michio provided Mr. Jostes an estimate for cost of repair totaling $9,519,891.86, which exceeded the NCC estimate by more than $8.3 million. (SOF ¶¶40-41) On the computer form for the estimate, Mr. Michio inserted the address where his name was supposed to go, leaving the impression (or at leaving open the possibility) that the estimate was not prepared by Mr. Michio, but instead by a qualified third-party acting in good faith (SOF ¶43).

The Michio estimate was based solely on his opinion that the entire 100,000 square foot roof needed to be replaced, and not just a limited area beyond the section of roof that collapsed. (SOF ¶44) Mr. Michio is not a structural engineer, and beyond his experience as a public adjuster, her has no experience that would qualify him to render an opinion about the need to repair the entire roof. (SOF ¶¶45-46) Nevertheless, he submitted his estimate to Mr. Jostes, expecting that they should blindly rely on it.

As it turns out, Acuity was wise not to rely on the estimate prepared by Mr. Michio. At roughly the same time Mr. Michio was attempting to manipulate the claim process here, he was being investigated by the Iowa Insurance Commissioner for endorsing checks on behalf of insureds and banks without proper authorization, failing to release client funds, failing to communicate or respond to inquiries from insureds, and taking higher fee

amounts than they were entitled to. (SOF ¶¶52-53) As a result of this investigation, Mr. Michio and his company were ordered to pay a total of more than $1.3 million in restitution, penalties and fees. (SOF ¶¶52-53) His public adjusters license was revoked in the state of Iowa and he was permanently banned from applying for a public adjuster license in that state. (SOF ¶¶52-53)

In view of these circumstances, it is grossly unfair and contrary to established Missouri law to force Acuity to accept Michael Michio as its insured in place of Bill Nottke.

### 2.  Public Policy

Both *Bowden* and *Magers* make passing reference to the public policy that favors assignments. In their holdings they implicitly conclude that the pro-assignment public policy warrants a result that completely disregards enforceable contract terms. While Missouri does have a longstanding public policy that favors the assignment of "choses in action", i.e., mature claims, that public policy is subordinate to the competing public policy that encourages and protects the parties' freedom to contract.

The public policy favoring the right of private parties to contract is less a "public policy" and more a fundamental guarantee that is rooted in the Constitution. "The protection of liberty and property guaranteed in the Fifth and Fourteenth Amendments includes freedom of contract." *Adkins v. Children's Hosp.,* 261 U.S. 525, 43 S. Ct. 394, 395 (1923). "That the right to contract about one's affairs is a part of the liberty of the individual protected by this clause, is settled by the decisions of [the United States Supreme Court] and is no longer open to question." *Id.* at 396. "In making such contracts, generally speaking, the parties have an equal right to obtain from each other the best terms they can

as a result of private bargaining." *Id.* at 397. While it is not absolute, the freedom of contract is the general rule and restraint the exception. *Id.*

"In determining the validity of a legislative declaration that a contract is contrary to public policy, regard is to be had to the general rule that competent persons shall have the utmost liberty of contracting and that it is only where enforcement conflicts with dominant public interests that one who has had the benefit of performance by the other party to a contract will be permitted to avoid his own promise." *Advance-Rumely Thresher Co. v. Jackson,* 287 U.S. 283, 288, 53 S.Ct. 133 (1932).

The right to contract includes the right to choose the party on the other end of the agreement. "A party has a right to select and determine with whom he will contract and cannot have another party thrust upon him without his consent." *Franta v. Hodge,* 302 S.W.2d 291, 293 (Mo. App. 1957) (citing with approval *Pancoast v. Dinsmore,* 75 Atl. 43, 45 (Me. 1909). "It may be of importance to him who prefers the contract. *Id.* He may contract with whom he pleases and the sufficiency of his reasons for so doing cannot be inquired into." *Franta* at 293.

In *Hines v. Government Employees Ins. Co.,* the Missouri Supreme Court the court was presented with the issue of whether it was appropriate—notwithstanding policy language to the contrary—to extend statutorily mandated uninsured motorist protection beyond the vehicle in which the insured was riding at the time of the accident. In refusing to do so, the court explained:

> We made an exception to the normal rule of freedom of contract because of this policy. The implied restriction, however, should not go further than is strictly necessary to serve the statutory policy. [...] We simply conclude that the courts should not limit freedom of contract under the circumstances shown by this record.

*Hines,* 656 S.W.2d 262, 265 (Mo. 1983).

"There is no rule of public policy which denies effect to [the contracting parties'] expressed intention, but, on the contrary, as the matter lies within the range of permissible agreement, **the highest public policy is found in the enforcement of the contract which was actually made.**" (Emphasis added.) *Govern v. Standard Oil Co.,* 192 F.2d. 962, 965 (Mo. App. 1951).

Likewise, this court should not infringe on Acuity's contractual right to select its insured. Nor should it rewrite the insurance policy by completely striking out the anti-assignment provision. Notwithstanding any public policy that favors the assignment of choses in action, that policy must yield to the much more fundamental policy that favors freedom of contract.

To be clear, Acuity has not denied coverage and it is not trying to get out of paying this claim. Instead, Acuity has paid more than $1.5 million to its insured for damages attributable to the roof collapse, and it has not ruled out the possibility of paying more if doing so is warranted under the facts. Acuity merely want to do business with the party who applied for and was approved for the policy. And for reasons made obvious from the moment Michael Paul and Wombat entered the picture, it does not want to be forced into a business relationship with a complete stranger.

If Acuity's Complaint for Declaratory Judgment is granted, Wombat is not an insured under the policy and it has no standing to make a claim for vexatious refusal to pay or breach of contract. As such the Court should also enter judgment in favor of Acuity on all counts in Wombat's counterclaim.

WHEREFORE, for reasons set forth herein, plaintiff Acuity respectfully requests an order of this Court entering judgment in its favor on the Complaint for Declaratory Judgment and all counts in Wombat's counterclaim, and for such additional relief as the Court deems appropriate under the circumstances.

Respectfully submitted,

BAKER STERCHI COWDEN & RICE LLC

/s/ Michael Shunk
James R. Jarrow MO # 38686
Michael W. Shunk MO # 43841
2400 Pershing Road, Suite 500
Kansas City, Missouri 64108
Tel: (816) 471-2121
jarrow@bakersterchi.com
mshunk@bakersterchi.com
ATTORNEYS FOR PLAINTIFF ACUITY,
A MUTUAL INSURANCE COMPANY

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served on all parties of record by operation of the Court's electronic case filing and case management system on February 13, 2026.

/s/ Michael Shunk