**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

|  |  |
|---|---|
| ACUITY, A MUTUAL INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> RIVERDALE PACKAGING CORPORATION, <br><br> and <br><br> LORA PROPERTY INVESTMENTS, LLC <br><br> and <br><br> WOMBAT ACQUISITIONS LLC, <br><br> Defendants. | Case No.: 4:24-cv-01277 |

**DEFENDANT WOMBAT'S MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,
OTT LAW FIRM

_____/s/ Joseph A. Ott_____
Joseph A. Ott, #67889
75 W. Lockwood Avenue Ste. 1
Webster Groves, MO 63119
Telephone: (314) 303-9360
Facsimile: (314) 689-0080
joe@ott.law
Attorney for Defendants

**TABLE OF CONTENTS**

I. Introduction ...........................................................................................................1
II. Statement of Undisputed Material Facts .........................................................2
III. Legal Standard ...................................................................................................4
IV. Argument...............................................................................................................5
    A. Because Acuity's Liability Became Absolute at the Time of the Roof Collapse, the Post-Loss Assignment Transferred a Valid Chose in Action Under Settled Missouri Law ....................................................................5
    B. Acuity Waived Any Anti-Assignment Defense by Investigating for Seven Months and Paying $1.3 Million Without Ever Issuing a Reservation of Rights ...................................................................................................9
    C. Because Acuity Intentionally Destroyed the Deceased Insured's Appraisal Demand, the Resulting Adverse Inference Precludes Acuity's Claim of Undisputed Facts ...............................................................................10
    D. Because Acuity Paid $1.29 Million Yielding Zero Completed Repairs and Rejected the Appraisal Demand, Genuine Disputes Defeat the Declaratory Judgment and Mandate a Trial on Vexatious Refusal..........................12
V. Conclusion ...........................................................................................................16

**TABLE OF AUTHORITIES**
**Cases**

*Academy Bank, N.A. v. AmGuard Ins. Co., 116 F.4th 768 (8th Cir. 2024)*......13
*Allen v. State Farm Mut. Auto. Ins. Co., 753 S.W.2d 616 (Mo. Ct. App. E.D. 1988)* ......................................................................................................................13
*Archer v. Merchants' & Mfrs.' Ins. Co., 43 Mo. 434 (1869)* ................................5
*Bistrian v. Levi, 448 F.Supp.3d 454 (E.D. Pa. 2020)* ......................................10
*Bowden v. Am. Mod. Home Ins. Co., 658 S.W.3d 86 (Mo. App. S.D. 2022* .......5
*Brown v. State Farm Mut. Auto. Ins. Co., 776 S.W.2d 384 (Mo. 1989)*.............8
*Dhyne v. State Farm Fire & Cas. Co., 188 S.W.3d 454 (Mo. banc 2006)*.........15
*Flint Frozen Foods, Inc. v. Firemen's Ins. Co., 86 A.2d 673 (N.J. 1952)*...........8
*Hallmark Cards, Inc. v. Murley, 703 F.3d 456 (8th Cir. 2013)*.......................12
*Hennessey v. Dairyland Ins. Co., 904 S.W.2d 73 (Mo. App. 1995)*...................10
*Liberty Life Ins. Co. v. Schaffer, 853 F.2d 591 (8th Cir. 1988)* ......................16
*Magers v. Nat'l Life & Accident Ins. Co., 329 S.W.2d 752 (Mo. banc 1959)*......5
*Maxus Metro., LLC v. Travelers Prop. Cas. Co., 163 F.4th 441 (8th Cir. 2025)* ......................................................................................................................15
*Mitchell v. Farmers Ins. Exchange, 396 S.W.2d 647 (Mo. App. 1965)* .............10
*Shelter Mut. Ins. Co. v. Baker,* 753 S.W.2d 646, 649 (Mo. Ct. App. 1988).......6
*Stevenson v. Union Pacific R. Co., 354 F.3d 739 (8th Cir. 2004)*.....................12
*Still v. Travelers Indem. Co.,* 374 S.W.2d 95, 103 (Mo. 1963)........................13
*Storhaug v. State Farm Fire & Cas. Co., 747 F.2d 443 (8th Cir. 1984)*...........16
*Sympson v. Rogers, 406 S.W.2d 26 (Mo. 1966)*.................................................7
*Tolan v. Cotton, 572 U.S. 650 (2014)*.................................................................4
*West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937)* ......................................8

