IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


ACUITY, A MUTUAL                )
INSURANCE,                      )
                                )
        Plaintiff,              )
                                )
        vs.                     ) No. 4:24-cv-01277-MTS
                                )
RIVERDALE PACKAGING             )
CORPORATIONS, et al.,           )
                                )
        Defendants.             )




VIDEOTAPED DEPOSITION OF
DAVE JOSTES
Taken on behalf of the
Defendant/Counter-Plaintiff
January 20, 2026




DEBRA S. KAESBERG, MO CCR #670, RPR

Exhibit B

                    IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF MISSOURI
                            EASTERN DIVISION


ACUITY, A MUTUAL          )
INSURANCE,                )
                          )
          Plaintiff,      )
                          )
          vs.             ) No. 4:24-cv-01277-MTS
                          )
RIVERDALE PACKAGING       )
CORPORATIONS, et al.,     )
                          )
          Defendants.     )


          VIDEOTAPED DEPOSITION OF DAVE JOSTES,

produced, sworn, and examined on behalf of the

Defendant/Counter-Plaintiff, January 20, 2026,

between the hours of 1:18 p.m. and 6:50 p.m. of

that day, at the offices of Baker Sterchi

Cowden & Rice, 100 South 4th Street, Suite 900,

St. Louis, Missouri, before DEBRA S. KAESBERG, a

Registered Professional Reporter and a Certified

Court Reporter within and for the State of

Missouri.

A P P E A R A N C E S


ACUITY, A MUTUAL INSURANCE was represented by:

    Michael W. Shunk, Esq.

    Baker Sterchi Cowden & Rice LLC

    2400 East Pershing Road, Suite 500

    Kansas City, Missouri 64108-2533

    816-448-9331

    mshunk@bakersterchi.com


WOMBAT ACQUISITIONS LLC was represented by:

    Joseph A. Ott, Esq.

    Ott Law Firm, LLC

    75 West Lockwood Avenue

    St. Louis, Missouri 63119

    314-293-3756

    joe@ott.law


VIDEOGRAPHER:  Logan Gahn

INDEX OF EXAMINATION

                                          Page

DIRECT EXAMINATION BY MR. OTT            8

CROSS-EXAMINATION BY MR. SHUNK           254

REDIRECT EXAMINATION BY MR. OTT          254

RECROSS-EXAMINATION BY MR. SHUNK         254


INDEX OF EXHIBITS

                                          Page

Plaintiff's Exhibit 1 - Plaintiff        11
Acuity's Answers to Wombat's
Interrogatories


Plaintiff's Exhibit 4 - First Dave       36
Jostes note


Plaintiff's Exhibit 5 - E-Mail chain     38
from Dave Jostes on January 23rd, 2024,
11:33 a.m., to Bill and Mark


Plaintiff's Exhibit 6 - January 31,      51
initial rough order of magnitude
prepared by Tom Celosky at Newman
Construction Consulting

DAVE JOSTES - CORP. REP.
JANUARY 20, 2026

JOB NO. 2324668

Plaintiff's Exhibit 7 - E-mail from          33
Nicole Brasser to the team, Re:
Initial Final Reinsurance Report

Plaintiff's Exhibit 8 - March 2024           82
E-mail - Acuity 380

Plaintiff's Exhibit 10 - April 2024          92
communication from Chad Gellner to Dave
Jostes

Plaintiff's Exhibit 11 - March 5th,          120
2024 communication from Mr. Gray, Re:
American Express customer

Plaintiff's Exhibit 16 - June 24th,          178
2024 E-mail from Michael Paul to Joe
Ott

Plaintiff's Exhibit 20 -  Additional         254
coverage language with respect to
collapse - Acuity 144

Plaintiff's Exhibit 22 - Component of         105
the policy at issue - Acuity 0152

Plaintiff's Exhibit 26 - Portions of        206

the policy that discuss actual

appraisal term


Plaintiff's Exhibit 26B - Portions of       206

the policy that discuss actual

appraisal term


Plaintiff's Exhibit 31 - E-mail from         254

Dave Jostes


Plaintiff's Exhibit 33                       254


Plaintiff's Exhibit 33 - June 20th,          254

3:23 p.m., E-mail from Michael Paul to

Dave Jostes


        (Exhibits retained by Mr. Ott.)

DAVE JOSTES - CORP. REP.                                                        JOB NO. 2324668
JANUARY 20, 2026

IT IS HEREBY STIPULATED AND AGREED by and between Counsel for the Plaintiff and Counsel for the Defendants that this deposition may be taken in shorthand by DEBRA S. KAESBERG, a Registered Professional Reporter and a Certified Court Reporter, and afterwards transcribed into typewriting, and that the signature of the witness was not waived by agreement and consent in my presence.

o-O-o

VIDEOGRAPHER:  Good afternoon.  We are on the record.  Today's date is January 20th, 2026, and the time is 1:18 p.m.  This is the video-recorded deposition of Dave Jostes in the matter of Acuity Mutual Insurance versus Riverdale Packaging Corporation, et al., Civil Action No. 4:24-cv-01277-MTS.  This deposition is being held at Baker Sterchi off 100 South Fourth Street in St. Louis, Missouri.

The court reporter is with Steno. And my name is Logan Gahr, the videographer with Gahr Productions.  The parties will now state who they are and who they represent.

MR. SHUNK:  Michael Shunk on behalf of plaintiff Acuity.

MR. OTT:  This is Joseph Ott on behalf of defendant and counter-plaintiff Wombat.

DAVE JOSTES,
of lawful age, being produced, sworn, and examined on the part of the Defendant/ Counter-Plaintiff, deposes and says:

DIRECT EXAMINATION

BY MR. OTT:

Q.   Mr. Jostes, my name is Joseph Ott. As you heard before, I represent Wombat in this matter.

Have you ever given your deposition before?

A.   I have.

Q.   How many times have you given your deposition before?

A.   Probably two other times.

Q.   Okay.  And what other matters did you give your deposition?

A.   One, I believe, was a lawsuit over a claim, and one was a personal suit over an

DAVE JOSTES - CORP. REP.                                              JOB NO. 2324668
JANUARY 20, 2026

automobile accident.

Q.   Okay.  And how long ago was the lawsuit over the claim?

A.   Probably three years.

Q.   Okay.  I think I may have seen that. It was a reported case in federal court; isn't that right?

A.   Yeah.  Pennsylvania?

Q.   Yes.

A.   Yes.

Q.   Okay.  And I guess the personal matter, what did that concern?

A.   It was an automobile accident.

Q.   Were you the plaintiff or the defendant?

A.   Defendant.

Q.   Okay.  Now, in the context of a deposition, you're familiar with the basic ground rules.  You want to let me finish asking my question before you start to answer.

Does that make sense?

A.   Yes.

Q.   Okay.  And then also, you want to make sure to verbalize your answers, so no uh-huh or huh-uh.

Does that make sense?

A.    Yes.

Q.    Okay.  Now, you -- you're employed by Acuity Insurance Company; is that right?

A.    That is correct.

Q.    And I believe your title is a senior property claims specialist; isn't that right?

A.    It was, yes.

Q.    Okay.  And what's your title now?

A.    Manager, property claims.

Q.    Okay.  And is that a promotion in terms of becoming a manager versus a senior property claims specialist?

A.    Correct.

Q.    Okay.  And when were you promoted?

A.    Probably three months ago.

Q.    Okay.  In the context of your position as a senior claims special- -- senior property claims specialist, that was the position you occupied in January of 2024; isn't that right?

A.    That is correct.

Q.    How long had you been in that position as of January 2024?

A.    Probably three years.  I think --

DAVE JOSTES - CORP. REP.                                        JOB NO. 2324668
JANUARY 20, 2026

But you can go ahead and --

Q.    (By Mr. Ott)  Okay.  So then, go ahead and explain how this does not show that he's --

A.    It's absolutely not true because, number 1, he didn't pay for them.  We said send us the bill, and we paid that vendor direct.

Q.    Right.

A.    So he did not spend his money. That's the first thing you said.

Q.    But he was repackaging them, was he not?

MR. SHUNK:  Hey.

