UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ACUITY, A MUTUAL INSURANCE
COMPANY,

       Plaintiff,

   v.

RIVERDALE PACKAGING
CORPORATION,

and

LORA PROPERTY INVESTMENTS,
LLC

and

WOMBAT ACQUISITIONS LLC,

       Defendants.

Case No.: 4:24-cv-01277

## PLAINTIFF ACUITY'S RESPONSES TO DEFENDANT WOMBAT'S STATEMENT OF ADDITIONAL FACTS

COMES NOW plaintiff Acuity, by and through its undersigned counsel of record, and pursuant to Local Rule 4.01(C), and submits the following response to Wombat's Statement of Additional Facts.

PROCEDURAL OBJECTIONS: Neither Rule 56, nor Local Rule 4.01(E) provides that a party opposing a motion for summary judgment may submit a statement of additional facts. To the extent this Court is inclined to consider such facts, they should be held to the same standard as the Statement of Uncontroverted

Material Facts referenced in Rule 4.01(E) requiring that "each relevant fact [be set forth] in a separately numbered paragraph."

Here, Wombat has filed a response to Acuity's statement of uncontroverted facts, which then includes a separate statement of additional material facts beginning at No. 56 and ending at No. 81. *Every single one* of those paragraphs are comprised of multiple facts, rendering it difficult to provide a clear and cogent response. Moreover, all but a very few of those facts relates to issues *other than* the issue raised by Acuity's motion for summary judgment.

[Numbering corresponds with source.]

54.  On June 21, 2024, the named insured William Nottke signed a formal demand for appraisal under the policy, invoking the policy provision that states: "If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss." The demand identified Ron Williamson as the insured's appraiser and was submitted to Jostes through Nottke's attorney, Bryan West. (Ex. A, Jostes Depo. 179:9-180:15, 206:3-12).

**Response:  These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

55.  On July 22, 2024, Jostes rejected the appraisal demand, stating: "I am rejecting this demand for appraisal as there has been no confirmation that you and we disagree on the amount of the loss." (Ex. A, Jostes Depo. 215:6-14). Jostes

conditioned appraisal on submission of a sworn proof of loss, despite having no dispute about the existence of the loss. (Ex. A, Jostes Depo. 211:21-25). There is no notation of the appraisal demand anywhere in Acuity's claim file. When asked to explain this omission, Jostes testified: "I cannot." (Ex. A, Jostes Depo. 182:10-13).

**Response:  These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

56.  Jostes rejected the assignment on May 24, 2024, before consulting counsel, before reviewing the anti-assignment clause, and before researching Missouri law on post-loss assignments. (Ex. A, Jostes Depo. 134:4-10; 133:20-134:3; 162:18-22). His stated rationale was purely financial: "There's no benefit of us accepting the assignment. There's only downside.... the only potential by letting the purchaser work with us is that they would ask for more money." (Ex. A, Jostes Depo. 156:23-158:8; Ex. F, Claim Log 05/24/2024 entry). He could not initially locate the anti-assignment clause in the policy: "I looked at the policy, and I didn't find anything restricting assignment." (Ex. F, Claim Log 05/24/2024 entry, note to supervisor Brasser, p. 14).

**Response:  Acuity admits that it did not consent to the assignment. Otherwise, the facts alleged in this paragraph are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether**

3

**Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

57.  On February 5, 2024, Acuity's own Rough Order of Magnitude estimate identified $3.2 million in what it termed "potential code upgrades" that could be triggered by the repairs: "ROM also includes potential code upgrades which have been valued at approximately $3.2 million if they are enforced. The policy only provides $60K in code upgrade coverage between the main policy and the Acuity Advantages endorsement." (Ex. F, Claim Log 02/05/2024 entry, p. 10). The NCC estimate of $1,179,293 did not include any code compliance costs. Acuity's own expert, Richmond, expected the adjuster to inform the insured about the $60,000 code compliance sub-limit. (Ex. B, Richmond Depo. 76:13-25).

**Response: These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

58.  NCC building consultant Celosky worked 100% for insurance carriers; approximately 50% of his 2024 files were for Acuity specifically. (Ex. C, Celosky Depo. 10:17-24; 22:20-23:2). He was tasked by the insurance company, not the insured. (Ex. C, Celosky Depo. 37:12-18). He never spoke to the insured Nottke about this claim. (Ex. C, Celosky Depo. 72:12-16). The NCC estimate was a carrier-to-carrier contractor arrangement in which the insured had no participation. (Ex. A, Jostes Depo. 195:13-17).