*Zubulake v. UBS Warburg LLC, 229 F.R.D. 422 (S.D.N.Y. 2004)* ...................*12*

## Statutes and Rules

Fed. R. Civ. P. 37(e) .................................................................................12
Fed. R. Civ. P. 56(a) ..................................................................................7
RSMo § 375.420........................................................................................15
RSMo § 379.195...........................................................................................4

## I. INTRODUCTION

Missouri settled this question in 1869. An insurer cannot weaponize a boilerplate anti-assignment clause to avoid paying a matured property claim after the loss has already occurred. *Archer v. Merchants' & Mfrs.' Ins. Co.*, 43 Mo. 434, 441 (1869). No Missouri court has deviated from that rule in the 157 years since.

Acuity's motion fails because it conflates unliquidated damages with unfixed liability, relies on constitutional law that the Supreme Court overruled ninety years ago, and masks deficient claims handling with *ad hominem* attacks on a third-party adjuster. The undisputed record tells a simpler story: Acuity's adjuster rejected the assignment on the day he learned of it because he saw "only downside" — before consulting counsel, before reading the policy, and before researching Missouri law. (RSMF ¶ 56.)

Acuity then spent seven months investigating the claim, paid $1.3 million, and never issued a reservation of rights. Along the way, it destroyed the insured's formal appraisal demand under a 21-day email deletion policy. The insured is now dead. The assignment is valid. The anti-assignment defense was waived. The spoliation creates an independent genuine dispute of material fact. And the vexatious refusal counterclaim survives because $1.29 million in payments produced zero completed building repairs. The Court should deny the motion.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

**The Collapse and Fixed Liability.** On January 20, 2024, a water pipe burst at a 100,000-square-foot warehouse at 4501 Gustine Avenue in St. Louis, spraying

water onto the roof. (RSMF ¶ 4.) Ice accumulated and collapsed a portion of the structure. (RSMF ¶ 6.) The loss damaged more than the roof — Acuity's own adjuster confirmed the fire suppression system sustained "substantial damage." (Ex. A, Jostes Depo. 113:7-10; RSMF ¶ 4.) The insurer's liability became absolute at the moment of collapse. RSMo § 379.195.

**Assignment Rejected for "Only Downside."** On May 24, 2024, Jostes learned of the intended assignment. He rejected it the same day — before consulting counsel, before reviewing the anti-assignment clause, and before researching Missouri law. (RSMF ¶ 56.) His rationale was financial: "There's no benefit of us accepting the assignment. There's only downside ... the only potential by letting the purchaser work with us is that they would ask for more money." (Ex. F, Claim Log 05/24/2024 entry; RSMF ¶ 56.) He could not even locate the anti-assignment clause: "I looked at the policy, and I didn't find anything restricting assignment." (RSMF ¶ 56.)

**Nottke Cooperated Fully — Acuity Admits It.** The executed Insurance Benefits Assignment Agreement required the Assignor to "reasonably cooperate with Assignee and Assignor's insurance company during the claim process in accordance with their insurance policy or policies terms and conditions." (Ex. G, WOMBAT 000386, § 3.) Nottke did exactly that. Acuity's own counsel acknowledged it in writing: the August 29, 2024 settlement letter stated that Acuity "appreciates [Nottke's] cooperation up to the time of assignment." (Ex. H, Settlement Letter, p. 2.) Jostes testified that Nottke volunteered to repackage damaged contents at his own expense

to save Acuity money. (Ex. A, Jostes Depo. 119:10-24.) Acuity has identified no act of non-cooperation by its named insured.

**Appraisal Demand — Rejected, Then Destroyed.** On June 21, 2024, Nottke signed a formal demand for appraisal, invoking the policy provision triggered when "we and you disagree on the value of the property or the amount of loss." (RSMF ¶ 54.) Acuity rejected this formal demand on July 22, 2024. (RSMF ¶ 55.) There is no notation of the appraisal demand anywhere in Acuity's claim file. When asked to explain, Jostes testified: "I cannot." (RSMF ¶ 55.) He admitted the email may have been deleted under Acuity's 21-day rolling deletion policy: "It's possible." (RSMF ¶ 73.) When pressed further: "Anything's possible." (RSMF ¶ 73.)