Q.    (By Mr. Ott)  He was repackaging these items?

A.    Some of them he was, yes.

Q.    So he was spending his money and his time?

A.    No.  He had a vendor repackage them. He was not doing it himself.

Q.    Did he -- okay.

A.    And his employees did not do it themselves.  He sent it to a third party.

Q.    Nevertheless, I mean, if he has a vendor that he's paying to do this, then this is

DAVE JOSTES - CORP. REP.
JANUARY 20, 2026

JOB NO. 2324668

a cost to his business.

Q.   Do you not agree with that?

A.   No.

Q.   You do not?

A.   I do not.

Q.   Okay.  Now, I want to talk with you a little bit about some of the other problems that may have arisen with the processing of this claim.

And first I want to note, we have on April 30th in your claims notes that you reached out to -- at 10/3 of '11, 10/3/11, you indicate that you reached out to BC Celosky to confirm, we have an undisputed repair estimate budget, and also included the contractor, which I guess is S-Pro, Servpro, Kevin Thole, advising, "We need all the billing for work that has been completed, along with the -- with any materials that are order, possibly paid, and not returnable."

So, with respect to the phrase "undisputed repair estimate," does that refer to an undisputed repair estimate between yourself, Servpro, and the building consultant?

A.   That refers to an undisputed repair estimate between Servpro and the building

consultant.

Q.   Okay.   So it does not reflect, then, some sort of undisputed estimate with respect to agreement from the insured?

A.   Correct.   We reached an agreement with the insured's contractor.   So they have a contract with Servpro.   That's who we work with. So that's who we reached the agreement with. That's who's representing him.

Q.   Okay.   Now, as of May 24th, you mark in your note, there's an indication about half -- three-quarters of the way down that "He has sold the building, and the purchaser wants to take over the claim.   I told both that I'm not inclined to accept any assignment, and I believe the policy excludes assignment.   I explained how the policy would address the claim by paying ACV to the insured, and he is free to pass this on to the purchaser.   It turns out this was his real estate broker."

So, first of all, when you're saying the ACV here, you're saying the actual cash value of the estimated repair, right?

A.   That is correct.

Q.   Okay.   So first in this context, is

DAVE JOSTES - CORP. REP.                                                  JOB NO. 2324668
JANUARY 20, 2026

it your testimony that Bill Nottke had agreed to accepting the ACV or the repair cost in terms of what Servpro had estimated?

A.    Could you repeat the question?

Q.    Is it your testimony that Bill Nottke, or anyone from Riverdale, was in agreement about the repair cost in terms of what was to be provided to Servpro or another contractor that they selected?

A.    I don't think Mr. Nottke had any kind of -- any idea of what the numbers actually were.

Q.    So to be clear, no, he did not have any agreement with them at that time?

A.    Correct.

Q.    Okay.  So at this point, there's an indication here that -- it says, "He stated they simply wanted the funds to repair the property." And you say "I advised them both that we had an agreed cost of repair with a contractor, and the only potential by letting the purchaser work with us is that they would ask for more money."

Do you see where you wrote that?

A.    I do.

Q.    So in this context, can you understand why the real estate agent is

Q.    And you said that, you know, I -- or I don't mean to mischaracterize you, but it's probably the best practice that if you receive an important communication, it's noted in the claims file; isn't that right?

A.    Correct.

Q.    Because there's supervisors that reviews the claims files, and everyone needs to be kept on the same page about what's happening in a claim, right?

A.    Correct.

Q.    Okay.  But you don't note this in the file; isn't that right?

A.    That's correct.

Q.    And that's despite the fact that it's a communication from your insured, formally invoking an appraisal under the terms and conditions of the policy and, in fact, executed by him; isn't that right?

A.    I don't think it was from him.

Q.    So in order to refresh your recollection, so I will show you the e-mail sent by Brian West.  And Brian West's e-mail to you as of June 21st, 2024, states, "I represent Bill Nottke and Riverdale Packaging Corporation in

connection with the 4501 Gustine Avenue property in St. Louis, Missouri.  Please see the attached notice that I have been asked to send to you."

Did I read that correctly?

A.    You did.

Q.    Okay.  And so, in fact, Mr. Nottke's attorney sent you a formal notice under the policy invoking the policy provision with respect to appraisal that's executed and dated.  And still there's no notation in the file as to your receipt of this communication.

Can you explain why that is?

A.    I cannot.

Q.    Okay.  So do you disagree that you received this communication?

A.    I'm not aware that I received it.

Q.    Okay.  And so is there something wrong with the communication on that day?  Like if we were to ask your IT folks to show whether or not you had received the communication, do you think that they would disagree that it was sent to you?

A.    I couldn't tell you.  I don't know.

Q.    Okay.  Now, with respect to the communication, what -- what explanation can you

offer as to why you would not have received such an e-mail?

MR. SHUNK:  Object to form.

You can answer.

A.    Well, I think, I mean, there's a lot of different things that could happen.  You could delete it by mistake, you could, you know -- it could get -- fall off your e-mail after a certain amount of time.  So there's things that can happen if it did come to me.

Q.    (By Mr. Ott)  So let's talk a little bit about that.  You said you could delete it by mistake.  So can you tell me, are you in the practice -- do you ever delete your e-mails?

A.    Yeah.

Q.    Okay.  And so, how often do you go through and delete your e-mails?

A.    Well, I mean, you delete them every day.

Q.    Okay.  So you have a daily practice of going through and deleting e-mails; is that right?

A.    Yeah.  I mean, you know, you're going through your stuff, you delete them, sometimes you grab the wrong one, sometimes you put one in

the wrong folder.  You know, sometimes that happens.

Q.    Right.  So you're saying it's possible that you deleted this e-mail; is that right?

A.    It's possible.

Q.    Right.

A.    Because I have no record of -- of that document.

Q.    Okay.  Is it possible then that you deleted any other important e-mails from this claims file?

A.    Anything's possible.

Q.    Right, anything's possible.  But, I mean, as to this particular communication, it appears that you never received it, and you're saying that it's possible you deleted it.  So I'm just wondering, you know, given that the same -- I mean, you would agree, this is an important e-mail, right?

A.    I would call it relatively important.

Q.    Okay.  So if you deleted this important e-mail, is it possible, then, that you deleted other important e-mails?

MR. SHUNK:  Object to form.

A.    I would say that anything is possible.  But I think it's highly unlikely that you would delete two important e-mails from the same file.

Q.    (By Mr. Ott)  Okay.  And so do you typically spread out the important e-mails that you delete?

A.    No.  I just think it would be -- if you want to look at percentage-wise, what's the chances?  I think it's probably pretty slim.

Q.    Okay.  Now, let's go back a little bit and talk more about the -- let's see.  So I think we were at May of '24.  Now, with respect to the transfer of rights provision, so it looks like on May 28th of 2024, there is some communications with respect to -- and you -- or Nicole Brasser is copied in the policy provision under the policy.

As of this day, were you aware of this possibility that there was state law that allowed assignment of benefits in spite of policy language prohibiting the same following a loss?

MR. SHUNK:  And I'll object to him disclosing any attorney-client communications.

If you learned -- if you have other

DAVE JOSTES - CORP. REP.                                          JOB NO. 2324668
JANUARY 20, 2026

information from other sources, you can testify about it, but I don't want you to talk about our conversations.

MR. OTT:  I think -- yes.  And I would just say, like, I think if he has knowledge of that, I don't think that that alone is attorney-client privilege.

Q.   (By Mr. Ott)  I think -- I'm not asking you to disclose what you were -- what was told to you.  I'm trying to establish your subsequent actions with respect to this claim. Were they made with knowledge of the possibility of this exception to the general rule allowing policy language to prohibit assignment?

MR. SHUNK:  So if the source of that information is an attorney-client communication, then it's privileged.

And I would instruct the witness not to answer.

MR. OTT:  Okay.