4

**Response: These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

59.  The $836,124.37 ACV payment was calculated by Jostes on August 8, 2024, but was not issued until August 13, 2024 — the same day Michio's vexatious refusal letter arrived. (Ex. F, Claim Log 08/08/2024 and 08/13/2024 entries, pp. 16–17). The payment was overnighted. (Ex. F, Claim Log 08/13/2024 entry, p. 17). The VP of Claims, James Loiacono, approved a $200,000 reserve increase just days before payment — involvement that Jostes testified "would only ever" occur on a routine file. (Ex. A, Jostes Depo. 149:7-11; 151:3-6). The loss had been open for 206 days; the NCC estimate had been available for 133 days.

**Response: These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

60.  Jostes admitted he never solicited a single electrician, plumber, architect, or fire suppression vendor to bid on any portion of the repair: "I don't have any solicitations for electricians, fire suppression vendors, architects, electricians, plumbers. I don't have any of those." (Ex. A, Jostes Depo. 114:16-19). When asked specifically about fire suppression bids, Jostes confirmed: "I don't solicit the bids, I

don't review the bids." (Ex. A, Jostes Depo. 104:19-20). No repairs were performed on the building from June through August 2024. (Ex. A, Jostes Depo. 199:23-200:5).

**Response: These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

61.  The covered loss included substantial damage to the fire suppression system. (Ex. A, Jostes Depo. 113:7-10). Yet Celosky's estimate of fire suppression damage was "based on a square footprint of an affected area" only, without assessing damage to neighboring components of the system. (Ex. C, Celosky Depo. 89:23-90:1; 66:9-12). Celosky testified he "would not be aware that there was any other impact outside of the immediate claimed event area." (Ex. C, Celosky Depo. 89:23-90:1; 66:9-12).

**Response: These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

62.  Acuity's own expert, Douglas Richmond, has testified exclusively for insurance companies for more than 15 years. (Ex. B, Richmond Depo. 13:17-23). He acknowledged he has "no basis to say that the assignment was somehow broadly invalid or unlawful." (Ex. B, Richmond Depo. 84:7-20). Richmond further conceded that the post-loss assignment exception has been Missouri law since at least 1959:

"At least with respect to certain categories of losses, yes, sir." (Ex. B, Richmond Depo. 102:6-10.)

**Response: This is a distortion of Mr. Richmond's testimony. The exact testimony is set forth below:**

```
    Q.    Okay.  So there is no factual or legal
dispute from you in terms of your opinion that
the assignment was valid as to -- as between
Riverdale and Wombat?
    A.    I -- I have no basis to say that the
assignment was somehow broadly invalid or
unlawful there.  As I've testified -- as I've
put in the report, it's Acuity's view,
disagreed with by Wombat anyway, in terms of
whether the assignment was effective with
respect to the Acuity policy. But I've not
attempted to determine whether the assignment
was effective more broadly as any sort of
transactional matter.
```

(Dep. Doug Richmond, 84:7-20)

**Mr. Richmond was not, as counsel for Wombat suggests, stating that the assignment was binding on Acuity.**

**As for the next statement attributed to Mr. Richmond, below is his testimony in its full context:**

```
    Q.    And this is post-loss assignment
exception, it's been Missouri law, therefore,
since at least 1959; isn't that right?
    A.    At least with respect to certain
categories of losses, yes, sir.
    Q.    Okay.  And with respect to those
categories of losses, there is an explanation
```

that the Bowden court gives a rationale for the rule; isn't that right?

A. Right. The rationale is at the time of the assignment, the insured's liability has already become fixed.

[…]

Q. Now, under Missouri law, it's -- the Bowden opinion necessarily holds that once a covered loss occurs, the insurer's liability is fixed?

A. I -- I -- I don't read the case that way. I read the case as saying that when -- when -- that you apply the rule because an insurer's liability has already become fixed. And so in this case Acuity has said its liability was not fixed. Wombat contests -- Wombat claimed it's owed over $9 million for the loss. Acuity believes it's fully paid the loss by paying a little over a million dollars, actually closer to 1.5, I think, if you add everything up. **And so Acuity's position is that liability was not fixed and so the general rule, and it is a general rule, I should say the exception to the general rule doesn't apply. And I believe that -- that Acuity or any other -- any other litigant has a right to litigate its obligations under Missouri law.**

(Emphasis added.) (Dep. Doug Richmond, 101:6-103:24)

63. Richmond conceded that Acuity's liability was established early in the claim: "it was calculated fairly soon thereafter, at least reasonably soon thereafter that it appeared to be a covered loss as evidenced by the fact that Acuity began making payments and engaged contractors." (Ex. B, Richmond Depo. 97:10-98:18).