**The 21-Day Deletion Policy.** Jostes personally deletes emails on a rolling 21-day schedule. After 21 days, claim-related emails are irrecoverable: "I couldn't. They'd be deleted already." (RSMF ¶ 74.) This deletion policy applied during active claims handling on a loss exceeding $1 million.

**Nottke Is Dead.** William Nottke passed away on November 6, 2025. (RSMF ¶ 69.) He cannot testify to rebut Jostes's self-serving characterization of their communications — or to confirm that he sent the appraisal demand Acuity claims never to have received.

**$836K Payment on the Day of the Vexatious Refusal Threat.** On August 13, 2024, Wombat's representative sent a letter alleging vexatious refusal. That same day, Acuity overnighted $836,124.37 to Riverdale. (RSMF ¶ 59.) The payment required a $200,000 reserve increase approved by the VP of Claims — involvement

Jostes testified would "never" occur on a routine file. (RSMF ¶ 59.) The loss had been open for 206 days. The NCC estimate had been available for 133 days.

**$1.29 Million Paid, Zero Completed Repairs.** Acuity paid a total of $1,299,107.45. Not one dollar funded a completed building repair. (RSMF ¶ 78.) Servpro's corporate designee confirmed: "we did not, like, rebuild the building back to pre-loss condition or anything." (Ex. T, Thole Depo. 68:9-10; RSMF ¶ 70.)

**No Reservation of Rights — Ever.** Acuity never issued a reservation of rights letter citing the anti-assignment clause or any other potential coverage defense. (RSMF ¶ 67.) Standard insurance practice when an insurer identifies a potential coverage defense is to issue a reservation of rights to preserve that defense while continuing to investigate. Acuity did not.

**Acuity's Own Offer Proves Its Estimate Was Inadequate.** Acuity's August 29, 2024 settlement offer of $1.3 million exceeded its own NCC estimate of $1,179,293 by $120,707 — an implicit concession that the preliminary estimate understated the covered loss. (RSMF ¶ 65.)

### III. LEGAL STANDARD

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view all facts and draw all reasonable inferences in favor of the non-moving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). Acuity bears the burden of establishing the absence of any genuine dispute.

## IV. ARGUMENT

***A. Because Acuity's Liability Became Fixed at the Time of the Roof Collapse, the Post-Loss Assignment Transferred a Valid Chose in Action Under Settled Missouri Law.***

Missouri has recognized the validity of post-loss assignments for over 150 years. In *Archer v. Merchants' & Manufacturers' Insurance Co.*, 43 Mo. 434, 441 (1869), the Missouri Supreme Court held that a post-loss assignment of insurance benefits "stood on the same footing as the assignment of a debt…" In the 157 years since *Archer*, no Missouri court has ever enforced an anti-assignment clause to bar a post-loss assignment of insurance benefits.

The Missouri Supreme Court reaffirmed the rule in *Magers v. National Life & Accident Insurance Co.*, 329 S.W.2d 752, 754 (Mo. banc 1959), holding en banc: "As a general rule, an assignment made by the insured after the event has occurred on which liability under an insurance policy is predicated does not violate a policy provision prohibiting assignment of the policy or its benefits." The Court permitted the assignment even though the claims had not yet been formally submitted for payment. *Id.* at 757.

Most recently, in *Bowden v. American Modern Home Insurance Co.*, 658 S.W.3d 86 (Mo. App. S.D. 2022), the court directly addressed first-party property insurance — the exact category at issue here — and explained the doctrinal logic:

> [A]llowing an insured to assign the right to coverage (pre-loss) would force the insurer to protect an insured with whom it had not contracted–an insured who might present a greater level of risk than the policyholder. However, allowing an insured to assign its right to

the proceeds of an insurance policy (post-loss) does not modify the insurer's risk.

*Bowden*, 658 S.W.3d at 94. The court held that "[a]fter the loss, the anti-assignment clause serves only to limit the free assignability of claims, which is not favored by the law," *Id.* The Missouri Supreme Court denied transfer — indicating it did not disagree with the result.