Q.   (By Mr. Ott)  So as of --

MR. OTT:  I mean, for the remainder of the deposition, I mean, he needs to -- I need to know whether or not he knew that it was attorney-client privilege -- or, I mean, whether

or not he knew that the assignment -- that the state law was there.

I mean, because he's taking a ton of these actions, and if he's doing it for a specific reason, then -- I mean, we could take it up with the Court.  I would have to come back and ask again.  I don't think that the -- I don't think that the knowledge itself -- in terms -- because it's his -- it's how the knowledge affects his behavior that I'm trying to discover. I'm not trying to discover what in particular was said.

Because if he's acting -- if he's acting on the basis of a belief that no such exception exists, it's different than if he's acting on the basis that an exception does exist, and he's just, you know, basically ignoring it, or otherwise.

MR. SHUNK:  At some point, he retained counsel.  And at some point, counsel became -- became involved and started advising Acuity and Mr. Jostes as to how to handle this unusual situation.  Now, how we advised them to do that is our work product and our attorney-client communications.

So I think he can say that he consulted counsel, and then he can say what he did next.

MR. OTT:  Yes, that's --

MR. SHUNK:  But he -- that's right.

MR. OTT:  Yeah.

MR. SHUNK:  But he can't say, well, my lawyer told me that under Missouri law, blah, blah, blah.

MR. OTT:  Yeah.  So, I mean, I think it's -- okay.  So then, that's fine.

Q.    (By Mr. Ott)  So, like -- so basically, as of the communication with Nicole Brasser and between -- or when Nicole Brasser made this note at 7:57 on May 28th, had you spoken with a lawyer about this claim yet?

A.    I'd have to look through my notes.

Can we -- do we know what this is?

MR. SHUNK:  Yeah.  That is -- I've already unredacted that, yeah.  He was just referring to the part that --

MR. OTT:  Can you just show me what you --

MR. SHUNK:  Here.  He just didn't know what that was, and I read it to you earlier.

MR. OTT:  Oh, okay.  This 5/28 note?

MR. SHUNK:  Yeah.

A.    Yeah, I probably would have to know exactly when I reached out to counsel in -- in my notes.

MR. SHUNK:  Yeah, and it's possible, Joe, that that's a -- it's possible that that's redacted.

MR. OTT:  I know.  But if he's asserting the privilege, and I am saying -- because there's questions about the redactions.  There's no privilege log.  I have to be able to investigate when he, like, had this conversation so that we know when the privilege --

MR. SHUNK:  Okay.

MR. OTT:  -- begins to apply.  I mean, this is true.

MR. SHUNK:  Yeah, I understand.  And I've been working with you on this.  So let me look and see if we can unredact anything else.  What we tried to do was redact any attorney-client communications.  I've -- I've given you stuff.

MR. OTT:  I know you have given me stuff.

MR. SHUNK:  Yeah.

MR. OTT:  I'm just saying, we've already established that at least some of the redactions were not privileged.  And in addition, we've established that he typically takes note about important things with the claim file, though, you know, obviously not always in this case.

So, I mean, if he -- if the testimony was, well, I remember on this day I called Mr. -- Mr. Jarro, then that's one thing.  But if the testimony is I don't remember, then I don't think that that is sufficient for the applicability of the privilege.

MR. SHUNK:  I get it.  Let me find -- let me find my unredacted set, and I'll answer your question.  And you can keep going if you want while I look for that.

MR. OTT:  I mean, I think even your internal notes reflecting when the consultation took place is probably sufficient for the assertion of the privilege, and a court would accept that.

Q.    (By Mr. Ott)  Okay.  So I'll just continue asking questions while he's looking for

that.

MR. SHUNK:  I'll have an answer for you soon.

Q.   (By Mr. Ott)  So with respect to the subsequent actions on the claim, between May and June 17th, May 28th, and June 17th, do you recall taking any other specific actions with respect to the claim file that may not have made it into your claim log?

A.   May 28th and June 17th.

Q.   And I will note, the note indicates, "I will pass on info from counsel as soon as I have it."

Did I read that correctly?

The May -- the June 17 note indicates, "I will pass on info from counsel as soon as I have it."

Did I read that correctly?

A.   Correct.

Q.   Okay.  So as of June 17, 2024, you're still advising that you would not accept the assignment to my client; isn't that right?

A.   That is correct.

Q.   And that's despite the fact that you have not received info from counsel about whether

DAVE JOSTES - CORP. REP.                                                    JOB NO. 2324668
JANUARY 20, 2026

or not to accept the assignment; isn't that right?

    A.   No.  I don't know that that's correct.

    Q.   Okay.  But the note specifically says, "I advised them that we have not accepted this assignment.  I will pass on info from counsel as soon as I have it."

    Isn't that right?  Mr. Jostes, isn't that what the note says?

    MR. SHUNK:  I'm simultaneously looking for what we were just talking about in front.  What was the question?

    MR. OTT:  I just asked him if it says what it says.  It says, "I advised them that we have not accepted assignment.  I will pass on info from counsel as soon as I have it."

    Right?

    MR. SHUNK:  Correct.

    Q.   (By Mr. Ott)  Okay.  So as of this day, June 17th, you're advising my client that you're not accepting the assignment, and this is despite the fact that you have not received info from counsel about whether or not to accept the assignment?

MR. SHUNK: Hang on just a second. Just look at -- look at the notation on 8/8/24. It's not redacted.

MR. OTT: Okay.

MR. SHUNK: The Nicole Brasser note.

MR. OTT: I understand.

MR. SHUNK: It says, "DAJ reviewing with counsel and having BC review. Will circle back and review reserve accordingly."

MR. OTT: I understand. But I'm asking him what the -- the document plainly says, "He advised them that they have not accepted assignment," and he also says that he doesn't have info from counsel about whether or not to accept the assignment. That is my question.

MR. SHUNK: Okay.

A. It says, "I will pass on info from counsel as soon as I have it." Okay.

Q. (By Mr. Ott) Yes. So the answer to my question is yes, you advised them --

A. Yeah.

Q. -- that you would not accept the assignment, and you also -- at the same time, you didn't have info from counsel about whether or not to accept the assignment?

A.    Correct.

Q.    Okay.  Thank you.  Now, in the context of the temp work, we talked before about the kiddie pool.  And in terms of additional temp work, do you -- do you feel that as of June, the repairs that Servpro did, those temporary repairs, were still sufficient to protect the remaining of the structure from water damage as a result of rain?

MR. SHUNK:  Object to form.

You can answer if you know.

A.    Yeah, I would have no idea, because I didn't -- I didn't look at it.

Q.    (By Mr. Ott)  Okay.  So on its face, though, is the request that additional temp work be performed, is that -- is that unreasonable as of June of 2024?

A.    Well, it's unreasonable if they stopped repairs.

Q.    Okay.

A.    So the repairs were ongoing.  They purchased the building.  Everything stopped.  Now we're trying to determine this whole assignment thing, and they want us to pay for it.  They should pay for it.

Q.   Okay.  So --

A.   They can do it.

Q.   Right.  So they --

A.   I just said, we're not paying for it.

Q.   So to be clear, at this point, you -- you have an agreement with the contractor about the cost of the repair, but you do not have an agreement with the insured about the cost of the repair; isn't that right?

A.   Mr. Nottke?

Q.   Right.

A.   Yeah.

Q.   Is the insured.  You do not have an agreement with Mr. Nottke about the cost of the repair?

A.   Yeah, there's -- there is no agreement.  We're working with this contractor.

Q.   Okay, sure.  But you just said that work was ongoing, but that's not true.  Because the work cannot begin until you reach an agreement about what work is going to be performed, how much is going to be paid for, right?

A.   No.  That's not true.  Because you don't always establish the value.  You know, we

know certain things that have to be done.  Those can begin, and those can happen before you have a final number, before you know what the claim is worth.  You address the most important things first.  And weather -- you know, weatherproofing a building is the most important things.  So that's always a race to get that done.

Q.   Right.

A.   So it doesn't mean that you have to have, you know, 50 million agreements and electricians and everything else.  As long as you have that agreed, that was already lined up.  The material was ordered.  It was going to get delivered.  We can work out the rest of the details as they come in.