**Response: Below is Mr. Richmond's testimony in context:**

8

I mean, the fact is we had the loss on January 20th of 2024, and we know that it was apparently -- it was calculated fairly soon thereafter, at least reasonably soon thereafter that it appeared to be a covered loss as evidenced by the fact that Acuity began making payments and engaged contractors. **But even after that loss occurs, I mean, keep in mind that the party's obligations don't end.**

Obviously, Acuity has an obligation to evaluate the loss, estimate the loss, calculate the loss, and pay the loss. And throughout that process, Riverdale has an obligation to cooperate.  So you could have the loss that occurs, the loss to be apparently covered by a policy, and yet an insured could refuse to cooperate.  And so even after a loss that appears to be covered occurs, the insured could lose coverage and that can continue right up until the time that the loss is fully paid and, in fact, thereafter, if the insurer were to determine it were somehow defrauded, then it could seek to recover moneys it was paid. I mean you just can't pick -- I mean, once the loss is -- once the loss is reported, what we have then is the parties acting under their contract which includes, on Riverdale's part, an obligation; one, to cooperate; and two, to comply with any conditions in the policy such as providing a signed, sworn proof of loss.

(Emphasis added.)(Depo. Doug Richmond, 97:14-98:18)

64.  For months after the collapse, the only protection for the building interior from rainwater was a kiddie pool placed in the middle of the room. Jostes was aware

9

of this and considered it adequate through at least May 2024. (Ex. A, Jostes Depo. 172:19-173:1; 174:1-12).

**Response:  These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

65.  Acuity's August 29, 2024 settlement offer of $1.3 million proves Acuity recognized its own NCC estimate of $1,179,293 was inadequate. The $120,707 difference between the NCC estimate and the settlement figure represents Acuity's own concession that additional damages existed beyond the preliminary estimate. (Ex. H, Settlement Letter, p. 2; Ex. F, Claim Log Page 30 of 41; Ex. C, Celosky Depo. 88:1-6, 88:17-24). The offer was accompanied by a coercive 30-day automatic withdrawal clause and was directed to a man Acuity knew had already assigned the claim.

**Response:  These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

66.  The Alternative Agreement executed in connection with the building sale expressly obligated Nottke — and, after his death, his estate — to continue cooperating with Acuity's claims process in the event Acuity refused to honor the assignment. Specifically, the Alternative Agreement provided for the seller to: (1)

hire an appraiser at buyer's cost; (2) hire counsel at buyer's cost; (3) hire a public adjuster at buyer's cost; and (4) grant buyer an irrevocable lien on claim proceeds. The transaction was structured to ensure Acuity retained the cooperation it claims to need. Acuity's assertion that the assignment deprived it of its named insured's cooperation is therefore without merit: the assignor remained contractually bound to cooperate, at the assignee's expense.

**Response:  This paragraph consists solely of counsel's argument and numerous alleged facts without any citation to the record of this case. These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection. Counsel is merely describing the terms of an agreement to which Acuity was not a party.**

67.  Acuity never issued a reservation of rights letter citing the anti-assignment clause or any other potential coverage defense. Standard insurance practice when an insurer identifies a potential coverage defense is to issue a reservation of rights letter to preserve that defense while continuing to investigate and pay undisputed amounts. Acuity's failure to issue any reservation of rights is additional evidence that it did not, in good faith, believe the anti-assignment defense was available — and constitutes additional grounds for waiver under Missouri law.

**Response:  This paragraph consists solely of counsel's argument and numerous alleged facts without any citation to the record of this case.These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection. Nevertheless, Acuity admits it did not issue a reservation of rights letter. Acuity has not denied coverage to its insured. It is denying coverage to Wombat—a third-party with whom Acuity has no connection.**

68.  Acuity initiated this litigation by filing an affirmative declaratory judgment action rather than simply denying the claim and waiting for Wombat to sue. This posture reflects Acuity's own recognition that its legal position was not strong enough to sustain a straightforward denial. An insurer confident in its coverage defense denies the claim and defends. An insurer that files preemptively for a judicial declaration signals doubt about whether that defense will hold. Acuity chose the latter course.