**RSMo § 379.195 confirms the analysis.** The statute provides that "whenever a loss occurs on account of a casualty covered by such contract of insurance, the liability of the insurance company, if liability there be, shall become absolute…" Missouri law confirms this interpretation of the statute. *Shelter Mut. Ins. Co. v. Baker*, 753 S.W.2d 646, 649 (Mo. Ct. App. 1988). The roof collapsed on January 20, 2024. At that moment, Acuity's liability became "absolute" and fixed. What remained was a dispute about the *amount* owed — not *whether* anything was owed. Acuity's central error is conflating *unliquidated damages* (the repair scope still being adjusted) with *unfixed liability*. If claims were only assignable after the exact dollar amount was agreed, the post-loss assignment doctrine would cease to exist.

Once the roof collapsed, Wombat's predecessor possessed a matured chose in action for money. Acuity's policy provides: "Your rights and duties under this policy may not be transferred without our written consent." (Ex. J, Policy, Section F.) This language restricts transfer of the ongoing insurance relationship — the executory contract. It does not, by its terms, restrict transfer of a matured claim for money.

As Bowden explained, "allowing an insured to assign its right to the proceeds of an insurance policy (post-loss) does not modify the insurer's risk. The insurer's

obligations are fixed at the time the loss occurs." 658 S.W.3d at 94. Even Acuity's own expert, Douglas Richmond, conceded that the post-loss assignment exception has been Missouri law since at least 1959: "At least with respect to certain categories of losses, yes, sir." (Ex. B, Richmond Depo. 102:6-10; RSMF ¶ 62.) Richmond further acknowledged he had "no basis to say that the assignment was somehow broadly invalid or unlawful." (Ex. B, Richmond Depo. 84:7-20; RSMF ¶ 62.)

**Acuity's "personal services" defense fails on the record.** Acuity argues the insurance contract is a personal services relationship that cannot be assigned without consent. The record destroys this theory. The executed Assignment Agreement itself required the Assignor to "reasonably cooperate" with "Assignee and Assignor's insurance company" during the claims process. (Ex. G, ¶ 3.) Acuity's own counsel then acknowledged — in writing — that Nottke had cooperated. (Ex. H, p. 2.) Meanwhile, on the same day as the assignment was executed (June 11), Nottke invoked the policy's appraisal provision — the contractual mechanism for resolving disputes about loss amount — demonstrating his continued engagement with the claims process. (Ex. N, Appraisal Demand, June 21, 2024.)

Acuity has not identified a single act of non-cooperation by Nottke. The "personal services" theory is hypothetical, not factual. In *Sympson v. Rogers*, 406 S.W.2d 26, 30-31 (Mo. 1966), the Missouri Supreme Court held that a right to receive money for an already-occurred event is a financial claim, not a personal service obligation — and therefore freely assignable. An insurer's obligation to pay a matured property claim is a debt, not a relationship of "personal confidence."

**Acuity's *Flint* argument backfires.** Acuity implies Defendants case law relies on reversed law in *Flint*. The New Jersey Supreme Court reversed *Flint* solely because the underlying debt had been fully repaid before the assignment — leaving the lower court's adoption of the majority post-loss assignment rule completely undisturbed. *Flint Frozen Foods, Inc. v. Firemen's Ins. Co.*, 86 A.2d 673, 675 (N.J. 1952).

**Acuity's constitutional argument is based on overruled law.** Acuity's "freedom of contract" argument rests on *Adkins v. Children's Hospital*, 261 U.S. 525 (1923) — a *Lochner*-era decision the Supreme Court explicitly overruled in *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 400 (1937). This Court should not credit an argument grounded in repudiated substantive due process.

**Michio's Iowa history is irrelevant.** Acuity's reliance on Wombat's adjuster's unrelated Iowa regulatory proceedings is *ad hominem*, not legal argument. The assignment is between Riverdale and Wombat — a corporate entity. Michio is not the assignee. Acuity's own adjuster rejected the assignment on May 24 for "business downside" — long before Jostes knew anything about Michio's Iowa regulatory history. The Iowa narrative is post-hoc rationalization, not the actual basis for Acuity's coverage decision. The identity of the claimant does not alter the damage to the roof.