Q.   Right.  But the weatherproofing of the building had not been performed as of June of 2024, June 17th of 2024, right?

A.   Yeah.  You mean putting the new roof on the building?

Q.   Right.

A.   Correct.

Q.   Right.  And so at that point, did -- additional temporary repairs would be beneficial, at least, to preventing subsequent damage to the

DAVE JOSTES - CORP. REP.                                        JOB NO. 2324668
JANUARY 20, 2026

building as a result of water coming in, right?

A.    Well, I don't know that.

Q.    So, let me ask you this:  In the context of negotiating the claim, is it your testimony that you would have withheld any additional temporary repairs to the building had Mr. Nottke disagreed about the full scope of the repair?

MR. SHUNK:  Object to form.

Q.    (By Mr. Ott)  Because it seems to me, for instance, at this point, you are -- you're saying, if -- if you want the roof fixed, you need to agree with what I have assessed as the reasonable cost of repair.

MR. SHUNK:  Object to the phrase "negotiating the claim."  That's vague and ambiguous.

A.    Yeah.  It certainly is -- it's not a negotiation when you have a contractor that has a price to do the work.  It's all planned, it's all scheduled, materials are ordered.  There's no -- there's no negotiation at that point.

The problem is, when you sell the building and another party wants to take over and eliminate those contractors and start all over

again, you've opened up Pandora's box as far as getting that building watertight.

And so the argument was, we were already there, you know.  We already saw the, you know, home plate.  We could have gotten the building closed up.  It wouldn't have been a problem.  Servpro was maintaining the waterproof status.  If they needed to come in to clean up, they would do cleanup.  There was no problem.

Q.   Right.  But the insured would have had to agree to that plan in order for those repairs to commence, right?

A.   Well, I mean, if he's got a contract with a contractor, then that agreement's between them.  It's not an agreement between me and Mr. Nottke.  It's between Mr. Nottke's contractor and then us.  It's a triangle.

Q.   Sure.  But the scope of the repair work, if Mr. Nottke had not agreed with the scope of repairs to be performed, would you still have withheld funding or coverage for additional temporary measures to prevent rain from washing into the structure beneath the plywood walls?

MR. SHUNK:  Object to form.

You can answer.

A.   I think -- I think that's -- it's speculation, you know.  You're speculating on what the possibilities are.

Q.   (By Mr. Ott)  Well --

A.   And you're speculating that maybe the system that's in place isn't working.  I don't know any of that to be true.

Q.   Okay.  But you were onsite for when the repairs were being performed?

A.   (Nods head.)

Q.   Right?  You have to say on the record.

A.   Yes.

Q.   Okay.  And so you saw that they were using this kiddie pool to collect the rainwater?

A.   I didn't see the kiddie pool.  I did see all the walls and all the flashings and everything else.  I did not see the kiddie pool. I was told that that's what they were doing.

Q.   Okay.

A.   And there's a pump that would pump the water out of the kiddie pool.

Q.   Okay.  Now, I want to talk with you a little bit further about this subsequent days. So throughout June and July and August -- or

DAVE JOSTES - CORP. REP.                                          JOB NO. 2324668
JANUARY 20, 2026

throughout June and July and continuing until August 8th, is it your understanding that any repairs were performed on the building?

A.    I'm not aware of any repairs being performed.

Q.    Okay.  And so Servpro was not doing any work on the building, right?

A.    I believe they were out of the picture at that point.

Q.    Okay.  And so in addition, you had told my client that you wouldn't pay for any of the additional temporary repairs; isn't that right?

A.    I told Wombat, who was now my insured, that if they decided to do something, that it's not something that I was -- they couldn't send me the bill.

Q.    Okay.  And in terms of your coverage decision, were you still -- did you still consider this claim to be an open claim?

A.    Yeah.  It was not closed.

Q.    Right.  So there were still -- do you agree that you still had obligations under the policy?

A.    Sure.  Absolutely.

Q.    Okay.  Okay.  Do you agree that throughout this time, under your interpretation of the law, that you had obligations to Mr. Nottke?

A.    Correct.

Q.    Okay.  So when Mr. Nottke sent you this appraisal demand on June 21st -- or June 11th of 2024 -- and I mean, you know, I under- -- you're saying that you didn't receive it, which I don't -- I don't quite understand.  But there's -- there certainly is an indication that you knew as of June that such an appraisal demand had been made.

Do you agree with that?

A.    I don't believe so.  I found out about the appraisal when I received an e-mail from Mr. Williamson, I believe.

Q.    Okay.

A.    And he asked about the appraisal.

Q.    Okay.  And when -- when is your -- so what is your testimony about when the first time you knew about the appraisal is?

A.    Well, I mean, I wouldn't even call what he sent a demand.  But Mr. Williamson sent in e-mails, he said he was the appraiser.

Q.    Okay.

A.    So I think my notes, you know, reflect that, you know, there was appraisal demand.  But it technically wasn't.  I kind of termed it an appraisal demand.  But, you know, it addressed appraisal.  And to my knowledge, there was no dispute about the value of the claim.

Q.    Okay.

MR. SHUNK:  Before we're guessing about what documents say, do you want to get it in front of you?  Do you have it in front of you?  Is it your claim file notes, or is it -- is it the e-mail exchange with Williamson?

THE WITNESS:  I think it's the e-mail exchange, yeah.

MR. SHUNK:  Do you have that as an --

MR. OTT:  I didn't mark that as an exhibit.  So I want to see in terms of -- I mean, I don't see it -- I don't see it reflected in your claims file about the demand for appraisal.

Q.    (By Mr. Ott)  So you have no --

MR. SHUNK:  Since we're getting towards the end of his claim file notes, I want you to look at the other unredacted thing I sent you this morning.

MR. OTT: Does that -- is that relevant to what we're talking about right now?

MR. SHUNK: I don't know, but you're right there on the claim file notes. So I unredacted something else that I want you to see.

MR. OTT: By the way, Judge Schelp denied your order, your motion.

MR. SHUNK: The motion for protective order?

MR. OTT: Yes.

MR. SHUNK: Oh. Don't sound so pleased.

MR. OTT: I mean, I love federal court for that reason.

MR. SHUNK: It was really just to preserve the objections.

MR. OTT: I understand. Oh, I understand why you did it. It's like, federal court's like -- it's more onerous, but also they give you what you ask for.

MR. SHUNK: They don't mess around.

MR. OTT: Yeah, no screwing around.

Q. (By Mr. Ott) Okay. So --

MR. SHUNK: Do you see what I sent you this morning?

MR. OTT:  Let's see here.

MR. SHUNK:  It's -- the e-mail says like supplemental production or something.

MR. OTT:  Let's see.  Okay.  From 12:52 p.m.?

MR. SHUNK:  That sounds about right.

MR. OTT:  This is the one from directly before the deposition?

MR. SHUNK:  Uh-huh.

MR. OTT:  Okay.  This is the stuff that you took out the unredacted -- you unredacted some of these documents?

MR. SHUNK:  One of the -- yeah, right.  And then the other one was the payment list.

MR. OTT:  Okay.

Q.    (By Mr. Ott)  So I'm still not getting the answer to my question, which was when did you learn about the demand for appraisal? That's what I really want to know the answer to. I understand you're saying that there's an e-mail that references it.

A.    Yeah.

MR. SHUNK:  Let me -- I'll pull it up.

DAVE JOSTES - CORP. REP.                                    JOB NO. 2324668
JANUARY 20, 2026

MR. OTT:  I'm looking for -- hold on. Because you're saying this is something that you would have produced?

MR. SHUNK:  Yeah.

MR. OTT:  Okay.

MR. SHUNK:  I think it would have been in the supplemental production from January 6th, I think.

MR. OTT:  Okay.  Let's just go off the record for a second so we're not having this conversation on the record.

VIDEOGRAPHER:  Going off the record. It's 5:31 p.m., ending media 4.

(Whereupon a short recess was taken at 5:31 p.m. and resumed at 5:40 p.m.)

VIDEOGRAPHER:  We are back on the record.  It's 5:40 p.m.  Beginning media 5.