**Response:  This paragraph consists solely of counsel's argument and alleged facts without any citation to the record of this case. These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no**

12

**connection. And counsel's position on the tacit effect of a declaratory action reflects a fundamental misunderstanding of that legal remedy.**

69.  William Nottke passed away on November 6, 2025. He can no longer testify, submit a proof of loss, respond to settlement offers, or otherwise participate in the claims process. Acuity's reliance on Nottke's failure to act — when Acuity is fully aware he is deceased — is unavailing.

**Response: This paragraph consists solely of counsel's argument and alleged facts without any citation to the record of this case. These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

70.  No structural repairs were ever performed on this building. Not by Servpro. Not by any other contractor. Not at any time. Servpro's corporate designee, Kevin Thole, confirmed under oath that Servpro never rebuilt the building: "So we did emergency reconstruction. . . . But we did not, like, rebuild the building back to pre-loss condition or anything." (Ex. E, Thole Depo. 68:7, 68:9-10). When asked about the building's current state, Thole testified: "The building is probably still sitting." (Ex. E, Thole Depo. 68:12-13). Servpro performed no billable work after March 14, 2024: "And there's no additional charges past March 14th." (Ex. E, Thole Depo. 66:17-19, 67:1-6). Servpro ceased all activity on or around April 30, 2024: "So your testimony as we sit here today is you ceased everything on or around April 30th, 2024? A. Right." (Ex. E, Thole Depo.

13

82:8-10). Nottke terminated Servpro because he was selling the building: "Don't do anymore work. We're firing you, basically, because we're selling the building." (Ex. E, Thole Depo. 85:7-9). Nottke waved Servpro off the project before Servpro reached any construction items: "So Mr. Nottke kind of waved you off the project before you got to these items? A. Correct." (Ex. E, Thole Depo. 101:4-6). No other contractor was engaged by Acuity or the insured to perform structural repairs. Jostes confirmed: "I'm not aware of any repairs being performed" during June through August 2024. (Ex. A, Jostes Depo. 199:23-200:5). Servpro was "out of the picture." (Ex. A, Jostes Depo. 200:6-9).

**Response:  These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

71.  Acuity paid Servpro for work that was never performed. On February 28, 2024, Jostes issued a $200,000 check labeled "ADVANCE PAYMENT ON BUILDING REPAIR BY SERVPRO." (Ex. F, Claim Log p. 11; acuity 1-278 2, p. 25). No building repair was ever performed. The "advance" was later credited against the mitigation invoice — not against any repair work, because no repair work existed. In addition, approximately $109,000 in alleged construction preparation has no invoice. Thole testified:

"you testified that there were efforts taken in terms of the substantive reconstruction, but you don't have, like, documented invoices of the work? A.

14

Correct. Because we just said, You're good. We'll take what we've got, and we're good to go."

(Ex. E, Thole Depo. 82:7-14). When pressed on the missing invoice, Thole confirmed: "you're saying it's not — there's no invoice, though, for that additional around $100,000?" (Ex. E, Thole Depo. 114:3-5). The arrangement was settled informally: "And then at the end to cancel, he was like, we're square. I was like, we'll be square." (Ex. E, Thole Depo. 113:20-21). Acuity treated $200,000 in payments to Servpro as an "advance" before audit: "So they call that an advance because it hasn't fully been audited yet." (Ex. E, Thole Depo. 36:18-21). Servpro's total invoiced work was $412,000 in emergency mitigation plus $57,000 in additional charges. The remaining approximately $109,000 represents undocumented, uninvoiced payments with no audit trail.

**Response:  These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

72.  On March 1, 2024, after receiving the EFI structural report, NCC consultant Celosky emailed Jostes acknowledging that the engineer's recommendations had fundamentally changed the scope of work from what was discussed on-site:

"It appears the recommendation has changed from our onsite discussion. Instead of repairing in place bar joist to the East of the ceiling hole, they are now

15

being replaced. This will increase the foot print of the roof portion repairs."