**B. Acuity Waived Any Anti-Assignment Defense by Investigating for Seven Months and Paying $1.3 Million Without Ever Issuing a Reservation of Rights.**

Under *Brown v. State Farm Mutual Automobile Insurance Co.*, 776 S.W.2d 384,

387 (Mo. 1989), waiver requires conduct that "clearly and unequivocally shows a purpose by the insurer to relinquish a contractual right," The Missouri Supreme Court held that "the insurer's unequivocal conduct, knowingly contrary to the claim provisions of its contract, that betrays the insurer's purpose to relinquish its right to rely on the contractual language." *Id.*

Acuity's conduct is textbook waiver:

- **May 24, 2024**: Jostes learned of the assignment. (RSMF ¶ 56.)

- **May 24 through August 2024**: Acuity continued investigating and adjusting the claim for seven months after knowledge of the assignment.

- **August 13, 2024**: Acuity overnighted $836,124.37 — the largest single payment in the claim's history. (RSMF ¶ 59.)

- **August 29, 2024**: Acuity offered $1.3 million to settle the building repair claim. (RSMF ¶ 65.)

- **At no time**: Acuity issued a reservation of rights letter citing the anti-assignment clause. (RSMF ¶ 67.)

Paying over $1.3 million after knowledge of an assignment, without a reservation of rights, is conduct that clearly and unequivocally shows a purpose to relinquish the anti-assignment defense. An insurer that investigates for seven months, overnights an $836,000 check, and extends a $1.3 million settlement offer — all while never once preserving its anti-assignment defense in writing, and *after* receiving notice of the assignment and demand for appraisal— has waived that defense as a matter of law. Acuity's Memorandum in Support does not address waiver

at all.

Even if the Court concludes that Acuity's conduct does not compel a finding of waiver as a matter of law, it at minimum creates a genuine dispute of material fact. *Hennessey v. Dairyland Ins. Co.*, 904 S.W.2d 73, 77 (Mo. App. 1995); *Mitchell v. Farmers Ins. Exchange*, 396 S.W.2d 647, 650 (Mo. App. 1965). Summary judgment is inappropriate when reasonable minds could differ on whether the insurer's conduct constituted waiver.

### C. Because Acuity Intentionally Destroyed the Deceased Insured's Appraisal Demand, the Resulting Adverse Inference Precludes Acuity's Claim of Undisputed Facts.

Federal Rule of Civil Procedure 37(e) establishes a two-tier sanctions regime for spoliation of electronically stored information. Under 37(e)(2), if a party "acted with the intent to deprive another party of the information's use in the litigation" the court may presume the lost information was unfavorable, instruct the jury accordingly, or dismiss the action. No separate finding of prejudice is required under 37(e)(2). Fed. R. Civ. P. 37(e), Advisory Committee Notes.

The circumstantial case for intentional spoliation is overwhelming.

**Selective preservation.** Jostes preserved routine claim log entries, vendor emails, and administrative documents — but not the insured's formal appraisal demand. "Common sense suggests that when a party preserves helpful or neutral information while deleting harmful information, that tends to indicate intentionality." *Bistrian v. Levi*, 448 F.Supp.3d 454 (E.D. Pa. 2020). The appraisal

Page 10 of 17

demand was the insured's formal exercise of a contractual right that Acuity rejected. Its preservation would have documented the insured's disagreement — directly contradicting Acuity's claim to this Court that "Mr. Nottke never expressed any concern or disagreement about the scope or cost of repair." (Acuity SUMF Para. 32.)

**Timing.** The demand was sent June 21, 2024 — after Acuity had retained a law firm for a coverage opinion about the claim, but before such decision was rendered. Courts examining spoliation intent treat timing of destruction as a key factor. *Bistrian*, 448 F.Supp.3d at 454.

**Contradictory testimony.** Jostes first said he did not receive the June 21 demand. When confronted with evidence it was emailed to him, he conceded "it's possible" he deleted it. When asked about other deletions: "anything's possible." (RSMF ¶ 73.) This progression from denial to admission is classic spoliation consciousness.