Q.    (By Mr. Ott)  Okay.  So Mr. -- so, Mr. Jostes, on -- it appears that on July 22nd, Mr. Williamson sent you an e-mail indicating that he was the identified appraiser by Bill Nottke.

And is it your testimony that attached to this e-mail was the demand for appraisal, and that this was the first time you learned about it?

A.   Yeah.  I don't even think there was an attachment to that e-mail.  That strictly was my interpretation of the fact that they were pursuing appraisal.  So it really wasn't a formal demand, but, you know, I kind of addressed it as if it was.

Q.   Okay.  So to be clear, though, the appraisal demand -- or the -- what it's -- you know, this appraisal demand letter, it says if -- "Per the policy terms and conditions, we formally invoke appraisal to set the amount of loss"; isn't that right?

A.   Correct.

Q.   Okay.  So in terms of construing this document, you wouldn't -- you would agree as we sit here today that this is a formal demand for appraisal under the terms of the policy?

A.   I would.

Q.   Okay.  So in terms of the actual appraisal term, I'm going to direct your attention to the portions of the policy that discuss it, which I previously marked as Exhibit 26 and 26B.

So in terms of appraisal, it says, "If you and" -- "If we and you disagree on the

amount of net income and operating expense, or the amount of loss, either may make written demand for an appraisal of the loss.

"In this event, each party will select a competent and impartial appraisal and notify the other of the appraisal selected within 20 days of the written demand for appraisal. The two appraisers will select an umpire" -- I already read this.

So in terms of this appraisal demand here, it doesn't say anything about -- it says, "If you and" -- "we and you disagree on the amount of net income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss."

So where in this policy provision here does it indicate that you can deny the appraisal because you -- you don't believe that there is a proof of dispute about loss?

A.    Could you scroll down?  I'd like to see what --

Q.    Yeah.  So this is --

A.    Could you scroll up?

Q.    Yes.

MR. SHUNK:  I'm going to object to

form on the last question, and it assumes facts not in evidence.

MR. OTT:  Okay.

A.    I think that, clearly, I was not aware that we had any dispute over the amount of loss.

Q.    (By Mr. Ott)  Okay.

A.    So in order to determine that we have a dispute, the insured party has to provide us with something to say this is what our measure is.

Q.    Okay.

A.    So if you see the response after I received the e-mail from Mr. Williamson, I immediately reached out to Mr. Nottke and Mr. Williamson and said, you need to send us a proof that tells us what you think this is worth.

Q.    Okay.

A.    And that would suffice -- if you go back to the last thing that you were looking at.

Q.    This --

MR. SHUNK:  His letter to Bill.

A.    Yeah.  Yeah.

MR. SHUNK:  Scroll down, maybe.

A.    Yeah, I think there -- I think there

may have been -- we -- is this the letter that was sent?

MR. SHUNK:  I've attached a copy of the --

A.    This is the formal letter.  But I sent him an e-mail --

MR. SHUNK:  Yeah.

A.    -- the same time I sent Mr. Williamson a response.  So it was like within an hour I sent them both an e-mail.

Q.    (By Mr. Ott)  Okay.

MR. SHUNK:  So, there's the attachment, sworn statement, proof of loss.

MR. OTT:  Okay.

A.    But that's not an e-mail, I think that's a letter.

Could you scroll to the top?

MR. SHUNK:  Do you think you cut and pasted it or something?

A.    No.  I think we mailed him this -- no, that was an e-mail -- yeah, it is an e-mail.

MR. SHUNK:  It could have been both.

A.    Yeah.  But there's another e-mail that came before this one that was in that chain with Mr. Williamson.

DAVE JOSTES - CORP. REP.                                    JOB NO. 2324668
JANUARY 20, 2026

Q.   (By Mr. Ott)  Okay.  So you're telling me that there's a separate e-mail that you sent to Mr. Nottke that copied Mr. Williamson and requested that Mr. Nottke provide a sworn proof of loss?

A.   I don't think I copied Mr. Williamson, because I sent two e-mails.  I sent one to Nottke and then I sent one to Williamson immediately after, and I said --

MR. SHUNK:  Oh, you just had that one up.  We just had that one up.

MR. OTT:  Well, we had the one to Williamson --

A.   Yeah.

MR. OTT:  -- but not the one to Nottke, because he's claiming that he requested sworn proof of loss on --

MR. SHUNK:  Let's let -- see, is that what you're talking about to Williamson?

A.   Yeah, yeah, yeah.  But in that group of documents there's another e-mail that went to Bill Nottke.

Q.   (By Mr. Ott)  Which was this, right?  I mean, this is the same day.

A.   Yeah.

Q.     So this says date, 7/22/2024.

A.     What about the time?  Does the time line up?

Q.     16:51.

A.     So is that the one?

MR. SHUNK:  I don't think there's anything else you sent to Bill Nottke on that day, based on what I've seen.  But if I'm wrong, this is your deposition.

A.     17:14, 16:51.  And then when did the one come in from Williamson?

MR. SHUNK:  Before this.

A.     3:57.  Yeah, so I guess that was the e-mail.

Q.     (By Mr. Ott)  Okay.  So where --

A.     And I said -- and I mentioned the proof of loss in Ron's e-mail, but I didn't cc him on Mr. Nottke's e-mail.

Q.     Okay.

A.     I just mentioned it in both e-mails.

Q.     Okay.  So to be clear, in terms of the sworn proof of loss, you have no dispute about the existence of the loss as of this time; isn't that right?

A.     Correct.

DAVE JOSTES - CORP. REP.                                                    JOB NO. 2324668
JANUARY 20, 2026

Q.    And, in fact, you had been paying contractors on this claim for almost seven months --

A.    Well, I think we paid Mr. Nottke and he paid the contractors.

Q.    Okay.  So there was one check that went directly to Servpro?

A.    Mitigation sometimes goes direct.

Q.    Okay.  So in any case, you had -- you had made payments under the policy, you agree there was a covered event that occurred, and that the policy coverage was -- was -- was fixed at the time that --

A.    The coverage?  The coverage?  Are you saying you agree that coverage applied to the loss?

Q.    Yes.

A.    Yeah.

MR. SHUNK:  Object to form.

Q.    (By Mr. Ott)  Okay.  So in terms of the proof of loss, are you aware of the Missouri's -- the Missouri regulatory authority that requires that you show prejudice prior to denying a claim from failure to submit a sworn proof of loss within a specified time frame?

A.     Am I aware?

MR. SHUNK:  Object to form.

Q.     (By Mr. Ott)  Okay.  So I'm going to show you what I'm marking as Plaintiff's Exhibit 33.  Now, you're aware that there is regulatory authority applicable to the handling of insurance claims in the State of Missouri; isn't that right?

A.     Correct.

Q.     Okay.  And so in particular there are regulations like the Unfair Claim Settlement Practices Act that govern what behaviors the legislature deems unfit for an insurance company to pursue --

MR. SHUNK:  I don't think it's the legislature.

MR. OTT:  Well, it would be --

MR. SHUNK:  An agency.

MR. OTT:  So it's the fourth branch.

Q.     (By Mr. Ott)  So in any event, there's regulatory authority about the necessity to adjust claims fairly and within the strictures of the mandates set by the agency, would you agree with that?

A.     Yeah.

Q.     Okay.  Are you familiar, generally, with the provisions of the unfair claims settlement practices act?

A.     I'd say generally.

Q.     Okay.  So with respect to the denial of a claim, are you aware of the requirement that you not deny a claim -- here, let me just pull this up here.  Let me see here.  Here it is.

MR. SHUNK:  So this relates to claim denial.

MR. OTT:  Well, okay.  Let me -- that's fine.  So I understand, and again, it is not your deposition.  So, you know, in terms of the testimony about it, I think we should let that be Mr. Jostes' responsibility.

Q.     (By Mr. Ott)  So I'm going to show you here and have the Court take judicial notice that 20 CSR 100-1.020, it says, "An insurer who engaged in one or more of the following acts or practices shall be deemed to be engaged in misrepresenting policy provisions as used in section 375.1007 1.