(Ex. L, Celosky Email, Mar. 1, 2024, p. 1). Celosky then directed expanded bidding encompassing the full range of building systems: "Please review the information and use this for the bid proposals going forward for but not limited to: Roofing, Structural Steel, Electrical, Plumbing, HVAC, Fire Suppression." (Ex. M, Celosky Email, Mar. 2024, p. 1). Jostes confirmed the scope change in deposition: "The engineer thought that there were going to be some bar joists that we could weld a bracket to... And said, no, I don't like that repair. I think we should replace them all. And he changed his scope of work."

(Ex. A, Jostes Depo. 94:22-95:2). Acuity's own claim log recorded the change as "increasing the repair area by 100%." (Ex. F, Claim Log 03/04/2024 entry, p. 12). Despite this 100% scope expansion, the NCC estimate still excluded fire suppression beyond the collapse footprint, all code compliance, and the $3.2 million in code upgrades Acuity's own ROM identified.

**Response:  These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

73.  Jostes admitted that the appraisal demand from the insured's attorney has no notation in Acuity's claim file. When asked to explain, he testified: "Can you explain why that is? A. I cannot." (Ex. A, Jostes Depo. 182:10-13). Jostes admitted that he may have deleted the appraisal demand email:

16

"Right. So you're saying it's possible that you deleted this e-mail; is that right? A. It's possible."

(Ex. A, Jostes Depo. 184:4-6). He further conceded that other important claim related emails may have been destroyed:

"Is it possible then that you deleted any other important e-mails from this claims file? A. Anything's possible."

(Ex. A, Jostes Depo. 184:10-13).

**Response: These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

74. Jostes testified to a 21-day rolling email deletion policy:

"you testified about the 21-day retention period. Are you saying that all of your e-mails are deleted every 21 days? A. Well, it's rolling."

(Ex. A, Jostes Depo. 245:17-21). After 21 days, the emails are irrecoverable: "So you wouldn't delete any claim-related materials after 21 days? A. I couldn't. They'd be deleted already." (Ex. A, Jostes Depo. 245:7-10). Jostes confirmed he personally deletes emails as a matter of daily practice: "So as a matter of practice, do you delete those e-mails? A. I mean, they eventually get deleted. Q. Who deletes them? A. I do." (Ex. A, Jostes Depo. 244:21-245:3). This 21-day rolling deletion policy applied to claim-related emails during active litigation and claims handling. The insured's

17

formal appraisal demand — a document with dispositive legal significance — may have been destroyed under this policy.

**Response:  These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

75.  No repairs were performed on the building from June through August 2024. Jostes testified:

"Throughout June and July and continuing until August 8th, is it your understanding that any repairs were performed on the building? A. I'm not aware of any repairs being performed."

(Ex. A, Jostes Depo. 199:23-200:5). Jostes confirmed Servpro was "out of the picture" during this period:

"And so Servpro was not doing any work on the building, right? A. I believe they were out of the picture at that point."

(Ex. A, Jostes Depo. 200:6-9). Jostes acknowledged that repairs had ceased entirely after the building sale: "So the repairs were ongoing. They purchased the building. Everything stopped." (Ex. A, Jostes Depo. 194:21-22). Yet Acuity refused to authorize additional temporary repairs during this period. When asked why, Jostes stated: "Well, it's unreasonable if they stopped repairs." (Ex. A, Jostes Depo. 194:1819). Acuity refused temporary measures while simultaneously withholding the ACV payment needed to fund permanent repairs.

**Response:  These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

76.  On August 8, 2024, Jostes made two contradictory entries in Acuity's claim log. In one entry, he wrote that the $1,179,134.27 NCC estimate "included mitigation temp repairs and repair of building." (Ex. F, Claim Log p. 15). In a separate entry on the same date, Jostes wrote that the amount "did not include mitigation or temp repairs." (Ex. F, Claim Log p. 16). Both statements cannot be true. This internal contradiction in Acuity's own contemporaneous records demonstrates that Acuity's primary claims handler did not understand the composition of the payments Acuity was making on this claim.

**Response:  These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

77.  Neither Acuity's engineer nor its mitigation contractor worked from the building's structural drawings. Servpro's corporate designee testified that Servpro never received structural drawings: "I don't believe so. I can double-check." (Ex. E, Thole Depo. 75:1). Acuity's structural engineer, Kraus, likewise did not work from the building's original structural plans. (Ex. D, Kraus Depo. 25:19-22). The scope of work was developed without this fundamental engineering document.