**The insured is dead.** Nottke died November 6, 2025. (RSMF ¶ 69.) He cannot testify that he sent the demand, confirm its contents, or rebut Jostes's self-serving characterization that Nottke never disputed coverage under the policy.

**21-day deletion during a million-dollar claim.** A 21-day auto-deletion policy during active claims handling on a loss exceeding $1 million falls below any reasonable preservation standard. Parties "must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents" once litigation is reasonably anticipated. *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004). Acuity's own

adjuster was discussing vexatious refusal threats and assignment disputes. Litigation was more than reasonably anticipated — it was promised.

**Eighth Circuit authority.** Under *Stevenson v. Union Pacific Railroad Co.*, 354 F.3d 739 (8th Cir. 2004), the court may give a permissive adverse inference instruction where the party seeking spoliation sanctions presents evidence of the spoliator's document retention and destruction practices. Under *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456 (8th Cir. 2013), where the evidence of intentional destruction is strong enough, even the failure to make explicit bad-faith findings is harmless error.

**This spoliation independently precludes summary judgment.** Because Acuity intentionally destroyed the deceased insured's formal appraisal demand, the Court must presume the destroyed communication was received by Acuity, and was Nottke's dispute of Acuity's scope of repair. Fed. R. Civ. P. 37(e)(2). This adverse inference strips Acuity of its ability to claim this important material fact is "undisputed." The spoliation alone creates a genuine dispute of material fact that independently precludes summary judgment as a matter of law, and buttresses the remaining factual record to support the conclusion that the assignment was enforceable.

***D. Because Acuity Paid $1.29 Million Yielding Zero Completed Repairs and Rejected the Appraisal Demand, Genuine Disputes Defeat the Declaratory Judgment and Mandate a Trial on Vexatious Refusal.***

Acuity seeks a declaratory judgment that Wombat has no rights under the

policy. But as shown in Section IV.A, the post-loss assignment is valid. As shown in Section IV.B, Acuity waived the defense. As shown in Section IV.C, the spoliation independently creates genuine disputes about Acuity's knowledge of Nottke's dispute. Any one of these grounds defeats Acuity's declaratory relief.

If the Court disagrees with all of the above, Wombat's counterclaim for vexatious refusal under RSMo § 375.420 survives summary judgement, because even if personal to Nottke, Nottke's claim for vexatious refusal was assigned to Wombat *in addition to* the assignment of the other benefits under the policy. Even if the assignment fails *viz.* the policy, Nottke's statutory vexatious refusal claim was still assigned to Wombat, who can enforce it. The vexatious refusal statute does not contain the word "insured" — it reaches "any action against any insurance company to recover the amount of any loss under a policy." Missouri law clearly recognizes that vexatious refusal claims are assignable. "Such assignment… [can] include [a] claim for penalties for vexatious delay." *Still v. Travelers Indem. Co.,* 374 S.W.2d 95, 103 (Mo. 1963).

**Two independent theories of vexatious refusal.**

*First, vexatious refusal to honor the assignment.* Jostes rejected the assignment on May 24, 2024, before consulting counsel, before reviewing the policy, and before researching Missouri law. His stated reason was "only downside." (RSMF ¶ 56.) He admitted he did not know what Missouri law provided. (Ex. A, Jostes Depo. 162:18-22.) Under *Allen v. State Farm Mutual Automobile Insurance Co.*, 753 S.W.2d 616, 618 (Mo. Ct. App. E.D. 1988), "[a] refusal to pay based on a suspicion that is

unsupported by substantial facts is vexatious." An adjuster who rejects an assignment without knowing the applicable law — and whose own expert later concedes the law supports the assignment — acted without reasonable cause or excuse.

*Second, vexatious refusal to pay the full amount.* Acuity paid $1,299,107.45 on this claim. Not one dollar funded a completed building repair. (RSMF ¶ 78.) The breakdown:

- **Emergency mitigation (Servpro)**: $412,231 — mitigation only, not building repair

- **Servpro "advance"**: $200,000 — labeled "BUILDING REPAIR," but no repair performed; ~$109K of this has no invoice at all (Thole: "we're square")

- **ACV balance**: $836,124 — withheld 133 days, overnighted the day Wombat threatened vexatious refusal

- **NCC/EFI consulting**: $19,768 — Acuity's own carrier-retained vendors

- **Contents**: $30,984 — personal property, not building repair

- **Miscellaneous**: $1,926

  **Total** : $1,299,107 — and zero dollars to a completed building repair.

(RSMF ¶ 78; Ex. T, Thole Depo. 68:9-10, 82:7-14, 113:20-21, 114:3-5.)