And then at section D it says, "No insurer shall deny any claim based upon the insured's failure to submit a written notice of

loss within a specified time following any loss, unless the failure operates to prejudice the rights of the insurer."

Did I read that correctly?

A.    It looks like it.

Q.    Okay.  So, now, in particular with respect to Exhibit 31, you indicate, "I am rejecting this demand for appraisal as there has been no confirmation that you and we disagree on the amount of loss."

So do you not agree that you are denying their request for appraisal solely on the basis of the absence of this sworn proof of loss statement?

MR. SHUNK:  Object to form.

A.    No.

Q.    (By Mr. Ott)  What other reason is there for you to not have provided the appraisal once you received the signed written demand invoking the policy provision?

A.    Could you repeat the question?

Q.    What other reason, other than the failure to submit a signed sworn proof of loss is there, that you denied the request for appraisal under the terms of the policy?

MR. OTT:  Object to form.

You can answer.

A.    Could you -- could you rephrase it?

Q.    (By Mr. Ott)  Is there any other reason that the claim for -- the request for appraisal was denied, except for you --

A.    The proof --

Q.    -- not receiving the sworn proof of loss?

A.    Yeah.

MR. SHUNK:  Sure, object to form.

Go ahead.

A.    There's no measure of the loss.  If they would have given us an estimate from a -- if he would have sent us an estimate from a contractor or something that says -- or even if he said, I'm a contractor, I don't agree with you --

Q.    Right.

A.    -- I think it's $15 million, that would suffice.

Q.    Okay.  But you did, in fact, receive from my client a estimate of damages that totaled approximately $9 million, didn't you?

A.    That's not my insured.

Q. Okay. So really the reason -- because -- because you have the facts, is there any other reason except for that, that he didn't send you -- you're saying he didn't send you the sworn proof of loss, and also he didn't say the contract -- send you like a contractor's letter saying what they thought it would be?

MR. SHUNK: Object to form. You got to give me a pause and then you can go.

THE WITNESS: Okay.

MR. SHUNK: There you go.

A. Okay. Yeah. I mean, he could have done several things --

Q. (By Mr. Ott) Okay.

A. -- to -- to, you know, that would cause us to invoke the appraisal. But in my correspondence with him, in my phone conversations with him, he clearly did not think that there was an issue.

And he certainly did not think that the estimate provided by Wombat was an issue. There's an e-mail where he says, I don't understand why they don't just take the money and settle the claim and be done.

Q. I don't know about that. So you're

saying that there's --

A.    Well, I do know about that.

Q.    -- there's another e-mail.  Okay.  I mean, if you're going to keep referring to these e-mails, I'm going to keep asking to see them. So where is the -- what e-mail are you talking about?  I mean, that's news to me if you're saying that Bill Nottke sent you an e-mail saying that he --

A.    It might have been in the claim notes; it could have been a phone conversation.

MR. SHUNK:  Tell me what we're looking for.  I don't know what we're looking for.

Q.    (By Mr. Ott)  Well, I don't see anything in the claims notes reflecting a conversation -- purported conversation with Bill Nottke.  Let me just ask you this:

A.    Would it be after the attorney-client privilege stuff kicked in.

MR. SHUNK:  I don't know.

MR. OTT:  That's not how that works.

MR. SHUNK:  I don't know.  But tell me -- tell me --

THE WITNESS:  I'm not an attorney, I

don't know how it works.

MR. SHUNK:  Let's go off the record and sort this out, because right now everybody's talking over one another.  Yeah.

VIDEOGRAPHER:  We're going off the record.  I'm going to go off the record.

COURT REPORTER:  Yeah.

VIDEOGRAPHER:  Okay.  Yeah.  It's 5:53 p.m., going off the record.  End of media 5.

(Whereupon a short recess was taken at 5:53 p.m. and resumed at 6:06 p.m.)

VIDEOGRAPHER:  We are back on the record now.  It's 6:06 p.m., beginning of media 6.

MR. SHUNK:  Okay.  So I have done a supplemental production of documents and unredacted some claim file notes.  And the version that I sent counsel for Wombat did not include the date on one of the claim file notes.

So the claim file note I'm referring to, it begins with, "Sent e-mail and letter to named insured."  That claim file note was sent, and I accidentally redacted the date and time from that.  That e-mail -- or that claim file note was prepared on July 22, 2024 at 4:38 p.m.,

and it was prepared by Dave Jostes.

MR. OTT:  Okay.

Q.    (By Mr. Ott)  So, we were previously talking about the posture that was taken in request -- in response to the e-mail from Mr. Williamson.  And that e-mail was dated July of -- or June of -- there's an e-mail on June of 2021 which you claim not to have received.

And then on July 22nd, Mr. Williamson sent you an e-mail directly.  And we were talking about why the request for appraisal had not been honored.  And the retort was with respect to the proof of loss, that you had requested proof of loss.

And now I'm looking at a now unredacted claim note.  And so it looks like you sent an e-mail to the named insured.  And what day was this again?  It was 8/8?

MR. SHUNK:  7/22/24.

Q.    (By Mr. Ott)  Okay.  So the same day, you sent an e-mail to the named insured stating that you would not accept the appraisal demand because he never indicated there was an issue regarding the amount of loss.

So with respect to the -- so --

MR. SHUNK:  Oh, you did see that there.

A.    What's the date?  June 22.

Q.    (By Mr. Ott)  So with respect to the indication about the amount of loss, does the fact that Mr. Nottke received over $3 million for this property not factor in to your assessment as to whether or not he disputed the insurance company's estimates and behavior in this case?

MR. SHUNK:  Object to form.

You can answer if you know.

A.    I have no idea how that plays into the insurance claim at all.  I don't even know -- are you saying that's what he sold the building for?

Q.    (By Mr. Ott)  Yes.

A.    Yeah, I have no idea how that would have anything to do with the claim.

Q.    Well, you received copies of the executed assignment of benefits; Isn't that right?

MR. SHUNK:  Object to form.

A.    I believe we did.

MR. SHUNK:  Oh.

A.    Sorry.

MR. OTT:  He did receive it.

Q.    (By Mr. Ott)  So with respect to the assignment of benefits form, I mean, you reviewed that assignment of benefits, right?

A.    I looked at it.

Q.    Okay.  And so did you have any rationale for believing that the assignment of benefits was somehow invalid as between my client and Mr. Nottke?

A.    I believe that the policy says you cannot transfer any rights or anything without prior written consent.  So in my opinion, the -- the assignment was invalid.

Q.    As to the insurance benefits.  But you agree that Mr. Nottke received payment for the building and the assignment of benefits?

A.    I don't know what he received.  I have no idea.

Q.    But you received the contract wherein he expressed that?

A.    Yeah.  I don't know what was deposited -- deposited in his bank.  I --

MR. SHUNK:  He's asking -- he's asking if you received the contract.  You don't know.

Q.    (By Mr. Ott)  You received -- you received the assignment of benefits directly from Mr. Nottke.  He sent you the assignment of benefits form.  So let me see if I can -- so let me see if I can find --

A.    I thought we got it from Michael Paul.

MR. SHUNK:  I think that's right. And I think it was an unsigned version.

Q.    (By Mr. Ott)  Okay.  Let's see here.

Do you disagree that you received, at some point, the assignment of benefits executed by Bill Nottke?

A.    I know that we received a copy of the assignment.  I don't recall if it was executed or not.

Q.    As we sit here today, do you have any reason to dispute that the -- that Bill Nottke received consideration for the building and the assignment of benefits, that he was -- in the context of the transaction to purchase the building, that he also agreed to assign the benefits to the claim?

MR. SHUNK:  Object to form.

You can answer.

A.    I guess my question is:  Do you mean as part of the compensation for the building?

Q.    (By Mr. Ott)  Yes.

MR. SHUNK:  Object to form.  Lacks foundation.

A.    Yeah, I have no idea.

Q.    (By Mr. Ott)  All right.  Well, then, hold on.

So I'm going to show you an e-mail which I'm presently marking as Plaintiff's Exhibit 33.