19

**Response:  These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

78.  Acuity paid a total of $1,299,107.45 on this claim. Not one dollar funded a completed building repair or even structural remediation. The payments consisted of emergency mitigation ($412,230.91), an unaudited building repair advance ($200,000.00), a litigation-triggered ACV estimate payment ($836,124.37), carrier consultant fees ($15,767.17 to NCC; $4,001.00 to EFI), contents ($30,984.00), and miscellaneous costs ($1,925.77). (Ex. F, Claim Log summary at Acuity 0025, p. 5). Servpro's total invoiced charges were $412,000 for mitigation plus $57,000 in additional work. (Ex. E, Thole Depo. 66:17-19, 67:1-6). An additional approximately $109,000 in claimed construction preparation has no invoice. (Ex. E, Thole Depo. 114:3-5). The building remains unrepaired.

**Response:  These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

79.  Servpro's corporate designee, Kevin Thole, testified that a "code upgrade" is work required solely by code — not work necessitated by the loss itself. When asked to distinguish code-related charges from loss-related charges, Thole testified:

"If we wouldn't have had to do it, if there was no code, it would go to regular if it's only done because of — so if a building has a fire and there's no sprinklers, but now you have to have sprinklers in the building, so in order to get occupancy in the building again you had to have sprinklers, that would be a code upgrade. Because you can't occupy a building without a code upgrade because that's what the city says."

(Ex. E, Thole Depo. 88:10-18). Under Thole's own framework, repairs necessitated by the covered loss — even if they happen to bring the building into code compliance — are not "code upgrades." They are covered repairs. Whether the $3.2 million ROM identified by Acuity's own consultant (RSMF Paragraph 57) falls into the "code upgrade" or "loss-required repair" category is a factual dispute that cannot be resolved on summary judgment.

**Response:  These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

80.  Celosky's April 3, 2024 repair estimate of $1,179,293 was expressly labeled as preliminary. (Ex. F, Claim Log 04/03/2024 entry; Ex. C, Celosky Depo. 88:1-6, 88:17-24., p. 12) It was prepared without the insured's input (Ex. A, Jostes Depo. 195:13-17), while bids for the fire suppression system were still outstanding (Ex. A, Jostes Depo. 104:19-20), and while city code requirements remained "still unknown." (Ex. F, Claim Log 04/03/2024 entry; RSMF Paragraph

29., p. 12) Despite the 100% scope expansion acknowledged by Celosky himself (RSMF Paragraph 72), no revised estimate was ever prepared. Acuity's own settlement offer of $1.3 million — $120,707 more than the NCC estimate — demonstrates that Acuity itself recognized the estimate was inadequate. (RSMF Paragraph 65.)

**Response:  These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by the assignment of benefits between its insured and a third-party with whom Acuity has no connection.**

81.  The Acuity commercial property insurance policy provides coverage for "direct physical loss of or damage to Covered Property... caused by or resulting from any Covered Cause of Loss." (Ex. K, Acuity Policy, p. 24) The policy's Additional Coverage for Collapse provides that collapse caused by the "weight of ice, snow, sleet or rain that collects on a roof" is a covered cause of loss. (Ex. K, Acuity Policy, Additional Coverage — Collapse, p. 37) Acuity does not dispute that the January 20, 2024 roof collapse was a covered loss. (RSMF Paragraph 9.) All damage flowing from that covered loss — including fire suppression system damage (RSMF Paragraph 4), structural damage beyond the collapse footprint (RSMF Paragraph 7), and code-necessitated repairs (RSMF Paragraph 79) — is therefore covered under the policy unless a specific exclusion applies.

**Response:  These alleged facts are not material to the narrow issue raised by Acuity in its motion for summary judgment, i.e., whether Acuity is bound by**

22

**the assignment of benefits between its insured and a third-party with whom**

**Acuity has no connection.**

Respectfully submitted,

BAKER STERCHI COWDEN & RICE
LLC

/s/ Michael Shunk
James R. Jarrow MO # 38686
Michael W. Shunk MO # 43841
2400 Pershing Road, Suite 500
Kansas City, Missouri 64108
Tel: (816) 471-2121
jarrow@bakersterchi.com
mshunk@bakersterchi.com
ATTORNEYS FOR PLAINTIFF ACUITY,
A MUTUAL INSURANCE COMPANY

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served on all parties of record by operation of the Court's electronic case filing and case management system on March 20, 2026.

/s/ Michael Shunk

23