Servpro's corporate designee, Kevin Thole, confirmed under oath: "we did not, like, rebuild the building back to pre-loss condition or anything." (Ex. T, Thole Depo. 68:9-10; RSMF ¶ 70.) Servpro performed no billable work after March 14, 2024, and ceased all activity by April 30. (RSMF ¶ 70.) Acuity issued a $200,000 check labeled

"ADVANCE PAYMENT ON BUILDING REPAIR BY SERVPRO." No building repair was ever performed. (RSMF ¶ 71.)

**Payment does not cure vexatious refusal.** In *Dhyne v. State Farm Fire & Casualty Co.*, 188 S.W.3d 454 (Mo. banc 2006), the Missouri Supreme Court held that permitting an insurer to defeat a vexatious refusal claim by paying before trial "would, from a practical standpoint, eliminate section 375.420." *Id.* at 458. The Eighth Circuit confirmed: "[e]ventual payment after the appraisal process did not cure its pre-appraisal vexatious delay." *Academy Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768 (8th Cir. 2024).

Most recently, in *Maxus Metropolitan, LLC v. Travelers Property Casualty Co. of America*, 163 F.4th 441 (8th Cir. 2025), the Eighth Circuit affirmed a $546,905 vexatious refusal award even though the insurer had made prior partial payments totaling $3.5 million. The court held that inadequate investigation and failure to explain coverage positions supported vexatious refusal even with reasonably litigable coverage issues.

**Inadequate investigation.** Jostes admitted he never solicited a single electrician, plumber, architect, or fire suppression vendor to bid on any repair: "I don't have any solicitations for electricians, fire suppression vendors, architects, electricians, plumbers." (Ex. A, Jostes Depo. 114:16-19; RSMF ¶ 60.) Under *Allen*, "[t]he adequacy of an insurer's investigation of a claim may be considered evidence of vexatiousness." 753 S.W.2d at 618. Acuity's investigation produced a single carrier-consultant estimate that its own settlement offer proved was inadequate by $120,707.

**Litigable issues do not preclude the penalty.** "The existence of a litigable issue, either factual or legal, does not preclude the statutory penalty where there is evidence the insurer's attitude was vexatious and recalcitrant." *Storhaug v. State Farm Fire & Casualty Co.*, 747 F.2d 443, 447 (8th Cir. 1984); *Liberty Life Ins. Co. v. Schaffer*, 853 F.2d 591, 594 (8th Cir. 1988). "Direct and specific evidence to show vexatious refusal is not required, the jury may find vexatious delay upon a general survey and a consideration of the whole testimony and all the facts and circumstances in connection with the case." *Allen*, 753 S.W.2d at 618. Questions of reasonableness are "not generally amenable to resolution by way of summary judgment." 35 MOPRAC Section 32:10. The jury must decide.

## V. CONCLUSION

The post-loss assignment doctrine is settled Missouri law. Acuity has never cited — and cannot cite — a single Missouri decision enforcing an anti-assignment clause against a post-loss assignment. Acuity waived any anti-assignment defense by paying $1.3 million without a reservation of rights. The spoliation of the deceased insured's appraisal demand independently creates a genuine dispute of material fact. And Wombat's vexatious refusal counterclaim — $1.29 million paid, zero completed repairs — must go to a jury.

The Court should deny Acuity's Motion for Summary Judgment in its entirety.

Respectfully submitted,

OTT LAW FIRM

/s/ Joseph A. Ott
Joseph A. Ott, #67889
75 W. Lockwood Avenue Ste. 1
Webster Groves, MO 63119
Telephone: (314) 303-9360
Facsimile: (314) 689-0080
joe@ott.law
Attorney for Defendants

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was

served on all parties of record by operation of the Court's electronic case filing and

case management system on this 10th Day of March, 2026.


/s/ Joseph A. Ott