(Plaintiff's Exhibit 33 was marked for identification.)

Q.    And it's an e-mail sent from Michael Paul to you on June 20th, and it was sent at 3:23 p.m.  With respect to the e-mail, Mr. Paul has indicated that he's following up with you regarding your decision on the assignment.

And at this time, were you considering the validity of the assignment agreement as of June 20th, 2024?

A.    Is this separate from the last question?

Q.    My question is whether you received the assignment agreement and you dispute the

validity of the assignment in terms of the transaction that was closed on June 10th. So I just want to know if you dispute whether or not the assignment was valid as between Bill Nottke and Michael Paul? So Michael Paul purchased the assignment -- an assignment of benefits which Bill Nottke provided to him.

MR. SHUNK: Object to form.

You can answer if you know.

A.    Yeah. I did not know that you could purchase an assignment of benefits.

Q.    (By Mr. Ott) Okay. So are you -- you are aware, though, that in this case, that Michael Paul purchased an assignment of benefits in conjunction with the transaction for the 4501 Gustine Avenue property?

A.    No. I had no idea.

Q.    Okay. So --

A.    I thought the assignment of benefits was just so they could get the building repaired. I didn't know that that's part of the purchase plan --

Q.    Okay. So then --

A.    -- and they paid for it.

Q.    So when you received this e-mail on

June 20th, 2024, were you considering the validity of the assignment, or what were you considering?

A.    I don't know.  I guess I'd have to see what you're talking about, because I don't recall that document.

Q.    Okay.  Let me see here, then. Assignment of benefit, okay.  Actually, it's going to be my original discovery documents.

A.    So would that be in here somewhere?

Q.    No, that's okay.  Let me see if I can pull it up.  Here's the policy.  Okay.

So I'm showing you what's previously been marked as Exhibit -- or that's marked as Wombat 386 through Wombat 388.  And you can see it says Insurance Benefits Assignment Agreement.

Do you see that?

A.    It's in here.

MR. SHUNK:  Can we not --

MR. OTT:  Oh, you can't see it on the screen.  My mistake.  Let me share.

So you can see here that says, Insurance Benefits Assignment Agreement at the top, right.

MR. SHUNK:  Yes.  Can we see the

thing that shows it was sent to him?

MR. OTT:  I understand.  I'm just going to ask him --

Q.   (By Mr. Ott)  I just -- I believe this was sent to you by Michael Paul?

MR. SHUNK:  If we can just see the letter, he may agree.  I don't know.

MR. OTT:  I know.  So I'm going to -- I can't find the cover e-mail.  I'll ask during the designee about -- with the assignment topic.  But again --

Q.   (By Mr. Ott)  But with respect to this document, do you disagree that -- do you have any memory of reading this document?

A.   You know, I don't remember reading it.  But, you know, there's a lot of documents in this.

Q.   Okay.  Sure.  So in the context of your consideration of the assignment following June 10th, were you ever evaluating this claim on the basis of whether or not the assignment was valid as between Bill Nottke and Michael Paul?

And I don't mean in terms of the insurance benefits.  I'm saying not as to whether or not you had to pay under the policy or whether

there was an exclusion for an assignment of benefits. I'm saying when you were reviewing the claim, and we can look at your claim notes, were you ever assessing during that period whether or not you viewed the assignment as being a valid assignment?

MR. SHUNK: Object to form. Do you mean valid as between the two parties?

MR. OTT: Valid as between the parties, yeah.

A. You mean Bill and --

Q. (By Mr. Ott) Michael Paul, yes.

MR. SHUNK: Object to form.

A. I never even considered that. Didn't even think about it.

Q. (By Mr. Ott) Okay. So then, no, so there wasn't any consideration as to whether it was valid as between Bill Nottke and Michael Paul?

A. No.

Q. Okay. That's all I was asking. Now, in the context of the decision regarding the interpretation of the assignment of benefits as to the terms of the policy, at what point did you -- or actually, let's look at that -- the

most -- that most recent e-mail that was unredacted.

So I've marked this as Plaintiff's Exhibit 33.  And you state that -- in your note, "Bill advised that he's caught in the middle of this.  The contract states that he will help the buyer with the claims process if necessary.  He stated he doesn't understand why the buyer won't just take the funds and move on."

You state, "I advised we know they will be making the repairs, so I will be paying -- willing to pay RC as a negotiated settlement on what we had agreed cost of repair for with the policyholder's release."

Now, was a policyholder's release ever issued for Mr. Nottke?

A.    No.

Q.    Okay.  So in the context of this note, you're considering whether -- or you're -- you're -- oh, it's not showing again.  So in the context of this note, your consideration of a policyholder's release, what would a policyholder's release have provided in this context?

A.    Well, in this context, it would be,

you know, no come-backs.  This is a settled claim.

Q.    Okay.  And to the fact, again, that he didn't provide that negotiated release, shows that the claim, from your perspective, even to this day, is not settled?

A.    Correct.

Q.    Now, in terms of your statement that you have not had evidence that the repairs will cost more, you did receive from my client the estimate as to the $10 million in costs.

Do you recall that?

A.    I do.

Q.    So, in fact, on August 8th as well, it looks like the -- it's your note at 15:51, Acuity 16 states that, "The purchaser of the property sent an e-mail.  When I viewed the three attached documents, it was an estimate for $10 million to replace the entire roof structure, including roof membrane, insulation board, metal decking, and metal bar joists.  It also included sprinkler systems, et cetera.  And this estimate refers to log notes in the claim file."

So you did have notice that at least Michael Paul disputed the value of the claim;

isn't that right?

A.    Yeah, I think that was clear.

Q.    Okay.  And you also had notice that Mr. Nottke had agreed to cooperate with Mr. Paul as a condition of his agreement to sell the building, right?

MR. SHUNK:  Object to form.

You can answer.

A.    I think my interpretation was that he agreed to work with us to try and get things settled.  So whatever we agreed to, that he would pass on to Michael Paul so that they could make the repairs to the building.

Q.    (By Mr. Ott)  Right.  But that's not what the note says.  The note says he --
"Contract states that he will help the buyer with the claims process if necessary."

A.    Okay.

Q.    Do you see that?

A.    He stated --

MR. SHUNK:  Do you see it?  Can you blow it up?

A.    Oh, yeah, I see it, yeah.  Yeah, yeah yep.

Q.    (By Mr. Ott)  So with respect to

Mr. Nottke's obligations under the contract, it appears your note is reflecting that he expressed that he had a contractual obligation to you to cooperate with the buyer in the claim; isn't that right?

MR. SHUNK:  Object to form.  Assumes facts not in evidence.

Q.    (By Mr. Ott)  Well, the note specifically says, "The contract states that he will help the buyer."

So is that a reflection of what he told you?

A.    Yeah.  I think it's -- you know, it's an interpretation that maybe you have.  But it says to me that, you know, he's not just going to walk away from this.  He's going to help the -- you know, whatever we deal with him on, he's going to help with the insured by passing it on to him.  In fact, that's -- there was a conversation where he said, you know, I'm going to pass the money to them.  Anything you pay me is going to go to them.  I don't keep any of it.

Q.    Right.  But the note specifically says, "Contract states that he will help the buyer with the claims process if necessary,"

right?

A.    Yeah.

Q.    So he's expressing to you at this time that he has a contract, right?

A.    His -- yeah, his contract, yeah.

Q.    Yeah.  He has a contract with the buyer, and the contract says that he will help with the claims process, right?

A.    Yes.

MR. SHUNK:  Object to form.

You can answer.

Q.    (By Mr. Ott)  Okay.  Does the fact -- doesn't the fact that Mr. Nottke has agreed with the buyer to participate in the claims process lend some credence to the buyer's estimate of damages in terms of your assessment of loss?

A.    Absolutely not.

Q.    Okay.  And what about the fact that he doesn't -- that Mr. Nottke has agreed to help the buyer?  Doesn't -- does that not suggest to you that he's authorized the buyer to provide this to you on his behalf?

MR. SHUNK:  Object to form.

A.    No, because that's not what he said.

Q.    (By Mr. Ott)  Okay.  But he has a

contract with the buyer.  Does that not mean that the buyer -- that he's agreed, at least, to help the buyer with the process, and, therefore, authorized the buyer to do things on behalf of the claim?

MR. SHUNK:  Object to form.  Lacks foundation.  Calls for speculation.

Go ahead.

A.   He could have contracts with everybody down that street, and that doesn't mean that they have anything to do with me.

Q.   (By Mr. Ott)  Okay.  But in this case, it does, because the contract that he's talking about also contains the assignment of benefits, right?

MR. SHUNK:  Object to form.

You can answer.

A.   I guess that that would be what he is talking about.

Q.   (By Mr. Ott)  Right.  So if the contract requires him to cooperate in the assignment of benefits, then when you receive the communications from the buyer, do you not agree that Mr. Nottke has authorized or blessed those communications in some way?

MR. SHUNK:  Object to form.  Lacks foundation.  Calls for speculation.

A.    No, I don't, especially based on conversations I had with him.

Q.    (By Mr. Ott)  Right.  And in the context of this note here, you've also indicated that -- you said there was an agreed cost of repair.  And he indicates below that if the estimate is more, that he would be open with the appraisal option.

Isn't that right?  Do you see at the bottom there?

A.    No.  I think that's me telling him he needs to provide some evidence of what the appraisal -- or what the repair cost would be, and if it's more, then that would open up the appraisal option.  So I'm telling him, if you can provide us with documentation that supports that there is a difference, that would open up the appraisal.

Q.    Okay.  And then it says, "He will tell the buyers to get an estimate," which he did, and he sent the estimate to you, right?

A.    Mr. Nottke didn't send the estimate to me.

Q.    Okay.  But the buyer sent the estimate to you?

A.    And the estimate was written by the buyer.

Q.    Right.  So in this context, though --

A.    So that --

Q.    I mean, if you're discussing the appraisal option and you're inviting an estimate, it says he needs to provide some evidence of what the repair cost on the property should be, right? And you were provided that estimate.

A.    Wonder -- one question I have is: When was the estimate provided?  Do we have that?

Q.    That was also on August 8th.

A.    Okay.

Q.    So if -- I mean, you were provided the estimate.  And, you know, similarly to the attorney that sent the request for appraisal on his behalf, the buyer is also sending you a request for appraisal.  Mr. Nottke has expressed to you that he's contractually obligated to work with the buyer as a result of the conditions of the sale.

So what, in particular, about the fact that Michael Paul sent the estimate

invalidates it, from your perspective, analyzing the appraisal conditions?

MR. SHUNK:  We're getting close -- I'm going to object to beating a dead horse, because this has been asked and answered before.

But go -- go ahead.

But I'm just saying we've kind of covered this.

MR. OTT:  Okay.

MR. SHUNK:  And he answered it.

A.    So Michael Paul is not my insured. Bill Nottke is.  So if Bill Nottke would have sent me the estimate, I may have given it some consideration.  But certainly when it was written by Michael Paul, that would really make it somewhat meaningless.

Q.    (By Mr. Ott)  Okay.  So let me just see what else I have in terms of the policy. Okay.  I just wanted to go through a few of the conditions of the policy.

So we were discussing some of the losses that Mr. Nottke had -- had under the policy with respect to his business.  And I know you were saying that the Amex was not -- you did not consider that to be a business loss, right?

A.    Well, it's not a business income loss, no.

Q.    Okay.  Now, in the context of the printer's errors and omissions liability component of the policy, do you read this component to provide coverage for Mr. Nottke's reimbursement of costs for materials lost in the covered event?

A.    No.  Because we would pay for materials lost under the business personal property claim.

Q.    Okay.  And is it your testimony that you paid for all of the materials that were lost as a result of this claim?

A.    Absolutely.

Q.    Okay.  And in the context of the Amex payment -- the payments for this repackaging of materials, you're not claim- -- you're not calling those covered under either this printer's errors and omissions or under the terms of the -- the personal property loss?

A.    It would be covered under property of others, which is technically part of the personal property loss.

Q.    Okay.  I think -- so I just want to

assess your compensation package with Acuity

during the year 2024.

So were you paid a salary by Acuity?

A.    Yes.

Q.    Okay.  And was the salary contingent

upon your performance?

A.    Well, I would say the salary was not.

Q.    Did you receive bonuses?

A.    No.  But your merit increase at the

end of the year is based on your performance.

Q.    Okay.  And tell me about the process

through which the merit increase is assessed.

A.    You have an annual performance

evaluation.

Q.    Okay.  And in 2024, what was the

basis for your -- did you receive a merit

increase?

A.    Yes.

Q.    Okay.  Now, when you were assessed on

the basis -- or for your merit increase, what

were the factors that you were assessed on?

A.    Boy, that's a good question.  It's

a -- I think it's about, you know, being on

mission with the company's mission statement and

values, and -- you know, it breaks down into your

daily work routine and some of those details.  I mean, I would have to have it in front of me to really dig into it with you.

Q.   Okay.  And in terms of the merit pay increase, did it reflect the manager and supervising manager's assessment of your claims-handling performance?

A.   I would say that that's part of it, yeah.

Q.   So -- and that includes this claim's handling performance?

A.   Probably.

Q.   Right.  So in some way, then, the claims handling that you had here contributed to the merit pay increase?

MR. SHUNK:  Object to form.  Lacks foundation.  Calls for speculation.

A.   I don't know that you can -- sorry.

MR. SHUNK:  Go ahead.

A.   I don't know if you could draw a straight line.  I mean, ultimately, your performance as a whole.  So if you want to consider that one nugget in, you know, the cookie, then, yeah, probably.

Q.   (By Mr. Ott)  Did you have similar

performance on other claims?

MR. SHUNK:  Object.  Vague and ambiguous as to "performance."

Q.    (By Mr. Ott)  In other claims, did you deny coverage where it was available, or maybe available under state law?

MR. SHUNK:  Objection.  Assumes facts not in evidence.

You can answer.

A.    Of course not.

Q.    (By Mr. Ott)  Okay.  So in the context of your claim-handling performance, when you received your review, was there any objective measure assessed about how you performed?

A.    Do you mean metrics?

Q.    Yes.

A.    No.

Q.    Okay.  Are there metrics that you track for the people that you supervise now?

A.    No.

Q.    And in terms -- so there's -- Acuity maintains no metrics, is your testimony, about claims-handler performance?

A.    Correct.

Q.    In the context of your evaluation for

your merit increase in 2024, did any component of it -- who -- who was the supervisor that rendered that evaluation?

A.    2024 would have been Nicole Brasser.

Q.    Right.  So during the meeting with Nicole Brasser, did you discuss this claim?

A.    I don't think so.

Q.    Okay.  Let me see here.

MR. SHUNK:  I've got a few minutes worth.

MR. OTT:  Oh, you have questions as well?

MR. SHUNK:  Yeah.

MR. OTT:  Okay.  Go ahead.

CROSS-EXAMINATION

BY MR. SHUNK:

Q.    Mr. Jostes, did you deny this claim?

A.    No, I did not.

Q.    Okay.  If we were to add up the amount of money that Acuity has paid to date on this claim, would it exceed a million dollars?

A.    I think it's around a million and a half, roughly.

Q.    Okay.

A.    Roughly.

Q.    Okay.  So that's far from denying a claim?

A.    Correct.

Q.    Okay.  I want to talk about the different kinds of e-mails that you received to that Acuity address that was up there.

Do you ever receive spam e-mails to that address?

A.    (Nods head.)

Q.    Do you ever -- oh, you need to answer out loud.

A.    Sorry.  Yes.

Q.    Yeah.  Okay.  Did you answer my previous question out loud, or did you just nod?

COURT REPORTER:  He answered, "correct."

Q.    (By Mr. Shunk)  Okay.  So I need to get verbal responses.

Do you receive spam e-mails to that address?

A.    I do.

Q.    Do you ever receive, like, solicitations of various types?

A.    I do.